**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

SHOSHANA HEBSHI,

        Plaintiff,

v.

UNITED STATES OF AMERICA, et al.,

        Defendants,

and

MARK DeBEAU, et al.,

        Cross-Plaintiffs,

v.

FRONTIER AIRLINES,

        Cross-Defendant.

Case No. 13-10253
Honorable Terrence G. Berg
Magistrate Judge Laurie J. Michelson

**PLAINTIFF'S RESPONSE TO THE INDIVIDUAL FEDERAL
DEFENDANTS' PARTIAL MOTION TO DISMISS AND THE WAYNE
COUNTY AIRPORT AUTHORITY DEFENDANTS' MOTION
FOR PARTIAL JUDGMENT ON THE PLEADINGS**

Plaintiff Shoshana Hebshi brought this suit against multiple state and federal law enforcement officials alleging, among other claims, that they violated her constitutional right to equal protection of the laws when she was arrested, detained, and strip searched at the Detroit Metropolitan Wayne County Airport on September 11, 2011.  Currently pending before the Court are a partial motion to dismiss (Dkt. # 57) the equal protection claim against the named federal officials, Defendants John Brand, David Lakatos, Nathanael Devins, Robert Ball, and Paul Brumley (the "Individual Federal Defendants"), and a motion for partial judgment on the pleadings (Dkt. # 69) with respect to the equal protection claim against Defendants Mark

DeBeau, Officer Johnson, Officer Grant, Detective Carmona, Officer Jeremy Bohn, Lieutenant M. Wasiukanis, Corporal Bradley, and Captain Patrick Driscoll of the Wayne County Airport Authority (the "WCAA Defendants").[1]  At the Scheduling Conference on June 5, 2013, the parties and the Court agreed that Ms. Hebshi could respond to both motions in a single filing, not to exceed thirty pages, to be due on the response deadline for the WCAA Defendants' later-filed motion.

Accordingly, Ms. Hebshi now submits this response in opposition to the Individual Federal Defendants' partial motion to dismiss and the WCAA Defendants' motion for partial judgment on the pleadings.

---

[1] Although Defendant Toya Parker has also joined the WCAA Defendants' motion for partial judgment on the pleadings, the complaint does not state an equal protection claim against her. (Compl. 22, Dkt. # 1.)  Ms. Hebshi will treat the motion for partial judgment on the pleadings as if it was brought by only those WCAA Defendants alleged to have violated her equal protection rights.

Respectfully submitted,

Michael J. Steinberg (P43085)
Kary L. Moss (P49759)
American Civil Liberties Union
    Fund of Michigan
2966 Woodward Avenue
Detroit, MI 48201
(313) 578-6823
msteinberg@aclumich.org

   *s/Rachel E. Goodman*
Dennis Parker
Rachel E. Goodman
Greger Calhan
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2500
rgoodman@aclu.org
dparker@aclu.org
gcalhan@aclu.org


William H. Goodman (P14173)
Julie H. Hurwitz (P34720)
Kathryn Bruner James (P71374)
Miriam R. Nemeth  (P76789)
Goodman & Hurwitz, P.C.
Cooperating Attorneys, American Civil
    Liberties Union Fund of Michigan
1394 E. Jefferson Ave.
Detroit, MI 48207
(313) 567-6170
bgoodman@goodmanhurwitz.com
jhurwitz@goodmanhurwitz.com
kjames@goodmanhurwitz.com
mnemeth@goodmanhurwitz.com

Anna P. Engh
Shelli Calland
Arjun Sethi
Sarah E. Tremont (P73809)
Covington & Burling LLP
1201 Pennsylvania Ave., N.W.
Washington D.C. 20004
(202) 662-6000
aengh@cov.com
scalland@cov.com
asethi@cov.com
stremont@cov.com


*Attorneys for Plaintiff*
SHOSHANA HEBSHI

Dated: June 28, 2013

3

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

SHOSHANA HEBSHI,

       Plaintiff,

v.

UNITED STATES OF AMERICA, et al.,

       Defendants,

and

MARK DeBEAU, et al.,

       Cross-Plaintiffs,

v.

FRONTIER AIRLINES,

       Cross-Defendant.

Case No. 13-10253
Honorable Terrence G. Berg
Magistrate Judge Laurie J. Michelson

**BRIEF IN SUPPORT OF PLAINTIFF'S RESPONSE TO THE**
**INDIVIDUAL FEDERAL DEFENDANTS' PARTIAL MOTION TO DISMISS**
**AND THE WAYNE COUNTY AIRPORT AUTHORITY DEFENDANTS'**
**MOTION FOR PARTIAL JUDGMENT ON THE PLEADINGS**

**ISSUE PRESENTED**

Are the Individual Federal Defendants and the WCAA Defendants entitled to qualified immunity on Ms. Hebshi's equal protection claim, when she has presented particularized factual allegations linking each Defendant to her arrest, detention, or strip search and shown that the only information connecting her to allegedly suspicious conduct onboard an airplane was her Arabic name and her arbitrary seat assignment?

*Ms. Hebshi answers:* No.

*The Individual Federal Defendants and the WCAA Defendants answer:* Yes.

## CONTROLLING AUTHORITIES

1. *Ashcroft v. Iqbal*, 556 U.S. 662 (2009).

2. *Handy-Clay v. City of Memphis, Tenn.*, 695 F.3d 531 (6th Cir. 2012).

3. *McGlone v. Bell*, 681 F.3d 718 (6th Cir. 2012).

4. *Davis v. Prison Health Servs.*, 679 F.3d 433 (6th Cir. 2012).

5. *Farm Labor Org. Comm. v. Ohio State Highway Patrol*, 308 F.3d 523 (6th Cir. 2002).

6. *United States v. Avery*, 137 F.3d 343 (6th Cir. 1997).

# TABLE OF CONTENTS

ISSUE PRESENTED ................................................................................................. i

CONTROLLING AUTHORITIES ............................................................................ ii

TABLE OF AUTHORITIES ..................................................................................... iv

INTRODUCTION ..................................................................................................... 1

FACTS ...................................................................................................................... 1

STANDARD OF REVIEW ....................................................................................... 5

ARGUMENT ............................................................................................................ 7

    A.    The Complaint States Particularized Factual Allegations Concerning Each
Individual Defendant's Violation of Ms. Hebshi's Equal Protection Rights .......... 8

    B.    Ms. Hebshi's Allegations of Discrimination Are Sufficient to Show an
Equal Protection Violation ...................................................................................... 13

        1.    *The Complaint Contains More Than a "Conclusory" Allegation of
Discrimination* ........................................................................................ 13

        2.    *Defendants Cannot Defeat Ms. Hebshi's Claims by Proffering a
Non-Discriminatory, Law-Enforcement Objective Behind Their
Actions* .................................................................................................... 15

        3.    *Ms. Hebshi Is Not Required to Plead that She Was Treated
Differently Than a Similarly Situated Individual* ..................................... 18

    C.    Defendants Are Not Entitled to Qualified Immunity, as Ms. Hebshi Has
Shown a Violation of a Clearly Established Equal Protection Right .................... 19

CONCLUSION ......................................................................................................... 22

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ahlers v. Schebil,*
    188 F.3d 365 (6th Cir. 1999) .................................................21

*Anderson News, L.L.C. v. Am. Media, Inc.,*
    680 F.3d 162 (2d Cir. 2012).................................................15

*Ashcroft v. al-Kidd,*
    131 S. Ct. 2074 (2011)...................................................7, 20

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009) ................................................ *passim*

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007)................................................. *passim*

*Boger v. Wayne Cnty.,*
    950 F.2d 316 (6th Cir. 1991) ...................................................7

*Braden v. Wal-Mart Stores, Inc.,*
    588 F.3d 585 (8th Cir. 2009) .................................................13

*Brandenburg v. Cureton,*
    882 F.2d 211 (6th Cir. 1989) .................................................21

*Burnette v. Fahey,*
    699 F.3d 804 (6th Cir. 2012) ...................................................6

*Ctr. for Bio-Ethical Reform, Inc. v. Napolitano,*
    648 F.3d 365 (6th Cir. 2011) .................................................19

*Davis v. Prison Health Services,*
    679 F.3d 433 (6th Cir. 2012) .................................................18

*Eidson v. Tenn. Dep't of Children's Servs.,*
    510 F.3d 631 (6th Cir. 2007) .................................................11

*Erickson v. Pardus,*
    551 U.S. 89 (2007).................................................................6

*Farm Labor Org. Comm. v. Ohio State Highway Patrol,*
    308 F.3d 523 (6th Cir. 2002) ...........................................17, 20

*Gaspers v. Ohio Dep't of Youth Servs.*,
    648 F.3d 400 (6th Cir. 2011) .......................................................................20

*Grose v. Caruso*,
    284 F. App'x 279 (6th Cir. 2008) ..............................................................21

*Guzman v. U.S. Dep't of Homeland Sec.*,
    679 F.3d 425 (6th Cir. 2012) .........................................................................6

*Handy-Clay v. City of Memphis, Tenn.*,
    695 F.3d 531 (6th Cir. 2012) ..................................................6, 11, 14, 15

*Harlow v. Fitzgerald*,
    457 U.S. 800 (1982).................................................................................7, 21

*High v. Fuchs*,
    74 F. App'x 499 (6th Cir. 2003) ................................................................16

*Hope v. Pelzer*,
    536 U.S. 730 (2002)..........................................................................7, 19, 20

*Jones v. Union Cnty., Tenn.*,
    296 F.3d 417 (6th Cir. 2002) .........................................................................7

*Lanman v. Hinson*,
    529 F.3d 673 (6th Cir. 2008) .......................................................................12

*Lindsay v. Yates*,
    498 F.3d 434 (6th Cir. 2007) .........................................................................5

*Marcilis v. Township of Redford*,
    693 F.3d 589 (6th Cir. 2012) ...............................................................12, 13

*McGlone v. Bell*,
    681 F.3d 718 (6th Cir. 2012) .........................................................................6

*Nelms v. Wellington Way Apartments, LLC*,
    No. 11-3404, 2013 WL 408034 (6th Cir. Feb. 4, 2013) .........................20

*Paige v. Coyner*,
    614 F.3d 273 (6th Cir. 2010) ...............................................................14, 17

*Personnel Adm'r of Mass. v. Feeney*,
    442 U.S. 256 (1979).....................................................................................14

*Pritchard v. Hamilton Twp. Bd. of Trustees*,
    424 F. App'x 492 (6th Cir. 2011) ..............................................................21

*Robbins v. Oklahoma*,
519 F.3d 1242 (10th Cir. 2008) ........................................12

*Rondigo, L.L.C. v. Twp. of Richmond*,
641 F.3d 673 (6th Cir. 2011) ...........................................14

*Sallier v. Brooks*,
343 F.3d 868 (6th Cir. 2003) ...........................................21

*Swanson v. Citibank, N.A.*,
614 F.3d 400 (7th Cir. 2010) ...........................................16

*Swierkiewicz v. Sorema N.A.*,
534 U.S. 506 (2002) .........................................................18

*Townsend v. Owens*,
No. 12-cv-10379, 2012 WL 6214395 (E.D. Mich. Dec. 13, 2012) .......................12

*Tucker v. Middleburg-Legacy Place*,
539 F.3d 545 (6th Cir. 2008) .............................................6

*United States v. Avery*,
137 F.3d 343 (6th Cir. 1997) ...................................... *passim*

*Valentino v. Vill. of S. Chicago Hts.*,
575 F.3d 664 (7th Cir. 2009) ...........................................14

*Washington v. Newsom*,
977 F.2d 991 (6th Cir. 1992) ...........................................21

*Wayte v. United States*,
470 U.S. 598 (1985) ..................................................17, 20

*Whren v. United States*,
517 U.S. 806 (1996) ..................................................16, 20

*Wiggins v. Argent Mortgage Co., LLC*,
--- F. Supp. 2d ----, 2013 WL 2034055 (E.D. Mich. May 14, 2013) .......................6

## Statutes and Rules

Fed. R. Civ. P. 8 .............................................................7

Fed. R. Civ. P. 12(b)(6).......................................5, 6, 15

Fed. R. Civ. P. 8(a)(2)........................................................6

Fed. R. Civ. P. 56 .........................................................21

**Other Authorities**

5 Charles Alan Wright, et al., *Federal Practice and Procedure* § 1234
    (3d ed. Supp. 2013)...................................................................................................................6

## INTRODUCTION

On September 11, 2011, Plaintiff Shoshana Hebshi, a freelance journalist, wife, and mother, was forcibly removed from an airplane, handcuffed, pat searched, strip searched, and locked in a cell for several hours without explanation at the Detroit Metropolitan Wayne County Airport.  Her crime—she was seated next to two South Asian strangers who went to the restroom on an airplane, and she is Arab.  Ms. Hebshi now seeks redress for this gross violation of her rights from the United States, from the airline that referred her to state and federal law enforcement personnel, and from the various officials responsible for arresting, detaining, and strip searching her.  These officials have asked the Court to grant them qualified immunity from Ms. Hebshi's claim that they violated her right to equal protection of the law.

Ms. Hebshi's complaint, viewed in its entirety, shows that each of the individual Defendants had a direct role in her arrest, detention, and strip search.  The complaint further states that Defendants acted with discriminatory intent, given that the only facts known to them were Ms. Hebshi's Arabic name and her arbitrary airplane seat assignment.  These allegations describe a deprivation of Ms. Hebshi's clearly established equal protection rights, and she should be given the opportunity to prove them through discovery.

## FACTS

On September 11, 2011, Ms. Hebshi was traveling home to her husband and two young sons in Sylvania, Ohio, after visiting her sister in San Francisco, California.  (Compl. ¶¶ 12, 39, Dkt. # 1.)  After clearing security at the San Francisco International Airport without incident, Ms. Hebshi had an uneventful flight on Frontier Airlines to Denver, Colorado.  (*Id.* ¶ 40.)  Once there, Ms. Hebshi waited within the security zone of the Denver International Airport before boarding another Frontier Airlines flight to her final destination, the Detroit Metropolitan Wayne County Airport.  (*Id.* ¶¶ 39, 41.)

1

On the flight out of Denver, Ms. Hebshi was assigned a window seat in the same row as two South Asian men whom she did not know.  (*Id.* ¶¶ 42-44.)  At no point during the flight did Ms. Hebshi leave her seat or speak to the two men.  (*Id.* ¶¶ 42, 44.)  Although Ms. Hebshi did not notice anything out of the ordinary about her seatmates, other passengers and flight attendants grew uneasy when they allegedly observed the two men each spending between ten and twenty minutes in the restroom around the same time and standing in the aisle of the plane for prolonged periods.  (*Id.* ¶ 45.)  The flight attendants notified the pilot about this alleged behavior, adding that the two men were of "possibly Arab descent."  (*Id.* ¶ 47.)  The pilot, in turn, sent a message to Frontier Airlines' dispatcher, asking for information about the passengers seated next to Ms. Hebshi because they were reportedly acting strangely.  (*Id.* ¶ 48.)

At this point, Ms. Hebshi was grouped with the two men and their allegedly suspicious conduct because of her name, despite the fact that no one had observed or reported anything unusual about her.  (*Id.* ¶ 46.)  After receiving the pilot's message, the Frontier Airlines Sector Operations Control Shift Manager, who was on the ground, forwarded it in an email to several other Frontier Airlines employees, along with the names of the two men and a note that Ms. Hebshi, the passenger seated next to them, might also "be with" the men.  (*Id.* ¶ 49.)  It appears these allegations were based solely on the perceived race or ethnicity of Ms. Hebshi's name—"Shoshana" is of Hebrew origin and "Hebshi" is of Arabic origin—and her arbitrary seat assignment.  (*Id.* ¶¶ 12, 50.)

Nevertheless, the email identifying Ms. Hebshi was passed along to an air marshal with the Transportation Security Administration ("TSA") and to Wayne County Airport Authority ("WCAA") Police Officers.  (*Id.* ¶ 51.)  TSA also notified WCAA of suspicious passenger behavior on the flight.  (*Id.* ¶ 53.)  Various officials from WCAA, TSA, Customs and Border

Protection ("CBP"), and the Federal Bureau of Investigation ("FBI") gathered at a designated inspection site to wait for the plane.  (*Id.* ¶ 54.)  They made contact via cell phone with the pilot, who stated that a male passenger in Ms. Hebshi's row had entered the restroom for a long period while the other male passenger from the row stood outside.  (*Id.* ¶ 55.)  The pilot allegedly added that the third passenger in the row (Ms. Hebshi) "may also be involved in the incident but is seated and compliant at this time."  (*Id.*)  At no point did any WCAA or federal law enforcement official ask for additional information or evidence linking Ms. Hebshi to the allegedly suspicious conduct of the two men seated in her row.  (*Id.* ¶ 56.)  Instead, they devised a plan to divert and board the aircraft, arrest Ms. Hebshi along with the two men seated in her row, and remove all three individuals to an airport detention facility for questioning.  (*Id.* ¶ 57.)

After the plane landed in Detroit, the pilot announced to the passengers that they were being diverted to another area of the airport and there would be consequences if anyone left their seats.  (*Id.* ¶ 63.)  Ms. Hebshi, having noticed nothing unusual during the flight, was unsure what to make of the numerous law enforcement vehicles that now surrounded the plane.  (*Id.* ¶ 64.)  She called her husband to tell him she would be delayed, although she did not know why or for how long.  (*Id.* ¶ 65.)  Being a journalist, she also posted messages on Twitter about what was happening in and around the plane.  (*Id.* ¶¶ 37, 105.)  When Ms. Hebshi saw a van with stairs approaching, she was relieved, believing that she and the other passengers would soon be allowed to leave the plane.  (*Id.* ¶¶ 66-67.)  Her relief turned to fear when, instead, several heavily armed law enforcement officers boarded the aircraft and ran down the aisle, shouting at the passengers to keep their heads down and put their hands on the seat in front of them.  (*Id.* ¶¶ 68-69.)  A stunned Ms. Hebshi complied when the officers stopped at her row and ordered her and the two men seated next to her to get up.  (*Id.* ¶ 70.)  The officers refused to

answer her questions about what was going on as they put her in handcuffs and forcibly removed her from the plane.  (*Id.* ¶¶ 71-73.)  She was frightened and humiliated.  (*Id.* ¶ 74.)

Once outside, the officers shoved Ms. Hebshi against a police car, asked if she was wearing explosives, and pat searched her.  (*Id.* ¶¶ 75-76.)  She asked again what was happening, and again they did not reply.  (*Id.* ¶ 77.)  Without any explanation, Ms. Hebshi was placed in the back of a police car and driven to an airport detention facility where, still handcuffed, she was taken to a six-by-ten foot cell.  (*Id.* ¶¶ 78, 80.)  An officer asked her if she spoke English, and she answered affirmatively, adding that she is a United States citizen.  (*Id.* ¶ 82.)  The officer then said he would stand by the door of her cell to make sure she did not "flush anything" down the toilet.  (*Id.* ¶ 83.)  Although Ms. Hebshi badly needed a restroom, she could not bring herself to use the toilet in full view of the male officer standing guard and the video camera hanging in the cell.  (*Id.* ¶ 84.)

After an hour, a female officer entered the cell and told Ms. Hebshi she was going to be strip searched.  (*Id.* ¶ 89.)  Afraid, Ms. Hebshi began to cry as the officer removed her handcuffs and instructed her to take off all of her clothing.  (*Id.* ¶¶ 90-91.)  Once Ms. Hebshi was completely naked, the officer told her to stand facing the wall, bend over, spread her buttocks, and cough.  (*Id.* ¶¶ 91-92.)  The officer then ran her fingers through Ms. Hebshi's hair, lifted her eyelids, and looked in her mouth.  (*Id.* ¶¶ 93-94.)  After this invasive and degrading search, Ms. Hebshi was finally told she could get dressed.  (*Id.* ¶¶ 95-96.)  The officer placed her back in handcuffs once again and left the cell.  (*Id.* ¶ 97.)  Ms. Hebshi asked the guard if she could call her husband, who did not know where she was or what had happened.  (*Id.* ¶ 98.)  She was told she could use the phone later.  (*Id.*)

Another two hours passed before an officer came and escorted Ms. Hebshi to an interview room.  (*Id.* ¶ 99.)  Two federal officers then questioned her about her family, her previous travel, and the men seated next to her on the plane.  (*Id.* ¶ 100.)  After having been detained for about three hours without any explanation, Ms. Hebshi was at last told why she had been arrested, detained, and strip searched—the officers informed her that someone had reported her seatmates as acting suspiciously during the flight.  (*Id.* ¶ 101.)  The interview lasted about a half hour, after which Ms. Hebshi was finally allowed to use the officers' restroom.  (*Id.* ¶¶ 102-03.)  Her handcuffs were removed; she was fingerprinted and asked the date and place of her birth, her weight, and her height, and returned to her cell.  (*Id.* ¶ 104.)  One of the officers who had questioned her then brought Ms. Hebshi's cell phone to her and made her show him the Twitter messages she had sent from the plane and her Facebook profile.  (*Id.* ¶ 105.)

After all this, Ms. Hebshi was informed that she was being released with no charges.  (*Id.* ¶¶ 1, 106-07.)  She was given permission to call her husband; upon reaching him, Ms. Hebshi began to cry.  (*Id.* ¶ 107.)  After another half hour, and a total of approximately four hours in detention, she was finally allowed to leave along with the other two men from the plane.  (*Id.* ¶¶ 4, 108.)  Federal officials have since publicly stated that Ms. Hebshi was not involved in any suspicious activity.  (*Id.* ¶ 4.)  To this day, Ms. Hebshi still feels anxiety and distress about being forced to endure this humiliating experience because of her perceived race or ethnicity.  (*Id.* ¶ 109.)

### STANDARD OF REVIEW

Both the Individual Federal Defendants' motion to dismiss and the WCAA Defendants' motion for judgment on the pleadings are evaluated under the failure-to-state-a-claim rubric of Federal Rule of Civil Procedure 12(b)(6).  *See Lindsay v. Yates*, 498 F.3d 434, 438 (6th Cir. 2007).  To successfully state a claim, a complaint must contain nothing more than a "short and

plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), sufficient to give the defendant "fair notice of what the . . . claim is and the grounds upon which it rests," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  "Specific facts are not necessary."  *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (per curiam); *Wiggins v. Argent Mortgage Co., LLC*, --- F. Supp. 2d ----, 2013 WL 2034055 (E.D. Mich. May 14, 2013) (quoting *Tucker v. Middleburg-Legacy Place*, 539 F.3d 545, 550 (6th Cir. 2008)).  Instead, a plaintiff shows "facial plausibility" by including "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Formidable presumptions favor plaintiffs at this stage.  All well-pleaded material allegations must be taken as true.  *McGlone v. Bell*, 681 F.3d 718, 728 (6th Cir. 2012).  While the Court need not accept legal conclusions couched as fact, *Iqbal*, 556 U.S. at 678, dismissal or judgment on the pleadings remains improper unless "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief," *Handy-Clay v. City of Memphis, Tenn.*, 695 F.3d 531, 538 (6th Cir. 2012) (quoting *Guzman v. U.S. Dep't of Homeland Sec.*, 679 F.3d 425, 429 (6th Cir. 2012)).

Defendants face a heavy burden.  In the Sixth Circuit, a request for dismissal under Rule 12(b)(6) "is disfavored, especially when one's civil rights are at stake."  *McGlone*, 681 F.3d at 728.  Because "fundamental rights and important questions of public policy are at issue, the district court should give the complaint special consideration and should not dismiss unless it is clear that no legally cognizable claim can be stated."  5 Charles Alan Wright, et al., *Federal Practice and Procedure* § 1234 (3d ed. Supp. 2013); *cf. Burnette v. Fahey*, 699 F.3d 804, 806 (6th Cir. 2012) (Gregory, J., dissenting from denial of rehearing en banc) ("While *Iqbal* and

6

*Twombly* most certainly heightened the pleading requirements of Fed. R. Civ. P. 8, they did not provide the Court *carte blanche* to shirk its duty to resolve important constitutional questions.").

## ARGUMENT

The Individual Federal Defendants and the WCAA Defendants have argued that qualified immunity bars Ms. Hebshi's equal protection claim.  Ms. Hebshi overcomes this defense by "plead[ing] facts showing (1) that [Defendants] violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2080 (2011) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  To demonstrate the former, Ms. Hebshi "must show that she is a member of a protected class and that she was intentionally and purposefully discriminated against because of her membership in that protected class." *Jones v. Union Cnty., Tenn.*, 296 F.3d 417, 426 (6th Cir. 2002) (citing *Boger v. Wayne Cnty.*, 950 F.2d 316, 325 (6th Cir. 1991)).  The latter is established if Defendants had "fair warning" that their conduct deprived Ms. Hebshi of her equal protection rights. *Hope v. Pelzer*, 536 U.S. 730, 740 (2002).

The factual averments in Ms. Hebshi's complaint are sufficient to overcome Defendants' claim of qualified immunity.  She has identified the specific role that each Individual Federal Defendant and WCAA Defendant played in her arrest, detention, and strip search, putting each of them on notice of what particular conduct violated her right to equal protection.  She has also adequately alleged that each Defendant acted with a discriminatory intent, thereby meeting her burden of pleading a violation of her constitutional rights.  Those rights were sufficiently clearly established that Defendants should have understood their conduct to have deprived Ms. Hebshi of equal protection of the law.  Accordingly, Defendants are not entitled to qualified immunity at this stage in the litigation.

**A.    The Complaint States Particularized Factual Allegations Concerning Each Individual Defendant's Violation of Ms. Hebshi's Equal Protection Rights**

Ms. Hebshi's allegations concerning each Individual Federal Defendant and WCAA Defendant are far more detailed than "unadorned, the-defendant-unlawfully-harmed-me accusation[s]," *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555), or "'naked assertion[s]' devoid of 'further factual enhancement,'" *id.* (alteration in original) (quoting *Twombly*, 550 U.S. at 557). She specifically avers each Defendant's personal role in her arrest, detention, and strip search. Some Defendants, like Officer Grant and Officer Johnson, reviewed the report of allegedly suspicious activity aboard the flight and alerted law enforcement officers. Others, like Defendants Mark DeBeau and Robert Ball, were present at the inspection site where the airplane was diverted and participated in the decision to arrest and detain Ms. Hebshi. Still others, like Defendants Paul Brumley and Detective Carmona, were part of the team that stormed the plane, handcuffed Ms. Hebshi, and forcibly removed her. Defendants John Brand and Lieutenant M. Wasiukanis made the decision to strip search her. The particular facts alleged with respect to each individual Defendant are as follows:

- **Defendant John Brand**, an FBI special agent, "participated in the decision to arrest, detain, strip search and interrogate Ms. Hebshi." (Compl. ¶ 15.) Defendant Brand was one of the officials who made the decision to strip search Ms. Hebshi. (*Id.* ¶ 85.) He also authorized Ms. Hebshi's release after four hours of detention, a strip search, and questioning by federal agents. (*Id.* ¶ 106.)

- **Defendant David Lakatos**, an officer with CBP, "participated in the decision to arrest and detain Ms. Hebshi." (*Id.* ¶ 30.) Defendant Lakatos was present at the inspection site where Ms. Hebshi's plane was routed after landing, and where various state and federal officers devised a plan to board the aircraft, arrest Ms. Hebshi and her seatmates, and remove them to the airport detention facility. (*Id.* ¶¶ 54, 57.)

- **Defendant Nathaniel Devins**, an officer with CBP, "participated in the decision to arrest and detain Ms. Hebshi." (*Id.* ¶ 31.) Defendant Devins was present at the inspection site where Ms. Hebshi's plane was routed after landing, and where various state and federal officers devised a plan to board the aircraft, arrest Ms. Hebshi and her seatmates, and remove them to the airport detention facility. (*Id.* ¶¶ 54, 57.)

- **Defendant Robert Ball**, the Federal Security Director for TSA in Detroit, "participated in the decision to arrest and detain Ms. Hebshi." (*Id.* ¶ 33.) Defendant Ball was present at the inspection site where Ms. Hebshi's plane was routed after landing, and where various state and federal officers devised a plan to board the aircraft, arrest Ms. Hebshi and her seatmates, and remove them to the airport detention facility. (*Id.* ¶¶ 54, 57.)

- **Defendant Paul Brumley**, an ICE special agent, "participated in Ms. Hebshi's arrest." (*Id.* ¶ 36.) Defendant Brumley was one of the heavily armed officers who executed the tactical entry of the plane that ended with Ms. Hebshi being forced off the plane in handcuffs. (*Id.* ¶ 68.)

- **Defendant Mark DeBeau**, the Vice President of Public Safety at WCAA, "participated in the decision to arrest Ms. Hebshi." (*Id.* ¶ 19.) Defendant DeBeau was present at the inspection site where Ms. Hebshi's plane was routed after landing, where he authorized the tactical entry of the plane and the decision to remove Ms. Hebshi and her two seatmates to the airport detention facility. (*Id.* ¶ 60.)

- **Defendant Jeremy Bohn**, the Officer-in-Charge for the WCAA Police during the events described in the complaint, "participated in Ms. Hebshi's arrest and transportation to the detention site" at the airport. (*Id.* ¶ 20.) Defendant Bohn was present at the inspection site where Ms. Hebshi's plane was routed after landing, and where various state and federal officers devised a plan to board the aircraft, arrest Ms. Hebshi and her seatmates, and remove them to the airport detention facility. (*Id.* ¶¶ 54, 57.) He was also one of the heavily armed officers who executed the tactical entry of the plane that ended with Ms. Hebshi being forced off the plane in handcuffs. (*Id.* ¶ 68.)

- **Defendant Captain Patrick Driscoll**, a member of the Special Response Unit for the WCAA Police, "participated in the decision to arrest, handcuff and detain Ms. Hebshi." (*Id.* ¶ 21.) Defendant Driscoll was told by Defendant Grant about the pilot's report of strange behavior aboard Ms. Hebshi's flight, including that Ms. Hebshi may have been traveling with the two men who were allegedly acting suspiciously. (*Id.* ¶ 52.) He determined that a tactical entry of the plane was necessary and recommended to Defendant DeBeau that Ms. Hebshi and her two seatmates be removed from the plane and taken to the airport detention site. (*Id.* ¶ 59.) He also told law enforcement agents at the inspection site that Ms. Hebshi and the other two suspects were to be handcuffed upon contact. (*Id.* ¶ 61.)

- **Defendant Lieutenant M. Wasiukanis**, an officer with the WCAA Police, "participated in the arrest, detention, and decision to strip search Ms. Hebshi." (*Id.* ¶ 22.) Defendant Wasiukanis was one of the officials who made the decision to strip search Ms. Hebshi. (*Id.* ¶ 85.)

- **Defendant Officer Grant**, a member of the Special Response Unit for the WCAA Police, "was part of the team that planned and executed the arrest of Ms. Hebshi." (*Id.* ¶ 24.) Defendant Grant was one of the WCAA officers who received the email

from Frontier Airlines containing the pilot's report of strange behavior aboard Ms. Hebshi's flight and the ground staff's notation that Ms. Hebshi "may be with" the two men who were allegedly acting suspiciously.  (*Id.* ¶¶ 49, 51.)  He relayed this information to WCAA Defendants Driscoll and Carmona, including the identification of Ms. Hebshi.  (*Id.* ¶ 52.)  Later, Defendant Grant organized the tactical entry of the plane.  (*Id.* ¶ 58.)

- **Defendant Detective Carmona**, an officer with the WCAA Police, "arrested and handcuffed Ms. Hebshi."  (*Id.* ¶ 25.)  Defendant Carmona was told by Defendant Grant about the pilot's report of strange behavior aboard Ms. Hebshi's flight, including that Ms. Hebshi may have been traveling with the two men who were allegedly acting suspiciously.  (*Id.* ¶ 52.)  He was also one of the heavily armed officers who executed the tactical entry of the plane.  (*Id.* ¶ 68.)  He put Ms. Hebshi in handcuffs before she was forced off the plane.  (*Id.* ¶ 72.)

- **Defendant Officer Johnson**, a K9 officer with the WCAA Police, "participated in Ms. Hebshi's arrest."  (*Id.* ¶ 26.)  Defendant Johnson spoke via cell phone with the pilot of Ms. Hebshi's flight from the designated airport inspection site where state and federal law enforcement officers waited to receive the plane.  (*Id.* ¶ 55.)  According to Defendant Johnson, the pilot told him that Ms. Hebshi "may also be involved in the incident but is seated and compliant at this time."  (*Id.*)  Defendant Johnson also helped Officer Grant organize the tactical entry of the plane, (*id.* ¶ 58), and he was one of the heavily armed officers who executed the entry, which ended with Ms. Hebshi being forced off the plane in handcuffs, (*id.* ¶ 68).

- **Defendant Corporal Bradley**, an officer with the WCAA Police, "arrested and transported Ms. Hebshi" to the airport detention facility.  (*Id.* ¶ 27.)  After Ms. Hebshi was forcibly removed from the plane, Defendant Bradley put her into a police car and drove her to the detention facility.  (Compl. ¶ 78.)

Against this factual backdrop, Ms. Hebshi alleges that each Individual Federal Defendant and WCAA Defendant "acted based on the perceived ethnicity, national origin, or race of Ms. Hebshi's name."  *Id.* ¶ 56.  According to the complaint, these named Defendants effectuated Ms. Hebshi's arrest, detention, and strip search in the ways specified above based solely on an email that, on its face, showed Ms. Hebshi had not been included in the pilot's original report of allegedly suspicious activity.  (*Id.* ¶¶ 48, 52.)  To the contrary, the email revealed that Ms. Hebshi had been identified by ground staff whose only information about her was her name and seat assignment.  (*Id.* ¶¶ 49-50.)  Despite the clear lack of any "articulable fact connecting Ms. Hebshi to suspicion of criminal activity," none of the Individual Federal Defendants or the

WCAA Defendants "requested further information or evidence regarding Ms. Hebshi's involvement in suspicious activities."  (*Id.* ¶ 56.)

Ms. Hebshi can plead the material elements of her claim with "either direct or inferential allegations," *Handy-Clay*, 695 F.3d at 538 (quoting *Eidson v. Tenn. Dep't of Children's Servs.*, 510 F.3d 631, 634 (6th Cir. 2007)), and the only "reasonable inference," *Iqbal*, 556 U.S. at 678, following from her allegations is that Defendants believed Ms. Hebshi's Arabic name and seat assignment—the only information known to them—justified her arrest, detention, and strip search.  In other words, Ms. Hebshi's claim of an equal protection violation crosses "the line between possibility and plausibility of entitlement to relief," *Twombly*, 550 U.S. at 557 (internal quotation marks and alterations omitted), because: (1) she has stated in detail the role each Defendant played in her arrest, detention, and strip search; (2) she averred that the only facts known to any of the Defendants when taking those actions were her arbitrary seat assignment and her Arabic name; and (3) taken together, these allegations strongly suggest that each Defendant "acted based on the perceived ethnicity, national origin, or race of Ms. Hebshi's name."  (Compl. ¶ 56.)  Indeed, the Sixth Circuit has opined that, in "selecting persons for investigation [by] choos[ing] names from a flight list," officials cannot choose to investigate only "individuals with hispanic [sic] or other ethnic surnames" without implicating equal protection rights.  *United States v. Avery*, 137 F.3d 343, 354 n.5 (6th Cir. 1997).

In this way, Ms. Hebshi has shown that "each Government-official defendant, through the official's own individual actions, has violated the Constitution."  *Iqbal*, 556 U.S. at 676. Contrary to both the Individual Federal Defendants' and the WCAA Defendants' assertion, *Iqbal* does not require more.  The portions of *Iqbal* upon which they rely simply reaffirm the principle that government officials cannot be held liable for constitutional violations on a theory of

11

respondeat superior.  *See* 556 U.S. at 676.  Here, Ms. Hebshi alleges that each Defendant personally took part in the decision-making leading to, or otherwise participated in, her arrest, detention, and strip search.  She does not seek to hold any Defendant accountable solely because he had supervisory authority over individuals who deprived her of her rights.

Ms. Hebshi's complaint, in fact, "contain[s] specific allegations tying the individual defendants to the alleged unlawful conduct."  (Br. Supp. Individual Fed. Defs.' Partial Mot. Dismiss 10, Dkt. # 57.)  In attempting to refute this point, the Individual Federal Defendants rely heavily on *Marcilis v. Township of Redford*, 693 F.3d 589 (6th Cir. 2012).  But this case is inapposite because, unlike Ms. Hebshi, the *Marcilis* plaintiffs just once "metion[ed]" the individual federal law enforcement officers whom they sued in their individual capacities, and otherwise made "only categorical references to 'Defendants.'"  693 F.3d at 596.  Faced with a complaint containing only this singular reference to the individual defendants, the *Marcilis* court correctly determined that the plaintiffs had "fail[ed] to 'allege, with particularity, facts that demonstrate what *each* defendant did to violate the asserted constitutional right.'"  *Id.* at 596-97 (quoting *Lanman v. Hinson*, 529 F.3d 673, 684 (6th Cir. 2008)).

In contrast to the *Marcilis* Plaintiffs, Ms. Hebshi has specified precisely which actions of each Individual Federal Defendant and WCAA Defendant violated her equal protection rights: some, working together, decided to arrest and detain her; some executed the tactical entry onto the plane and forcibly removed her; some decided that she should be strip searched.  In alleging the facts concerning each Defendant's role in her arrest, detention, and strip search, Ms. Hebshi has adequately put them on notice of "what particular unconstitutional *acts* they are alleged to have committed."  *Robbins v. Oklahoma*, 519 F.3d 1242, 1250 (10th Cir. 2008) (emphasis added); *see also Townsend v. Owens*, No. 12-cv-10379, 2012 WL 6214395, at *4 (E.D. Mich.

12

Dec. 13, 2012) ("The Plaintiff identifies, by name, each of the Defendants as assisting . . . in [a] violation of his constitutional rights.  That he alleges that the Defendants did this together, and were joined by others, does not render the claim implausible." (distinguishing *Marcilis*, 693 F.3d at 596-97)).

### B.  Ms. Hebshi's Allegations of Discrimination Are Sufficient to Show an Equal Protection Violation

In addition to describing with particularity the discrete acts that each Individual Federal Defendant and WCAA Defendant is alleged to have committed in arresting, detaining, and strip searching Ms. Hebshi, the complaint adequately alleges a discriminatory intent behind these actions.  It thereby  demonstrates that Ms. Hebshi is entitled to relief on her equal protection claim and shows that Defendants violated her constitutional rights.

### 1.  The Complaint Contains More Than a "Conclusory" Allegation of Discrimination

In arguing that Ms. Hebshi's "lone allegation of discrimination is wholly conclusory," both the Individual Federal Defendants and the WCAA Defendants take far too narrow a view of the complaint.  (*See* Br. Supp. Individual Fed. Defs.' Partial Mot. Dismiss 11; *accord* Br. Supp. WCAA Defs.' Mot. Partial J. Pleadings 11-12, 14-15, Dkt. # 69.)  When determining the sufficiency of the complaint, it "should be read as a whole, not parsed piece by piece to determine whether each allegation, in isolation, is plausible."  *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 594 (8th Cir. 2009).  As already described in detail, Ms. Hebshi has stated more than a "lone allegation of discrimination."  (*See* Br. Supp. Individual Fed. Defs.' Partial Mot. Dismiss 11.)  She has alleged the particular acts each Defendant took to effectuate her arrest, detention, and strip search.  She has averred that, before taking these acts, the only facts Defendants knew were her arbitrary seat assignment and her Arabic name, indicating that their conduct was motivated at least in part by her perceived ethnicity, national origin, or race.  *See*

13

*Avery*, 137 F.3d at 354 n.5.  This is not a case where the complaint, on its face, provides no support for the equal protection claim.  *Cf. Rondigo, L.L.C. v. Twp. of Richmond*, 641 F.3d 673, 682-84 (6th Cir. 2011) (rejecting as conclusory allegations of an equal-protection violation based on gender discrimination when complaint suggested only that complainant business was owned by a woman and exhibits revealed legitimate reasons for treating another, male-owned business more favorably than complainant), *cited in* Br. Supp. Individual Fed. Defs.' Partial Mot. Dismiss 11, 12-13.

Other allegations in the complaint likewise suggest that Ms. Hebshi's ordeal was premised upon the perception that she was Arab.  The first alerts about the allegedly suspicious behavior of the two men seated next to Ms. Hebshi on the plane took note that the men were of "possibly Arab descent," (Compl. ¶ 47), like Ms. Hebshi.  And one of the first questions that law enforcement officers asked Ms. Hebshi after she was arrested and detained was whether she spoke English.  (*Id.* ¶ 82.)  Thus, Ms. Hebshi has done far more than proffer a "formulaic recitation of the elements" of her equal protection claim.  *Twombly*, 550 U.S. at 555.  She has alleged that Defendants arrested, detained, and strip searched her "because of, not merely in spite of" her perceived ethnicity, national origin, or race.  *Id.* (internal quotation marks omitted) (quoting *Personnel Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979)).  This is enough to get past the pleading stage.  Because it is frequently impossible "for a plaintiff to have smoking gun evidence" of a defendant's mental state, *Handy-Clay*, 695 F.3d at 546 (quoting *Valentino v. Vill. of S. Chicago Hts.*, 575 F.3d 664, 672 (7th Cir. 2009)), "[a] defendant's motivation for taking action against the plaintiff is usually a matter best suited for the jury," *Paige v. Coyner*, 614 F.3d 273, 282 (6th Cir. 2010).

14

> ## 2. *Defendants Cannot Defeat Ms. Hebshi's Claims by Proffering a Non-Discriminatory, Law-Enforcement Objective Behind Their Actions*

Both the Individual Federal Defendants and the WCAA Defendants attempt to undercut Ms. Hebshi's equal protection claim by proffering an "obvious alternative explanation" for the law enforcement actions taken against her.  (Br. Supp. WCAA Defs.' Mot. Partial J. Pleadings 16-17 (quoting *Iqbal*, 556 U.S. at 683); *accord* Br. Supp. Individual Fed. Defs.' Partial Mot. Dismiss 14-15.)  According to them, the complaint suggests that each Individual Federal Defendant and WCAA Defendant was simply acting on a report of suspicious conduct from Frontier Airlines when they arrested, detained, and strip searched Ms. Hebshi.  Defendants allege that, because their actions might be explained by this "neutral, investigative reason," *Iqbal*, 556 U.S. at 677, Ms. Hebshi's allegations are merely "consistent with," but do not "plausibly suggest[]," discriminatory conduct, *Twombly*, 550 U.S. at 557.  This argument falls flat for several reasons.

First, as a general matter, Ms. Hebshi is required to show the plausibility of her claims, not to disprove or overcome defendants' version of events.  The plausibility of Defendants' gloss on the facts—that entirely innocent intentions underlay their decision to arrest, detain, interrogate, and strip search Ms. Hebshi, despite the total absence of suspicious behavior on her part—is not the question before the court.  "[C]rediting the defendant's, rather than the plaintiff's version of facts unduly raises the pleading standard beyond the heightened level of *Iqbal* and *Twombly*, forcing the plaintiff's well-pleaded facts to be not only plausible, but persuasive. That is not the appropriate burden at this stage of the litigation."  *Handy-Clay*, 695 F.3d at 548; *see also Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 184-185 (2d Cir. 2012), *cert. denied*, 133 S. Ct. 846 (2013) ("The choice between two plausible inferences that may be drawn from factual allegations is not a choice to be made by the court on a Rule 12(b)(6) motion.");

*Swanson v. Citibank, N.A.*, 614 F.3d 400, 404 (7th Cir. 2010) ("[I]t is not necessary to stack up inferences side by side and allow the case to go forward only if the plaintiff's inferences seem more compelling than the opposing inferences."). Ms. Hebshi's "complaint identifies the type of discrimination that she thinks occur[red] . . . by whom . . . and when . . . . This is all that she needed to put in the complaint." *Swanson*, 614 F.3d at 405.

Second, the facts as alleged by Ms. Hebshi cast serious doubt on whether the tip relayed by Frontier Airlines provided probable cause to arrest, detain, or strip search Ms. Hebshi. The only information conveyed to the Individual Federal Defendants and WCAA Defendants was that Ms. Hebshi was possibly traveling with two men who had each used the restroom for ten to twenty minutes and stood in the aisle of the plane during the flight. (Compl. ¶¶ 49, 55.) No one on the plane ever reported, or even suggested, that Ms. Hebshi was acting in a manner considered suspicious. (*Id.* ¶ 46.) These allegations, assumed to be true, sustain a "reasonable inference," *Iqbal*, 556 U.S. at 678, that Defendants' treatment of Ms. Hebshi violated the Fourth Amendment. This, in turn, undercuts Defendants' contention that a legitimate law enforcement objective motivated Ms. Hebshi's arrest, detention, and strip search.

Third, even if Frontier Airlines' report of the allegedly suspicious behavior aboard Ms. Hebshi's flight was sufficient to establish probable cause, and Defendants acted with a neutral, investigatory purpose, this alone would not preclude Ms. Hebshi's equal protection claim. The Equal Protection Clause "prohibits selective enforcement of the law based on considerations such as race." *Whren v. United States*, 517 U.S. 806, 813 (1996). This prohibition exists "independent of the Fourth Amendment protection against unreasonable searches and seizures." *Avery*, 137 F.3d at 352. As a result, an arrest supported by probable cause can still give rise to an equal protection violation. *High v. Fuchs*, 74 F. App'x 499, 502 (6th Cir. 2003). To state a

claim, Ms. Hebshi is not required to show that Defendants "had no race-neutral reasons for the challenged enforcement decision." *Farm Labor Org. Comm. v. Ohio State Highway Patrol*, 308 F.3d 523, 538 (6th Cir. 2002).  She must only demonstrate that Defendants' challenged conduct was motivated "at least in part because of its adverse effects upon an identifiable group." *Id.* (internal marks omitted) (quoting *Wayte v. United States*, 470 U.S. 598, 610 (1985)).  This she has done, by alleging each Defendant's specific role in her arrest, detention, and strip search and averring that Defendants knew she was identified by Frontier based only on her arbitrary seat assignment and Arabic name.  The most logical conclusion is that Ms. Hebshi's perceived ethnicity, national origin, or race was a motivating factor in Defendants' actions.

While law enforcement officers acting on "a tip from a source outside the police organization . . . obviously cannot control the race of the person they investigate and ultimately contact," they cannot target persons for investigation based on their "ethnic surname." *Avery*, 137 F.3d at 354 n.5.  Ms. Hebshi's name was brought to the Individual Federal Defendants' and WCAA Defendants' attention by Frontier Airlines employees, but it was obvious from this "tip" that it was based solely on a ground employee's examination of a passenger list.  (*See* Compl. ¶ 50.)  The Individual Federal Defendants' argument that there is no evidence they knew Ms. Hebshi's race, ethnicity, or national origin, based on her name or otherwise, cannot be credited at the pleading phase.  According to the complaint, a communication showing that Ms. Hebshi was identified as a suspect based on her Arabic name and seat assignment was transmitted to state and federal law enforcement officials.  (Compl. ¶ 51.)  How that information was disseminated to the Individual Federal Defendants, and precisely what they knew when they took action against Ms. Hebshi, are fact questions that cannot be resolved on a motion to dismiss.  *See Paige*, 614 F.3d at 282 ("A defendant's motivation for taking action against the plaintiff is usually a matter

best suited for the jury.")  Ms. Hebshi's allegations that Defendants devised and executed a plan

to arrest, detain, and strip search her because she has an "ethnic surname" demonstrate that she

has a plausible claim for relief.  *See Avery*, 137 F.3d at 354 n.5.

### 3.      Ms. Hebshi Is Not Required to Plead that She Was Treated Differently Than a Similarly Situated Individual

Finally, both the WCAA Defendants and the Individual Federal Defendants are mistaken

in asserting that Ms. Hebshi's equal protection claim is deficient because she did not allege that

she was treated differently than a similarly situated individual.  (*See* Br. Supp. WCAA Defs.'

Partial Mot. J. Pleadings 17; Br. Supp. Individual Fed. Defs.' Partial Mot. Dismiss 9 n.8.)  As the

Sixth Circuit recognized in *Davis v. Prison Health Services*, 679 F.3d 433, 439-40 (6th Cir.

2012), proving disparities in the treatment of similarly situated individuals is only one way of

establishing an equal protection violation.  Ms. Hebshi, in contrast, has presented direct evidence

of discriminatory intent by averring that the *only* fact linking her to any allegations of suspicious

conduct, aside from her arbitrary seat assignment, is her Arabic name.  (Compl. ¶ 50.)  That Ms.

Hebshi was singled out because of her perceived ethnicity, race, or national origin is bolstered by

additional facts.  For example, reports of suspicious conduct on board her plane were attributed

to individuals of "possibly Arab descent."  (Compl. ¶ 47.)  And, once detained, law enforcement

officers asked Ms. Hebshi if she spoke English.  (*Id.* ¶ 82.)  In light of these allegations, she need

not identify a similarly situated individual.  *See Davis*, 679 F.3d at 440 (observing that, because

plaintiff's complaint "contains allegations that, if accepted as true, would constitute direct

evidence" of discriminatory animus, he did not need to identify any similarly situated

individuals).  Requiring her to do so would obligate her "to plead more facts than [s]he may

ultimately need to prove to succeed on the merits," in contravention of Supreme Court precedent.

*Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 512 (2002).

As a factual matter, too, the circumstances of Ms. Hebshi's arrest, detention, and strip search are so unusual that comparison to a similarly situated individual is not possible.  There was no one else who was seated on the flight in the same row as the two individuals believed to be acting suspiciously.  Ms. Hebshi has alleged that no other passenger, aside from those two individuals, was forcibly removed from the plane, taken to a detention facility, and strip searched, and she has claimed that this would not have happened to her if she did not have an Arabic name.  (*See* Compl. ¶¶ 56, 73.)  Her choice not to formulate these allegations using the legal jargon of "disparate treatment" or "similarly situated persons," *see Ctr. for Bio-Ethical Reform, Inc. v. Napolitano*, 648 F.3d 365, 379 (6th Cir. 2011), is in keeping with the Supreme Court's instructions that pleading legal conclusions does not make a claim for relief more plausible, *see Iqbal*, 556 U.S. at 678-79.

### C.     Defendants Are Not Entitled to Qualified Immunity, as Ms. Hebshi Has Shown a Violation of a Clearly Established Equal Protection Right

Ms. Hebshi has pleaded an equal protection violation by each Individual Federal Defendant and WCAA Defendant, as the foregoing discussion shows.  Defendants are therefore not entitled to qualified immunity unless Ms. Hebshi's right to equal protection was not clearly established, so as to give Defendants "fair warning" that their actions violated that right.  *Hope v. Pelzer*, 536 U.S. 730, 741 (2002).  The complaint, on its face, demonstrates that Ms. Hebshi's right was clearly established, and Defendants are not entitled to qualified immunity.

As described above in great detail, Ms. Hebshi has alleged that each Defendant could have had no knowledge about her except the perceived ethnicity of her name, as contained in an email that made clear she had not been reported as engaging in suspicious activity.  It was, without question, clearly established on that date that arresting, detaining, and strip searching an individual partly because of the perceived ethnicity, national origin, or race of her name runs

afoul of the Equal Protection Clause. *See, e.g.*, *Whren*, 517 U.S. 806, 813 (1996) (holding that equal protection rights are violated when law is selectively enforced based on race); *Farm Labor Org. Comm.*, 308 F.3d at 538 (holding that police violate equal protection rights when a stop is made "at least in part because of" race (internal quotation marks omitted) (quoting *Wayte v. United States*, 470 U.S. 598, 610 (1985))); *Avery*, 137 F.3d at 354 n.5 (opining that choosing to investigate only "individuals with hispanic or other ethnic surnames" on a flight list raises equal protection concerns).

Defendant law enforcement officers were undoubtedly on high alert when confronted with a report of allegedly suspicious conduct onboard a commercial airline flight on the tenth anniversary of the 9/11 terrorist attacks. Yet they should have known that, given the significance of this anniversary and the anxiety undoubtedly felt by airline passengers because of it, false reports of suspicious conduct may have been especially likely to occur. While the circumstances of Ms. Hebshi's arrest, detention, and strip search might have presented a "novel factual situation[]," this does not mean that her equal protection rights were not clearly established. *Hope*, 536 U.S. at 731. It is not necessary to have "a case directly on point" for a right to be clearly established. *al-Kidd*, 131 S. Ct. at 2083. Instead, it is sufficient that existing precedent place the question "'beyond debate.'" *Nelms v. Wellington Way Apartments, LLC*, No. 11-3404, 2013 WL 408034, *6 (6th Cir. Feb. 4, 2013) (quoting *al-Kidd*, 131 S. Ct. at 2083). To take law enforcement action based on Ms. Hebshi's Arabic name, against the backdrop of a clearly-established right to be free of racially or ethnically selective enforcement of the law, is "objectively unreasonable in light of the clearly established constitutional rights." *Gaspers v. Ohio Dep't of Youth Servs.*, 648 F.3d 400, 412 (6th Cir. 2011).

Further, where, as here, "'the legal question of immunity is dependent upon which view of the facts' the trier of fact accepts," *Washington v. Newsom*, 977 F.2d 991, 996 (6th Cir. 1992) (quoting *Brandenburg v. Cureton*, 882 F.2d 211, 216 (6th Cir. 1989)), dismissal based on qualified immunity before the development of any factual record is especially inappropriate.  *See Grose v. Caruso*, 284 F. App'x 279, 283 (6th Cir. 2008) ("Dismissals on the basis of qualified immunity are generally made pursuant Fed. R. Civ. P. 56 summary judgment motions, not 12(b)(6) sufficiency of pleadings motions.").  Ms. Hebshi has alleged a violation of clearly established law and objectively unreasonable actions violating that law.  At this stage, she need not do more.

Qualified immunity protects government officials "as long as their conduct does not violate 'clearly established statutory or constitutional rights of which a reasonable person would have known,'" *Sallier v. Brooks*, 343 F.3d 868, 878 (6th Cir. 2003) (quoting *Harlow*, 457 U.S. at 818); it does not give them license to act with "impunity."  *Pritchard v. Hamilton Twp. Bd. of Trustees*, 424 F. App'x 492, 503 (6th Cir. 2011) (quoting *Ahlers v. Schebil*, 188 F.3d 365, 371 (6th Cir. 1999)).  On September 11, 2011, Ms. Hebshi underwent a terrible ordeal—she was handcuffed and forced off a plane by heavily armed law enforcement officers, locked in a cell, strip searched in a degrading manner, and detained for several hours without any explanation. The facts alleged in the complaint suggest that she was subjected to this treatment because of her Arabic name.  Under these circumstances, dismissing Ms. Hebshi's equal protection claim would be granting the Individual Federal Defendants and WCAA Defendants "impunity," not immunity.

**CONCLUSION**

For these reasons, Ms. Hebshi respectfully requests that the Court deny the Individual Federal Defendants' partial motion to dismiss and the WCAA Defendants' motion for partial judgment on the pleadings.

Respectfully submitted,

Michael J. Steinberg (P43085)
Kary L. Moss (P49759)
American Civil Liberties Union
    Fund of Michigan
2966 Woodward Avenue
Detroit, MI 48201
(313) 578-6823
msteinberg@aclumich.org

  *s/Rachel E. Goodman*
Dennis Parker
Rachel E. Goodman
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2500
rgoodman@aclu.org
dparker@aclu.org
gcalhan@aclu.org


William H. Goodman (P14173)
Julie H. Hurwitz (P34720)
Kathryn Bruner James (P71374)
Miriam R. Nemeth  (P76789)
Goodman & Hurwitz, P.C.
Cooperating Attorneys, American Civil
    Liberties Union Fund of Michigan
1394 E. Jefferson Ave.
Detroit, MI 48207
(313) 567-6170
bgoodman@goodmanhurwitz.com
jhurwitz@goodmanhurwitz.com
kjames@goodmanhurwitz.com
mnemeth@goodmanhurwitz.com

Anna Engh
Shelli Calland
Arjun Sethi
Sarah E. Tremont (P73809)
Covington & Burling LLP
1201 Pennsylvania Ave., N.W.
Washington D.C. 20004
(202) 662-6000
aengh@cov.com
scalland@cov.com
asethi@cov.com
stremont@cov.com


*Attorneys for Plaintiff*
SHOSHANA HEBSHI

Dated: June 28, 2013

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 28, 2013, I electronically filed the foregoing paper with the

Clerk of the Court using the ECF system, which will send notification of such filing to the

following:

> Lynn Marie Dodge, lynn.dodge@usdoj.gov
> Sarah E. Whitman, sarah.whitman@usdoj.gov
> Alexander A. Ayar, AAyar@FosterSwift.com
> Brian T. Maye, bmaye@amm-law.com
> Steven L. Boldt, sboldt@amm-law.com
> Alan B. Havis, ahavis@AirportDefender.com
> Lindsey A. Kaczmarek, lkaczmarek@cmda-law.com
> T. Joseph Seward, tjseward@cmda-law.com

> *s/Rachel E. Goodman*
> Rachel E. Goodman
> American Civil Liberties Union Foundation
> 125 Broad Street, 18th Floor
> New York, NY 10004
> (212) 549-2500
> rgoodman@aclu.org