# Exhibit 2

Not Reported in F.Supp.2d, 2011 WL 4345243 (E.D.Mich.)

Motions, Pleadings and Filings
Judges and Attorneys
Only the Westlaw citation is currently available.

United States District Court,
E.D. Michigan,
Southern Division.
UNITED STATES of America, Plaintiff,
v.
Umar Farouk ABDULMUTALLAB, Defendant.

No. 10–20005.
Sept. 16, 2011.

Cathleen M. Corken, Jonathan Tukel, Michael C. Martin, U.S. Attorney's Office, Detroit, MI, for Plaintiff.

## OPINION AND ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS STATEMENTS MADE AT THE UNIVERSITY OF MICHIGAN HOSPITAL [55]

NANCY G. EDMUNDS, District Judge.

*\*1* At an evidentiary hearing held on September 14 and 15, 2011, this matter came before the Court on Defendant's motion to suppress statements made at the University of Michigan Hospital [55]. Defendant's motion raises two separate issues:

(1) whether Defendant's statements to federal agents at the University of Michigan Hospital on December 25, 2009 were voluntary, and

(2) whether the circumstances present at the time of this questioning fall within the public safety exception to *Miranda* recognized by the Supreme Court in *New York v. Quarles,* 467 U.S. 649, 104 S.Ct. 2626, 81 L.Ed.2d 550 (1984).

The answer to both is yes. Because the Court finds the government's witnesses to be credible and for the reasons stated more fully below, Defendant's motion is DENIED.

### I. Facts—Evidentiary Hearing

On December 25, 2009, when Northwest–Delta Flight 253 landed, U.S. Customs and Border Protection officers met the plane at the gate, having been advised of an incident on board the plane. They quickly determined that Defendant's burns were far too extensive to have been caused by firecrackers. After assessing the severity of Defendant's burns, U.S. Customs officers transported Defendant to the U of M Hospital for treatment and informed the FBI's Joint Terrorism Task Force of the situation.

Defendant arrived at the hospital about 12:25 p.m. and received treatment for his burns, including 50 micrograms of the painkiller fentanyl that was administered through an IV at 2:00 p.m.

Defendant was then transferred to the hospital's burn unit, where his treatment was continued. Between 2:30 p.m. and 3:00 p.m., his primary care nurse, R.N. Julia Longenecker, administered incremental doses of fentanyl through an IV for a total of 300 micrograms to relieve pain while Defendant's burn wounds were scrubbed. After the scrubbing, Defendant's wounds were dressed, and he was transferred to a room across the hall. The R.N. testified that she monitored Defendant's medical condition during this time. All the medical data and her observations confirmed that Defendant's reaction to the painkiller was normal and that he was tolerating the drug well. She also

monitored his mental alertness and testified that he was not confused or "high" at any time. Rather, he was very lucid, alert, gave appropriate responses to verbal commands, and was "orientated times 3"—meaning that he knew who he was, where he was, and when/what time it was—throughout and after his burn scrubbing and dressing treatment.

Around 3:35 p.m., after he was moved to a room, Defendant was questioned by FBI Special Agent Timothy Waters. Other federal agents were present, including FBI Special Agent Peissig, and U.S. Customs Officer Steigerwald. Before the 3:35 interview began, Special Agent Waters had learned from U.S. Customs and Border Protection Officer Steigerwald that Defendant had admitted that he had detonated an explosive device hidden in his underwear while on Flight 253 and that he was acting on behalf of al-Qaeda. He had also learned from other federal agents that an explosive device similar to the one used by Defendant had been used previously, although not on a plane. He also knew that the explosive device had no mechanical devices associated with it and was thus problematic because it could defeat airport security and, indeed, had done so in this instance. Mindful of Defendant's self-proclaimed association with al-Qaeda and knowing the group's past history of large, coordinated plots and attacks, the agents feared that there could be additional, imminent aircraft attacks in the United States and elsewhere in the world. For these reasons, Agent Waters questioned Defendant for about 50 minutes without first advising him of his *Miranda* rights.

*\*2* During that interview, Agent Waters testified, as R.N. Longenecker had, that Defendant appeared at all times during the questioning to be alert and lucid. Defendant told him that he was not in pain, that he felt fine, and that he understood that the agents needed to ask him some questions. There was no evidence that Defendant was reluctant to answer questions, that he was confused or having trouble understanding the questions. He knew where he was, why he was there, and what had happened and when. Defendant had no trouble understanding or speaking English. Agent Waters asked Defendant where he traveled, when he had traveled, how, and with whom; the details of the explosive device; the details regarding the bomb-maker, including where Defendant had received the bomb; his intentions in attacking Flight 253; and who else might be planning an attack. Every question sought to identify any other potential attackers and to prevent another potential attack. Defendant answered, providing information that helped the agents to determine where to go next and investigate if anyone else might be planning to or was already in the process of carrying a similar device on an aircraft. At the end of the interview, once they received the public safety information, the agents turned their attention to immediately sharing the information with law enforcement and intelligence agencies worldwide.

## II. Analysis
### A. Voluntariness of Defendant's Statements

"When a defendant claims that a confession was coerced, the government bears the burden of proving by a preponderance of the evidence that the confession was in fact voluntary." *United States v. Mahan,* 190 F.3d 416, 422 (6th Cir.1999).

Defendant concedes that the "voluntariness" of a statement is determined by looking at the totality of the circumstances, *United States v. Rutherford,* 555 F.3d 190, 195 (6th Cir.2009) (citing *Colorado v. Connelly,* 479 U.S. 157, 166, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986)), but argues that consideration of the totality of the circumstances warrants a finding that his statements were involuntary and thus should be suppressed.

As the Sixth Circuit observed in *Rutherford,* "[t]here is no bright-line rule for determining whether a suspect's statements were given voluntarily. Voluntariness is instead judged by the 'totality of the circumstances' in which the person made the statement." 555 F.3d at 195. In making that "voluntariness" determination, the courts consider whether:

"(i) the police activity was objectively coercive; (ii) the coercion in question was sufficient to overbear the defendant's will; and (iii) the alleged police misconduct was the crucial motivating factor in the defendant's decision to offer the statement ."

*Id.* (quoting *United States v. Mahan,* 190 F.3d at 422). Other "[r]elevant factors may include the defendant's age, education and intelligence; whether the defendant has been informed of his

constitutional rights; the length and extent of the questioning; and the use of physical punishment, such as the deprivation of food or sleep." *Mahan,* 190 F.3d at 422–23. Considering the totality of the circumstances, the court must determine "whether a defendant's will was overborne at the time [ ]he confessed." *McCalvin v. Yukins,* 444 F.3d 713, 719 (6th Cir.2006).

*\*3* Defendant argues that statements he gave to federal agents during the interview that began at 3:35 p.m. should be suppressed and relies primarily on *Mincey v. Arizona,* 437 U.S. 385, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978), for support. Similar to *Mincey,* Defendant argues, he suffered third degree burns to his lower extremities, was transported to the hospital, was given 350 micrograms of fentanyl, and then interrogated for approximately 50 minutes by federal agents while he was in the burn care unit. Also, like the defendant in *Mincey,* Defendant here was isolated from his family, friends, and legal counsel. Moreover, unlike *Mincey,* Defendant was questioned without first being read his *Miranda* rights.

Based on the testimony and exhibits introduced at the evidentiary hearing, *Mincey* is distinguishable. The defendant in *Mincey* was interrogated for about four hours, complained that his pain was "unbearable," was forced to write his answers to questions on pieces of paper because he was intubated, and was evidently confused and unable to think clearly about either the events of that afternoon or the circumstances of his interrogation.

> [Mincey] had been seriously wounded just a few hours earlier, and had arrived at the hospital "depressed almost to the point of coma," according to his attending physician. Although he had received some treatment, his condition at the time of [the detective's] interrogation was still sufficiently serious that he was in the intensive care unit. He complained to [the detective] that the pain in his leg was "unbearable." He was evidently confused and unable to think clearly about either the events of that afternoon or the circumstances of his interrogation, since some of his written answers were on their face not entirely coherent. Finally, while Mincey was being questioned he was lying on his back on a hospital bed, encumbered by tubes, needles, and breathing apparatus.

*Mincey,* 437 U.S. at 398–99 (internal footnotes omitted). In reaching its decision to suppress the defendant's statements, the *Mincey* Court determined that his "statements were not the product of his free and rational choice. To the contrary, the undisputed evidence makes clear that Mincey wanted not to answer [the detective]. But Mincey was weakened by pain and shock, isolated from family, friends, and legal counsel, and barely conscious, and his will was simply overborne." *Id.* at 401 (internal quotation marks and citation omitted).

Unlike the defendant in *Mincey,* Defendant's statements at the U of M Hospital during his interview with Agent Waters were voluntary and not the result of law enforcement coercion. That Defendant received a painkiller before being questioned is insufficient in and of itself to render his statements involuntary. This Court finds the testimony of the government witnesses at the evidentiary hearing to be credible. Both the testimony and the exhibits introduced at the hearing support its conclusion that Defendant's challenged statements were voluntary. Specifically, RN Longenecker testified that, immediately before being interviewed, Defendant was lucid, fully "oriented times 3," was not confused, and gave no indication that he did not or could not understand the questions being asked or the circumstances in which they were being asked. The Court's conclusion is also supported by Special Agent Waters's testimony that Defendant was not reluctant to answer his questions, was not confused, and understood where he was, why he was there, what he was there for, and what had happened. The Court's conclusion is also supported by the evidence regarding the painkiller fentanyl—there was no evidence that it had impacted Defendant's ability to understand and respond lucidly to Agent Waters's questions.[FN1]

> FN1. Although Defendant argued that the painkiller fentanyl may induce confusion or a "high," both Ms. Longenecker and the government's expert, Dr. Eugene Schoener, testified that such a side effect is uncommon. Fentanyl is an analgesic of the opiate family which is effective in reducing pain, but it has a short half-life in the brain. Moreover, the observations made by Ms. Longenecker and confirmed by the medical records submitted as exhibits by the government, establish that Defendant exhibited no

signs of confusion, euphoria, or other mental instability, and that all physical responses were well within normal limits.

**\*4** That a defendant has taken a painkiller before being questioned by law enforcement is just one factor among many to be considered under the "totality of the circumstances" test for voluntariness. *See United States v. Martin,* 781 F.2d 671, 674 (9th Cir.1985) (affirming the district court's conclusion that the defendant's statements were voluntary, although provided after he was administered a painkiller (demerol) while hospitalized due to injuries caused while handling explosives, because he "was awake and relatively coherent during the questioning at the hospital;" "sat up in his bed and spoke freely with [law enforcement];" questioning stopped when he "became too groggy to understand the detective's questions;" there was "no evidence of extended and oppressive questioning;" the defendant's "injuries, while painful, did not render him unconscious or comatose;" he "said that he wanted to talk to the officers and was not reluctant to tell his story."); *Wolfrath v. LaVallee,* 576 F.2d 965, 972–73 (2d Cir.1978) (reversing the district court's conclusion that the defendant's statement was involuntary and holding that involuntariness cannot "be decided solely by reference to the general properties of [hospital-administered] drugs" but rather "[t]he voluntariness of the confession must be judged under the totality of the circumstances."). *See also United States v. Khalil,* 214 F.3d 111, 121–22 (2d Cir.2000) (affirming district court's decision that the defendant's statements were voluntary under the "totality of the circumstances test" and rejecting the defendant's "contention that his medical condition prevented his statements from being knowing and voluntary" based on testimony at his suppression hearing from the interrogating agent that although he was in pain, the defendant "was alert, seemed to understand the agent's questions, and gave responsive answers" and testimony from the defendant's surgeon that the defendant "was alert and had no difficulty in understanding her explanation of the surgical procedure he would undergo.").

Other factors considered when determining "voluntariness" likewise support the Court's conclusion. At the time Defendant gave the challenged statements, he was an adult (age 23); was well-educated, having graduated from a number of prestigious and demanding preparatory schools and universities, including the British School of Lome, the University College of London in the United Kingdom with a degree in Engineering, and had been enrolled in a post-graduate program at the University of Wollongong in Dubai, United Arab Emirates; was a sophisticated international traveler, having been on his own throughout the world, including Ghana, Yemen, the United Kingdom, the United Arab Emirates, Saudi Arabia, and two previous trips to the United States; had been provided immediate medical care; and had not been deprived of food or sleep. Moreover, the FBI agents who questioned Defendant made no threats, displayed no weapons, and offered no promises or inducements.

**\*5** Finally, the Court will address the fact that Defendant was not provided *Miranda* warnings before being questioned. The government argues that this is only one factor among many under the "totality of the circumstances" test for voluntariness and should not weigh in Defendant's favor if the exigent public safety circumstances that existed at the time of Defendant's questioning fall within the *Quarles* exception to *Miranda.* The Court agrees with the government, and now addresses the key issue in Defendant's second suppression argument—whether the circumstances present at the time of Defendant's questioning fall within the public safety exception to *Miranda* recognized in *Quarles.*

### B. *Quarles* Exception

Defendant argues that his statements to the federal agents on December 25, 2009 at U of M Hospital should be suppressed because the federal agents failed to first advise him of his *Miranda* rights. The Court disagrees. The circumstances present at the time of Defendant's questioning fall within the public safety exception to *Miranda* recognized in *Quarles,* 467 U.S. at 657. The Sixth Circuit has applied the *Quarles* exception. *See United States v. Talley,* 275 F.3d 560, 564 (6th Cir.2001) (applying the *Quarles* public safety exception).

The federal courts have extended the logic of *Quarles* to the questioning of terrorism suspects. *See Khalil,* 214 F.3d at 121. In *Khalil,* the district court determined that the *Quarles* exception to *Miranda* applied when, after a raid on the defendant's apartment where he was injured, officers questioned the defendant at the hospital "about the construction and stability of the bombs" discovered in his apartment and included within the *Quarles* exception the defendant's response to the officer's inquiry

"whether he had intended to kill himself in detonating the bombs." *Id.* On appeal, the defendant challenged the district court's "ruling only insofar as the court failed to suppress" his response to the question about his intent to kill himself, arguing that "that question was unrelated to the matter of public safety." *Id.* The Second Circuit resolved the issue as follows:

> We are inclined to disagree, given that [the defendant]'s vision as to whether or not he would survive his attempt to detonate the bomb had the potential for shedding light on the bomb's stability. In any event, even if we were to take a different view as to the relevance of that question, we would conclude that the admission of [the defendant's] response at trial was, at worst, harmless error.

*Id. See also In re Terrorist Bombings of U.S. Embassies in E. Africa,* 552 F.3d 177, 203 n. 19, 204 (2d Cir.2008) (assuming Quarles would apply to exigent circumstances in a terrorism case).

In light of the testimony provided at the evidentiary hearing, the logic of *Quarles* extends to the questioning of Defendant, a terrorism suspect at the time of his December 25, 2009 questioning. The agents' questions were intended to shed light on the obvious public safety concerns in this case and were "necessary to secure ... the safety of the public[.]" *Quarles,* 467 U.S. at 659. Defendant was asked where he traveled, when he had traveled, how, and with whom; the details of the explosive device; the details regarding the bomb-maker, including where Defendant had received the bomb; his intentions in attacking Flight 253; who else might be planning an attack; whether he associated with, lived with, or attended the same mosque with others who had a similar mind-set as Defendant about jihad, martyrdom, support for al-Qaeda, and a desire to attack the United States by using a similar explosive device on a plane, and what these individuals looked like—all in an attempt to discover whether Defendant had information about others who could be on planes or about to board planes with explosive devices similar to the one Defendant used because, based upon his training, experience, and knowledge of earlier al-Qaeda attacks, this was not a solo incident and the potential for a multi-prong attack existed even if Defendant was unaware of any specific additional planned attack.

**\*6** Special Agent Waters reiterated that, before he interviewed Defendant, he was aware that Defendant claimed to be acting on behalf of al-Qaeda. The agents were also well aware that on September 11, 2001, al-Qaeda operatives hijacked four airplanes in an attack on the United States that killed almost 3,000 people. Mindful of Defendant's self-proclaimed association with al-Qaeda and knowing the group's past history of large, coordinated plots and attacks, the agents logically feared that there could be additional, imminent aircraft attacks in the United States and elsewhere in the world.

Defendant was asked questions that sought to identify any other attackers or other potentially imminent attacks—information that could be used in conjunction with other U.S. government information to identify and disrupt such imminent attacks before they could occur. The agents limited their questioning to approximately 50 minutes, at which time they had sufficient information to address the threat to public safety. The agents then concluded their interview and immediately passed that information on to other law enforcement and intelligence agencies worldwide, further underscoring that it was obtained for purposes of public safety, to deal with other possible threats.

The circumstances present at the time of Defendant's questioning fall within the public safety exception to *Miranda* recognized in *Quarles.* Accordingly, the fact that he was questioned by federal agents at U of M Hospital on December 25, 2009 before receiving *Miranda* warnings does not warrant suppression of his challenged statements. Doing so here was fully justified.

### III. Conclusion
For the above-stated reasons, Defendant's motion to suppress is DENIED.

E.D.Mich.,2011.
U.S. v. Abdulmutallab
Not Reported in F.Supp.2d, 2011 WL 4345243 (E.D.Mich.)

Motions, Pleadings and Filings (Back to top)

- 2012 WL 652489 (Trial Motion, Memorandum and Affidavit) Defendant Abdulmutallab's Response to the Government's Sentencing Memorandum (Feb. 15, 2012) Original Image of this Document (PDF)
- 2012 WL 652493 (Trial Motion, Memorandum and Affidavit) Defendant Abdulmutallab's Motion to Strike Government's Memorandum for the Court Prepared by Dr.simon Perry (Doc. #130-1) and/or Defendant Abdutallab's Request for Production of Documents (Feb. 15, 2012) Original Image of this Document (PDF)
- 2012 WL 432112 (Trial Motion, Memorandum and Affidavit) Government's Sentencing Memorandum (Feb. 10, 2012) Original Image of this Document (PDF)
- 2012 WL 432113 (Trial Motion, Memorandum and Affidavit) Defendant Abdulmutallab's Motion to Hold Mandatory Life Statute Unconstitutional. as It is Cruel and Unusual Punishment, and Violative of the Commerce Clause as Applied, and for a Sentence Not Withstanding the Advisory Guideline Range and Request for a Variance (Feb. 10, 2012) Original Image of this Document (PDF)
- 2011 WL 7277350 (Trial Motion, Memorandum and Affidavit) Defendant Abdulmutallab's Motion in Limine to Preclude the Government From Using the Term "Bomb," or "Explosive Device" When Referencing the Alleged Device the Defendant Had on His Person the Day in Question (Abdulmutallab's Motion in Limine No. 1) (Oct. 11, 2011) Original Image of this Document (PDF)
- 2011 WL 7277351 (Trial Motion, Memorandum and Affidavit) Defendant's Motion in Limine to Exclude Photographs of Defendant's Burned Genitals (Oct. 11, 2011) Original Image of this Document (PDF)
- 2011 WL 7277349 (Trial Motion, Memorandum and Affidavit) Motion of the United States to Exclude Fact Witnesses and to Permit Attendance of Expert Witnesses, and Brief in Support Thereof (Oct. 7, 2011) Original Image of this Document (PDF)
- 2011 WL 7277348 (Trial Motion, Memorandum and Affidavit) Defendant's Motion to Strike Juror Number 222 for Cause (Oct. 6, 2011) Original Image of this Document (PDF)
- 2011 WL 7277347 (Trial Motion, Memorandum and Affidavit) Defendant's Motion to Strike Juror Number 144 for Cause (Oct. 5, 2011) Original Image of this Document (PDF)
- 2011 WL 7277345 (Trial Motion, Memorandum and Affidavit) Government's Second Motion for Protective Order (Sep. 23, 2011) Original Image of this Document (PDF)
- 2011 WL 7277344 (Trial Motion, Memorandum and Affidavit) Government's Supplemental Brief in Support of Motion in Limine to Admit Demonstrative Evidence Regarding Defendant's Explosive Device (Sep. 22, 2011) Original Image of this Document (PDF)
- 2011 WL 7277357 (Trial Motion, Memorandum and Affidavit) Defendant Abdulmutallab's Response to the Government's Motion in Limine to Admit Demonstrative Evidence Regarding Defendant's Explosive Device (Sep. 20, 2011) Original Image of this Document (PDF)
- 2011 WL 7277355 (Trial Motion, Memorandum and Affidavit) Government's Motion in Limine to Preclude Expert Testimony on Mental Condition and to Preclude Duress Defense (Sep. 9, 2011) Original Image of this Document (PDF)
- 2011 WL 7277356 (Trial Motion, Memorandum and Affidavit) Government's Motion in Limine to Admit Demonstrative Evidence Regarding Defendant's Explosive Device (Sep. 9, 2011) Original Image of this Document (PDF)
- 2011 WL 7277340 (Trial Motion, Memorandum and Affidavit) Defendant's Reply to the Government's Brief in Opposition to Defendant's Motion to Suppress Hospital Statement (Sep. 1, 2011) Original Image of this Document (PDF)
- 2011 WL 7277352 (Trial Motion, Memorandum and Affidavit) Government's Motion for Protective Order (Aug. 5, 2011) Original Image of this Document (PDF)
- 2011 WL 7277353 (Trial Motion, Memorandum and Affidavit) Motion to Suppress Statements Made at the University of Michigan Hospital (Aug. 5, 2011) Original Image of this Document (PDF)
- 2011 WL 7277354 (Trial Motion, Memorandum and Affidavit) Motion to Suppress Statements Made to Government Agents at the Milan Correctional Facility (Aug. 5, 2011) Original Image of this Document (PDF)
- 2011 WL 4944989 (Trial Motion, Memorandum and Affidavit) Government's Combined Response

and Brief to Motion to Waive Presence of Defendant At Pretrial Conference, and to Motion for Discovery/Release of Prior Counsel's File Including Expert Reports (Jan. 14, 2011) Original Image of this Document (PDF)
- 2010 WL 7767824 (Trial Pleading) First Superseding Indictment (Dec. 15, 2010) Original Image of this Document (PDF)
- 2010 WL 22849 (Trial Pleading) Indictment (Jan. 6, 2010) Original Image of this Document (PDF)
- 2:10cr20005 (Docket) (Jan. 6, 2010)
- 2009 WL 8572310 (Trial Motion, Memorandum and Affidavit) United States' Brief in Opposition to Defendant's Motion to Suppress Hospital Statement (R.55) and Response to Motion to Suppress Statements Made to Government Agents at the Milan Correctional Facility (R.59) (Dec. 25, 2009) Original Image of this Document (PDF)

Judges and Attorneys (Back to top)

Judges | Attorneys

Judges

- **Edmunds, Hon. Nancy G.**
United States District Court, Eastern Michigan
Detroit, Michigan 48226
Litigation History Report | Judicial Motion Report | Judicial Reversal Report | Judicial Expert Challenge Report | Profiler

Attorneys

Attorneys for Plaintiff

- **Martin, Michael C.**
Montreal, Unknown State
Litigation History Report | Profiler

- **Tukel, Jonathan**
Detroit, Michigan 48226
Litigation History Report | Profiler

END OF DOCUMENT

(c) 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.