## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

SHOSHANA HEBSHI,

        Plaintiff,

v.

UNITED STATES OF AMERICA,
et al.,

        Defendants.

and

MARK DeBEAU, et al.,

        Cross-Plaintiffs,

v.

FRONTIER AIRLINES,

        Cross-Defendant.

Case No. 13-10253
The Honorable Terrence G. Berg
Magistrate Judge Laurie J.
    Michelson

## PLAINTIFF'S OPPOSITION TO THE WAYNE COUNTY AIRPORT AUTHORITY DEFENDANTS' JOINT MOTION FOR PARTIAL JUDGMENT ON THE PLEADINGS [DKT. # 89]

Plaintiff Shoshana Hebshi brought this suit alleging, among other claims, that various state and federal officials violated her Fourth Amendment rights to be free from unreasonable searches and seizures when they arrested, detained, and strip searched her at the Detroit Metropolitan Wayne County Airport on September 11, 2011.  Currently before the Court is a motion for partial judgment on the

pleadings (Dkt. # 89) with respect to the Fourth Amendment claims against Defendants Mark DeBeau, Officer Johnson, Officer Grant, Officer Toya Parker, Detective Carmona, Officer Jeremy Bohn, Lieutenant M. Wasiukanis, Corporal Bradley, and Captain Patrick Driscoll of the Wayne County Airport Authority (the "WCAA Defendants").

 For the reasons set forth in the accompanying brief, the WCAA Defendants' motion for partial judgment on the pleadings should be denied.

Respectfully submitted,

Michael J. Steinberg (P43085)
Kary L. Moss (P49759)
Brooke Merriweather-Tucker
AMERICAN CIVIL LIBERTIES UNION
    FUND OF MICHIGAN
2966 Woodward Avenue
Detroit, MI 48201
(313) 578-6823
msteinberg@aclumich.org
kmoss@aclumich.org
btucker@aclumich.org

Dennis Parker
Rachel E. Goodman
AMERICAN CIVIL LIBERTIES UNION
    FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2500
rgoodman@aclu.org
dparker@aclu.org

   s/Sarah E. Tremont

William H. Goodman (P14173)
Julie H. Hurwitz (P34720)
Kathryn Bruner James (P71374)
Miriam R. Nemeth  (P76789)
GOODMAN & HURWITZ, P.C.
Cooperating Attorneys, American Civil
    Liberties Union Fund of Michigan
1394 E. Jefferson Ave.
Detroit, MI 48207
(313) 567-6170
bgoodman@goodmanhurwitz.com
jhurwitz@goodmanhurwitz.com
kjames@goodmanhurwitz.com
mnemeth@goodmanhurwitz.com

Anna P. Engh
Shelli L. Calland
Arjun Sethi
Sarah E. Tremont (P73809)
COVINGTON & BURLING LLP
1201 Pennsylvania Ave., N.W.
Washington D.C. 20004
(202) 662-6000
aengh@cov.com
scalland@cov.com
asethi@cov.com
stremont@cov.com

*Attorneys for Plaintiff*
SHOSHANA HEBSHI

Dated: December 24, 2013

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

SHOSHANA HEBSHI,

        Plaintiff,

v.

UNITED STATES OF AMERICA, et al.,

        Defendants.

and

MARK DeBEAU, et al.,

        Cross-Plaintiffs,

v.

FRONTIER AIRLINES,

        Cross-Defendant.

Case No. 13-10253
The Honorable Terrence G. Berg
Magistrate Judge Laurie J.
    Michelson

## BRIEF IN SUPPORT OF PLAINTIFF'S OPPOSITION TO THE WAYNE COUNTY AIRPORT AUTHORITY DEFENDANTS' JOINT MOTION FOR PARTIAL JUDGMENT ON THE PLEADINGS [DKT. # 89]

## ISSUE PRESENTED

Are the WCAA Defendants entitled to qualified immunity on Ms. Hebshi's Fourth Amendment claims, when she has presented plausible factual allegations that the WCAA Defendants arrested, detained, and strip searched her in violation of her clearly established constitutional rights?

*Ms. Hebshi answers:* No.

*The WCAA Defendants answer:* Yes.

## CONTROLLING AND MOST APPROPRIATE AUTHORITIES

1. *Florida v. Royer*, 460 U.S. 491 (1983).

2. *Bell v. Wolfish*, 441 U.S. 520 (1979).

3. *Stoudemire v. Mich. Dep't of Corr.*, 705 F.3d 560 (6th Cir. 2013).

4. *Centanni v. Eight Unknown Officers*, 15 F.3d 587 (6th Cir. 1994).

5. *Shqeirat v. U.S. Airways Grp., Inc.*, 645 F. Supp. 2d 765 (D. Minn. 2009).

# TABLE OF CONTENTS

ISSUE PRESENTED ................................................................. i

CONTROLLING AND MOST APPROPRIATE AUTHORITIES ........................ ii

INTRODUCTION ................................................................ 1

FACTS AND PROCEDURAL HISTORY ........................................ 1

STANDARD OF REVIEW ....................................................... 6

ARGUMENT .................................................................... 6

I.  Ms. Hebshi's Arrest and Detention by the WCAA Defendants
    Violated Her Clearly Established Fourth Amendment Rights ...................... 7

    A.  No Probable Cause or Reasonable Suspicion Justified Arresting
        or Detaining Ms. Hebshi ...................................................... 7

        1.  The Seizure of Ms. Hebshi Was a *De Facto* Arrest that
            Required Probable Cause ............................................. 7

        2.  The Facts That Led to Ms. Hebshi's Detention Did Not
            Amount to Reasonable Suspicion or Probable Cause .............. 10

    B.  Ms. Hebshi's Right Not to Be Seized Absent Reasonable
        Suspicion or Probable Cause Was Clearly Established .................... 14

II. Ms. Hebshi's Strip Search by the WCAA Defendants Violated Her
    Clearly Established Fourth Amendment Rights .......................... 15

    A.  Strip Searching Ms. Hebshi Was Not Reasonable Under the
        Circumstances Described in the Complaint ....................... 15

        1.  Ms. Hebshi Suffered an Extreme Invasion of Her Privacy
            as a Result of the Strip Search ................................ 16

        2.  The Strip Search of Ms. Hebshi Was Not Reasonably
            Related to a Legitimate Penological Interest ......................... 18

    B.  Ms. Hebshi's Right Not to Be Strip Searched Under the
        Circumstances Alleged Was Clearly Established .............................. 20

III.   None of the WCAA Defendants Are Entitled to Qualified Immunity
       for Violating Ms. Hebshi's Fourth Amendment Rights ............................... 20

       A.   Grant and Johnson Failed to Investigate Tips About Ms. Hebshi ..... 21

       B.   DeBeau, Driscoll, and Wasiukanis Unjustifiably Ordered the
            Arrest, Detention, and Strip Search of Ms. Hebshi ........................... 22

       C.   Grant, Johnson, Bohn, Carmona, Bradley, and Parker Effected
            the Unlawful Arrest, Detention, and Strip Search of Ms. Hebshi...... 23

       CONCLUSION ..................................................................................................... 25

iv

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ahlers v. Schebil*,
188 F.3d 365 (6th Cir. 1999) ...................................................................13, 22

*Ashcroft v. al-Kidd*,
131 S. Ct. 2074 (2011)................................................................................7, 14

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)....................................................................................6, 20

*Bell v. Wolfish*,
441 U.S. 520 (1979)..........................................................................15, 16, 19

*Centanni v. Eight Unknown Officers*,
15 F.3d 587 (6th Cir. 1994) .......................................................................9, 14

*Daugherty v. Campbell*,
33 F.3d 554 (6th Cir. 1994) .............................................................................19

*Dobrowolskyj v. Jefferson County*,
823 F.2d 955 (6th Cir. 1987) ...........................................................................19

*Dorsey v. Barber*,
517 F.3d 389 (6th Cir. 2008) ...........................................................................24

*Dufrin v. Spreen*,
712 F.2d 1084 (6th Cir. 1983) .........................................................................17

*Dunaway v. New York*,
442 U.S. 200 (1979)...................................................................................9, 10

*Ellsworth v. Wachtel*,
No. 1:11-CV-0381, 2013 WL 140342 (N.D.N.Y. Jan. 11, 2013) ....................18

*Farag v. United States*,
587 F. Supp. 2d 436 (E.D.N.Y. 2008) .............................................................14

*Flonder v. Sheriff of Kankakee County*,
No. 12-2115, 2012 WL 4321714 (C.D. Ill. Aug. 31, 2013) ..............................18

v

*Florida v. Royer*,
  460 U.S. 491 (1983)..................................................................................8, 9, 14

*Graham v. Sequatchie County*,
  No. 1:10-cv-20, 2011 WL 1305961 (E.D. Tenn. Apr. 4, 2011) ..................18, 20

*Gregory v. City of Louisville*,
  444 F.3d 725 (6th Cir. 2006) ...............................................................23

*Handy-Clay v. City of Memphis, Tenn.*,
  695 F.3d 531 (6th Cir. 2012) .................................................................6

*Hayes v. Florida*,
  470 U.S. 811 (1985)..........................................................................7, 9

*Hoover v. Walsh*,
  682 F.3d 481 (6th Cir. 2012) .......................................................8, 9, 10

*Hope v. Pelzer*,
  536 U.S. 730 (2002)........................................................................14, 19

*Lindsay v. Yates*,
  498 F.3d 434 (6th Cir. 2007) .................................................................6

*Masters v. Crouch*,
  872 F.2d 1248 (6th Cir. 1989) ..............................................................20

*McGlone v. Bell*,
  681 F.3d 718 (6th Cir. 2012) .................................................................6

*Messerschmidt v. Millender*,
  132 S. Ct. 1235 (2012).................................................................*passim*

*Shqeirat v. U.S. Airways Grp., Inc.*,
  645 F. Supp. 2d 765 (D. Minn. 2009)..........................................10, 12, 13

*Stanley v. Henson*,
  337 F.3d 961 (7th Cir. 2003) ...............................................................17

*Stoudemire v. Mich. Dep't of Corr.*,
  705 F.3d 560 (6th Cir. 2013) .......................................................*passim*

*Stricker v. Twp. of Cambridge*,
    710 F.3d 350 (6th Cir. 2013) ..............................................................................11

*Terry v. Ohio*,
    392 U.S. 1 (1968)...........................................................................8, 10, 12, 14

*United States v. Cochrane*,
    702 F.3d 334 (6th Cir. 2012) ................................................................................8

*United States v. Jeter*,
    721 F.3d 746 (6th Cir. 2013) ................................................................................7

*United States v. Lopez-Medina*,
    461 F.3d 724 (6th Cir. 2006) ................................................................................7

*United States v. Lyons,*
    687 F.3d 754 (6th Cir. 2012) ..............................................................................24

*United States v. Mendenhall*,
    446 U.S. 544 (1980)............................................................................................10

*United States v. Place*,
    462 U.S. 696 (1983)..............................................................................................8

*United States v. Yang*,
    286 F.3d 940 (7th Cir. 2002) ..............................................................................10

*United States v. Young*,
    707 F.3d 598 (6th Cir. 2012) ..............................................................................14

*Washington v. Newsom*,
    977 F.2d 991 (6th Cir. 1992) ..............................................................................24

*Wilson v. City of Kalamazoo*,
    127 F. Supp. 2d 855 (W.D. Mich. 2000) ...........................................................16

*Wood v. Clemons*,
    89 F.3d 922 (1st Cir. 1996)................................................................................16

*Ybarra v. Illinois*,
    444 U.S. 85 (1979)..............................................................................................12

*Young v. County of Cook,*
   616 F. Supp. 2d 834 (N.D. Ill. 2009)................................................................17

**Other Authorities**

U.S. Const., Amend IV .......................................................................*passim*

## INTRODUCTION

On September 11, 2011, Plaintiff Shoshana Hebshi was handcuffed, forcibly removed from an airplane at gunpoint, pat searched, placed in the back of a police car, transported to a detention facility, strip searched, locked in a cell for hours, and interrogated at the Detroit Metropolitan Wayne County Airport—all without articulable facts linking her to any criminal offense.  In this suit seeking redress for this gross violation of her rights, the WCAA Defendants ask for qualified immunity on Ms. Hebshi's claim that her detention and strip search were unconstitutional.  Because the facts alleged in Ms. Hebshi's complaint show that each WCAA Defendant violated Ms. Hebshi's clearly established Fourth Amendment rights, Ms. Hebshi's claims should proceed to discovery.

## FACTS AND PROCEDURAL HISTORY

On September 11, 2011, Ms. Hebshi was traveling home to her husband and two young sons in Sylvania, Ohio, after visiting her sister in San Francisco. (Compl. ¶¶ 12, 39, Dkt. # 1.)  She flew first to Denver, then boarded a connecting flight run by Defendant Frontier Airlines, Inc. ("Frontier") to her destination, Detroit Metropolitan Wayne County Airport.  (*Id.* ¶¶ 39-41.)

On the flight out of Denver, Ms. Hebshi was seated in the same row as two South Asian men whom she did not know.  (*Id.* ¶¶ 42-44.)  During the flight, other passengers and flight attendants grew uneasy when they observed the two men

1

each spending between ten and twenty minutes in the restroom and standing in the aisle of the plane.  (*Id.* ¶ 45.)  After the flight attendants notified the pilot about this allegedly suspicious behavior, the pilot sent a message to Frontier's dispatcher seeking information about the two men.  (*Id.* ¶¶ 47-48.)

At no point during the flight did Ms. Hebshi leave her seat or speak with her two seatmates, and no one on the plane ever observed or reported anything suspicious about her or her conduct.  (*Id.* ¶¶ 42, 44, 46.)  Yet, when forwarding the pilot's message to other Frontier employees, a Frontier manager on the ground included a note that Ms. Hebshi "may be with" the two men in her row, based only on Ms. Hebshi's name and seat assignment.  (*Id.* ¶¶ 49-50.)

The email identifying Ms. Hebshi was passed along to WCAA Police, including Defendant Officer Grant.  (*Id.* ¶ 51.)  Various federal and WCAA officials then gathered at an inspection site to wait for the plane; among them were Defendant Jeremy Bohn, the Officer-in-Charge for the WCAA Police, and Defendant Mark DeBeau, Vice President of Public Safety for the WCAA. (*Id.* ¶¶ 54, 59-60.)  Defendant Officer Johnson contacted the pilot, who stated that a male passenger in Ms. Hebshi's row had entered the restroom for a long period while the other male passenger from the row stood outside.  (*Id.* ¶ 55.)  According to Johnson, the pilot added that the third passenger in the row (Ms. Hebshi) "may also be involved in the incident but is seated and compliant at this time."  (*Id.*)

2

At no point did any WCAA or federal official ask for information linking Ms. Hebshi to the allegedly suspicious conduct of the two men in her row.  (*Id.* ¶¶ 56, 62.)  The officers, including Johnson, Grant, and Defendant Captain Patrick Driscoll, instead devised a plan to divert and board the aircraft, handcuff and arrest Ms. Hebshi and her seatmates, and remove them to an airport detention facility for questioning.  (*Id.* ¶¶ 57-59, 61.)  DeBeau authorized this plan.  (*Id.* ¶¶ 59-60.)

After the flight landed in Detroit and the plane reached the inspection site, several heavily armed law enforcement officers—Defendant Detective Carmona, Bohn, Johnson, and others—boarded the aircraft and ran down the aisle. (*Id.* ¶¶ 66, 68.)  A stunned Ms. Hebshi complied when the officers ordered her and her seatmates to get up.  (*Id.* ¶ 70.)  The officers refused to answer her questions about what was happening as Carmona put her in handcuffs and forcibly removed her, frightened and humiliated, from the plane.  (*Id.* ¶¶ 71-74.)

Once outside, the officers shoved Ms. Hebshi against a police car, asked if she was wearing explosives, and pat searched her.  (*Id.* ¶¶ 75-76.)  She asked again what was happening, and again they did not reply.  (*Id.* ¶ 77.)  Defendant Corporal Bradley placed Ms. Hebshi in the back of a police car and drove her to the detention facility.  (*Id.* ¶ 78.)  Still handcuffed, she was taken to a six-by-ten foot cell.  (*Id.* ¶¶ 80-81.)  A male officer told Ms. Hebshi he would stand by the door of her cell to make sure she did not "flush anything" down the cell's toilet.  (*Id.* ¶ 83.)

3

Meanwhile, Defendant Lieutenant M. Wasiukanis, in consultation with Defendant John Brand of the FBI, decided that Ms. Hebshi and the two other passengers should be strip searched. (*Id.* ¶ 85.) However, there were no articulable facts that suggested Ms. Hebshi was concealing a weapon or a controlled substance or that connected her to any crime. (*Id.* ¶ 87.)

An hour passed, during which no evidence surfaced to justify a strip search of Ms. Hebshi. (*Id.* ¶ 88.) Defendant Officer Toya Parker then arrived on the scene, entered Ms. Hebshi's cell, and told Ms. Hebshi she would be strip searched. (*Id.* ¶ 89.) Afraid, Ms. Hebshi began to cry as Parker removed her handcuffs and instructed her to take off all of her clothing. (*Id.* ¶¶ 90-91.) Once Ms. Hebshi was completely naked, Parker told her to stand facing the wall, bend over, spread her buttocks, and cough. (*Id.* ¶¶ 91-92.) Parker then ran her fingers through Ms. Hebshi's hair, lifted her eyelids, and looked in her mouth. (*Id.* ¶¶ 93-94.) After this invasive and degrading search, Parker told Ms. Hebshi she could get dressed, then placed her back in handcuffs and left the cell. (*Id.* ¶¶ 95-97.)

After another two hours, an officer came and escorted Ms. Hebshi to an interview room, where two federal officers questioned her about her family, her previous travel, and the men seated next to her on the plane. (*Id.* ¶¶ 99-100.) After Ms. Hebshi had been detained for about three hours without any explanation, she was at last told why she had been arrested and strip searched: someone had

reported her seatmates as acting suspiciously during the flight. (*Id.* ¶ 101.) The interview lasted about a half hour; Ms. Hebshi's handcuffs were then removed and she was fingerprinted, asked the date and place of her birth, her weight, and her height, and returned to her cell. (*Id.* ¶¶ 102, 104.)

After all this, Ms. Hebshi was informed that she was being released with no charges. (*Id.* ¶¶ 106-07.) She was given permission to call her husband; upon reaching him, Ms. Hebshi began to cry. (*Id.* ¶ 107.) After another half hour, and a total of approximately four hours in detention, she was finally allowed to leave along with the two men from the plane. (*Id.* ¶¶ 4, 108.) Federal officials have since publicly stated that Ms. Hebshi was not involved in any suspicious activity. (*Id.* ¶ 4.) To this day, Ms. Hebshi still feels anxiety while traveling and is distressed and humiliated about being forced to endure this experience. (*Id.* ¶ 109.)

On January 22, 2013, Ms. Hebshi initiated the instant suit based on these events against the United States, Frontier, and various federal and WCAA law enforcement officials. (*Id.* ¶¶ 6-8.) With respect to the WCAA Defendants, Ms. Hebshi claims: (1) DeBeau, Bohn, Driscoll, Grant, Wasiukanis, Carmona, Johnson, and Bradley violated her Fourteenth Amendment right to equal protection of the law (Count IV), (*id.* ¶¶ 132-38); (2) DeBeau, Bohn, Driscoll, Grant, Wasiukanis, Carmona, Johnson, and Bradley violated her Fourth Amendment right to be free from unreasonable seizure (Count V), (*id.* ¶¶ 139-45); and (3) Wasiukanis and

5

Parker violated her Fourth Amendment right to be free from unreasonable searches (Count VI), (*id.* ¶¶ 146-52).  Before the Court is the WCAA Defendants' joint motion for partial judgment on the pleadings with respect to Ms. Hebshi's Fourth Amendment Claims.  (Dkt. # 89.)

## STANDARD OF REVIEW

The WCAA Defendants' motion for judgment on the pleadings is evaluated under the failure-to-state-a-claim rubric of Federal Rule of Civil Procedure 12(b)(6).  *See Lindsay v. Yates*, 498 F.3d 434, 438 (6th Cir. 2007).  A complaint successfully states a claim when it shows "facial plausibility" by including "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  Dismissal at the pleadings stage "is disfavored, especially when one's civil rights are at stake," *McGlone v. Bell*, 681 F.3d 718, 728 (6th Cir. 2012), and is inappropriate unless "it appears beyond doubt that the plaintiff can prove no set of facts [that] would entitle him to relief," *Handy-Clay v. City of Memphis, Tenn.*, 695 F.3d 531, 538 (6th Cir. 2012) (internal quotation marks omitted).

## ARGUMENT

The extreme invasion of Ms. Hebshi's privacy that occurred on September 11, 2011, was a violation of the Fourth Amendment "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches

6

and seizures." U.S. Const. amend. IV. Ms. Hebshi overcomes the WCAA

Defendants' claim of qualified immunity by "plead[ing] facts showing (1) that

[Defendants] violated a statutory or constitutional right, and (2) that the right was

'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*,

131 S. Ct. 2074, 2080 (2011). She has done so here.

## I.   Ms. Hebshi's Arrest and Detention by the WCAA Defendants Violated Her Clearly Established Fourth Amendment Rights

### A.   No Probable Cause or Reasonable Suspicion Justified Arresting or Detaining Ms. Hebshi

Law enforcement officers undoubtedly detained Ms. Hebshi "under

circumstances where a reasonable person would not feel free to leave," thereby

triggering the protections of the Fourth Amendment. *See United States v. Lopez-*

*Medina*, 461 F.3d 724, 739 (6th Cir. 2006). "There are two types of seizure

recognized under Fourth Amendment jurisprudence: arrests, for which there must

be probable cause, and temporary detentions, such as an investigatory stop, which

require a lesser showing of reasonable suspicion." *United States v. Jeter*, 721 F.3d

746, 751 (6th Cir. 2013). Defendants' seizure of Ms. Hebshi met neither standard.

#### 1.   The Seizure of Ms. Hebshi Was a *De Facto* Arrest that Required Probable Cause

The circumstances of Ms. Hebshi's detention were "so intrusive with respect

to [her] freedom of movement and privacy interests" that it constituted an arrest

requiring probable cause. *See Hayes v. Florida*, 470 U.S. 811, 815-16 (1985).

7

Contrary to the WCAA Defendants' assertion, Ms. Hebshi's detention was not a mere investigatory stop that, under *Terry v. Ohio*, 392 U.S. 1 (1968), qualifies for a "limited exception[] to the general rule that seizures of the person require probable cause to arrest." *Florida v. Royer*, 460 U.S. 491, 499 (1983) (plurality opinion).

To fall within *Terry*, "an investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop." *Id.* at 500. Ms. Hebshi was detained for approximately four hours, and she was not questioned by law enforcement officers or told the reason for her detention until after she had been handcuffed in a locked cell for more than three hours. (*See* Compl. ¶¶ 1, 88, 99, 101.) A detention lasting three to four hours is far beyond the pale of a "valid *Terry* stop," which "must be 'limited in . . . duration.'" *United States v. Cochrane*, 702 F.3d 334, 340 (6th Cir. 2012) (quoting *Royer*, 460 U.S. at 500). In *United States v. Place*, 462 U.S. 696 (1983), the Supreme Court reiterated that it has "never approved a seizure of the person for [a] prolonged 90-minute period"—less than half the time for which Ms. Hebshi was detained. 462 U.S. at 709-10.

Similarly, in a *Terry* stop, "the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time." *Royer*, 460 U.S. at 500. In *Hoover v. Walsh*, 682 F.3d 481 (6th Cir. 2012), the Sixth Circuit stated that whether an investigative detention had been conducted reasonably depends on "factors such as [1] the

8

transportation of the detainee to another location, [2] significant restraints on the detainee's freedom of movement involving physical confinement or other coercion preventing the detainee from leaving police custody, and [3] the use of weapons or bodily force."  682 F.3d at 498 (internal quotation marks omitted).

Each of these factors indicates that Ms. Hebshi's detention was, in fact, an arrest requiring probable cause.  First, Ms. Hebshi was forcibly transported from her seat on the airplane to a police car on the tarmac, then to a detention facility.  "[T]he removal of a suspect from the scene of the stop generally marks the point at which the Fourth Amendment demands probable cause."  *Centanni v. Eight Unknown Officers*, 15 F.3d 587, 591 (6th Cir. 1994); *see also Hayes*, 470 U.S. at 816.  The Supreme Court has held, for example, that an airport stop became an arrest when police moved the detainee from the concourse to an interrogation room.  *Royer*, 460 U.S. at 502-03 (plurality opinion); *accord id*. at 509 (Brennan, J., concurring in judgment).  Second, Ms. Hebshi, confined in handcuffs and a locked cell, experienced "significant restraints on [her] freedom of movement involving physical confinement."  *See Hoover*, 682 F.3d at 498.  "[D]etention for custodial interrogation—regardless of its label—intrudes so severely on interests protected by the Fourth Amendment as necessarily to trigger the traditional safeguards against illegal arrest."  *Dunaway v. New York*, 442 U.S. 200, 216 (1979).  Third, the detaining officers "use[d] weapons [and] bodily force" on Ms.

9

Hebshi when they stormed the aircraft heavily armed and forced Ms. Hebshi off the plane, into a police car, and into a cell.  *See Hoover*, 682 F.3d at 498.

Under these circumstances, Ms. Hebshi was subject to a *de facto* arrest. *Accord Shqeirat v. U.S. Airways Grp., Inc.*, 645 F. Supp. 2d 765, 783 (D. Minn. 2009) (finding *de facto* arrest when individuals removed from an airplane "were placed in handcuffs, pat searched, had their personal belongings removed and inventoried, and were transported in the police cruisers to the police command center").  If the *Terry* exception were construed to "cover a seizure as intrusive as that in this case," it "would threaten to swallow the general rule that Fourth Amendment seizures are 'reasonable' only if based on probable cause."  *See Dunaway*, 442 U.S. at 213.[1]

### 2.   The Facts That Led to Ms. Hebshi's Detention Did Not Amount to Reasonable Suspicion or Probable Cause

The facts known to law enforcement officers at the time Ms. Hebshi was seized did not provide probable cause for an arrest, or even reasonable suspicion for an investigatory stop.  "For probable cause to arrest to exist, the facts and

---

[1] *United States v. Yang*, 286 F.3d 940 (7th Cir. 2002), cited by the WCAA Defendants, is not to the contrary.  The *Yang* court stated in dicta that, in the "unique situation" of that case, handcuffing a detainee while transporting him between airport terminals did not transform a *Terry* stop into an arrest.  286 F.3d at 950.  But, unlike Ms. Hebshi, Yang *agreed* to return with customs agents to the other terminal.  *Id.* at 944.  When a suspect consents to accompany law enforcement officers to a different location, a seizure mandating Fourth Amendment protections does not occur.  *See United States v. Mendenhall*, 446 U.S. 544, 557 (1980).

circumstances within the officer's knowledge must be sufficient to warrant a prudent person in believing that the suspect has committed, is committing or is about to commit an offense." *Stricker v. Twp. of Cambridge*, 710 F.3d 350, 362 (6th Cir. 2013) (internal quotation marks and alterations omitted).  Nowhere in their brief do the WCAA Defendants even attempt to argue that they had probable cause to arrest Ms. Hebshi.  The minimal facts known to officers at the time of Ms. Hebshi's detention do not come close to meeting this standard.

The WCAA Defendants cite four facts that purportedly gave them reason to detain Ms. Hebshi: (1) the incident occurred on the tenth anniversary of the 9/11 terrorist attacks; (2) the incident occurred at an airport that had been the target of the "Underwear Bomber" two years earlier; (3) while in flight, passengers and flight crew reported that two men were allegedly acting suspiciously; and (4) Frontier staff identified Ms. Hebshi as potentially involved in the incident.  (S*ee* WCAA Defs.' Br. Supp. Joint Mot. Partial J. Pleadings 15-16.)  Taken together, these do not amount to probable cause.

Significantly, the first three of these four facts do not concern Ms. Hebshi at all.  Officers' generalized "hunch" that illegal activity might be more likely to occur on the anniversary of the September 11th terrorist attacks or at the Detroit airport is an "inchoate and unparticularized suspicion" that does not justify stopping any specific individual.  *See Terry*, 392 U.S. at 27.  "Unquestionably the

11

events of 9/11 changed the calculus in the balance American society chooses to make, especially in airport settings, between liberty and security." *Shqeirat*, 645 F. Supp. 2d at 788. "But when a law enforcement officer exercises the power of the Sovereign over its citizens, she or he has a responsibility to operate within the bounds of the Constitution and cannot raise the specter of 9/11 as an absolute exception to that responsibility." *Id.*

Against this backdrop, the WCAA Defendants received a tip from Frontier that the flight crew on an inbound plane "believed" two male passengers were "acting strangely" and "repeatedly using the restroom," and that "a male passenger from row 12 had entered the airplane restroom for a long period of time, while the other man from row 12 stood outside." (Compl. ¶¶ 48, 55.) Even if these sparse reports provided probable cause for detaining the two men, they did not for Ms. Hebshi. "[A] search or seizure of a person must be supported by probable cause particularized with respect to that person. This requirement cannot be undercut or avoided by simply pointing to the fact that coincidentally there exists probable cause to search or seize another." *Ybarra v. Illinois*, 444 U.S. 85, 91 (1979).

That leaves the fourth and final fact, the only that pertains to Ms. Hebshi. An on-the-ground Frontier employee speculated that Ms. Hebshi "might also be with" the two "suspicious" men. (Compl. ¶¶ 46, 49.) Later, according to Johnson, the pilot told him "a third passenger seated in 12A may also be involved in the

12

incident but is seated and compliant at this time." (*Id.* ¶ 55.) The only description of Ms. Hebshi's behavior, allegedly given by the pilot, was that she was currently "seated and compliant"—in short, that she was *not* acting suspiciously. (*Id.* ¶ 55).

The WCAA Defendants acted unreasonably in failing to ascertain why Frontier employees had identified Ms. Hebshi as potentially "with" her seatmates or "involved in the incident." (*Id.* ¶¶ 49, 55.) The Fourth Amendment prohibits officers from making "hasty, unsubstantiated arrests" based on "incomplete, poorly conducted investigations." *Ahlers v. Schebil*, 188 F.3d 365, 371 (6th Cir. 1999). Hence, in *Shqierat*, the court found that, even if officers believed "there might be evidence approaching probable cause" to arrest six airplane passengers of Middle Eastern descent about whom a passenger had expressed concern to the pilot, "their next action should have been to check the veracity of this information." 645 F. Supp. 2d at 785. Because "a cursory investigation by the officers would have cast further doubt about many of the 'facts' raising suspicion," the officers lacked even "arguable probable cause" to detain the passengers. *Id.*

The information reported about Ms. Hebshi was even less concrete than what was known about the *Shqierat* plaintiffs, who had requested seatbelt extensions, taken a "mysterious" seating arrangement on the plane, and been heard praying loudly before the flight and criticizing U.S. involvement in Iraq. *Id.* Defendants thus surely lacked probable cause to arrest Ms. Hebshi on the bare

13

assertions provided in the Frontier tip.  *See also Farag v. United States*, 587 F. Supp. 2d 436, 457-68 (E.D.N.Y. 2008) (rejecting officers' claim that plaintiffs' Arab ethnicity taken with "a number of benign circumstances" alleged to be suspicious provided probable cause).  Indeed, Defendants likely lacked "specific and articulable facts which gave rise to reasonable suspicion of criminal activity" permitting even a *Terry* stop.  *See United States v. Young*, 707 F.3d 598, 603 (6th Cir. 2012) (internal quotation marks omitted).

### B. Ms. Hebshi's Right Not to Be Seized Absent Reasonable Suspicion or Probable Cause Was Clearly Established

"Whether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the objective legal reasonableness of the action, assessed in light of the legal rules that were clearly established at the time it was taken."  *Messerschmidt v. Millender*, 132 S. Ct. 1235, 1245 (2012) (internal quotation marks and alteration omitted).  It is not necessary that there have been "a case directly on point," *al-Kidd*, 131 S. Ct. at 2083, only that existing precedent give officials "fair warning" that their conduct violates a constitutional right, *Hope v. Pelzer*, 536 U.S. 730, 741 (2002).

Decades of Supreme Court and Sixth Circuit precedent place beyond doubt that a detention as extended and intrusive as Ms. Hebshi's qualifies as an arrest requiring probable cause.  *See, e.g.*, *Royer*, 460 U.S. at 502-03; *Centanni*, 15 F.3d at 592 ("[I]t has been clearly established that—regardless of any exigent

circumstances—the seizure and removal to the station house of an individual who is not suspected of any criminal activity constitutes a de facto arrest requiring probable cause.  Surely, any reasonable official would understand that a warrantless intrusion of this degree has simply never been tolerated by this court or any other.").  That the WCAA Defendants did not have probable cause to arrest Ms. Hebshi is also beyond cavil; indeed, the WCAA Defendants themselves do not assert this in their brief.  Consequently, Ms. Hebshi's arrest and detention amounted to a violation of her clearly established Fourth Amendment rights.

## II.  Ms. Hebshi's Strip Search by the WCAA Defendants Violated Her Clearly Established Fourth Amendment Rights

### A.  Strip Searching Ms. Hebshi Was Not Reasonable Under the Circumstances Described in the Complaint

The reasonableness of a search of a detainee like Ms. Hebshi "requires a balancing of the need for the particular search against the invasion of personal rights that the search entails."  *Bell v. Wolfish*, 441 U.S. 520, 559 (1979).  To assess whether a particular search is reasonable, a court first "examine[s] the scope, manner, and location of the search—as well as the justification for initiating it—in order to assess the degree to which it invaded the prisoner's right to privacy."  *Stoudemire v. Mich. Dep't of Corr.*, 705 F.3d 560, 572 (6th Cir. 2013).  Then, the court "determine[s] whether the search was reasonably related to legitimate penological interests" by evaluating the "need for the search, giving due

deference to the correctional officer's exercise of her discretionary functions," against the invasion. *Id.* The asserted need for Ms. Hebshi's strip search is far outweighed by its severe intrusiveness, in violation of the Fourth Amendment.

### 1. Ms. Hebshi Suffered an Extreme Invasion of Her Privacy as a Result of the Strip Search

"[A] strip search, by its very nature, constitutes an extreme intrusion upon personal privacy, as well as an offense to the dignity of the individual." *Wood v. Clemons*, 89 F.3d 922, 928 (1st Cir. 1996) (internal quotation marks omitted), *quoted in Stoudemire*, 705 F.3d at 572. "It is a practice that 'instinctively gives us . . . pause,' since '[u]ndergoing such an inspection is undoubtedly humiliating and deeply offensive to many . . . .'" *Stoudemire*, 705 F.3d at 572-73 (quoting *Bell*, 441 U.S. at 558, and *Florence*, 132 S. Ct. at 1524 (Alito, J., concurring)).

The specific facts of Ms. Hebshi's search establish that it was maximally intrusive in scope, even for a strip search. First, Ms. Hebshi was told by Parker to remove all clothing, including her undergarments. (Compl. ¶ 91.) That Ms. Hebshi was completely naked for her strip search weighs heavily on the degree of the search's intrusiveness. *See Wilson v. City of Kalamazoo*, 127 F. Supp. 2d 855, 861 (W.D. Mich. 2000). Second, as part of the strip search, Parker instructed Ms. Hebshi to bend over, spread her buttocks, and cough. (Compl. ¶ 92.) In what is already a humiliating experience, this "bend-and-spread" method has been referred to as "less dignified" than the "squat-and-cough" method, *Young v. County of*

16

*Cook,* 616 F. Supp. 2d 834, 851 (N.D. Ill. 2009), and approximates a more invasive

"visual body cavity search," *see Dufrin v. Spreen*, 712 F.2d 1084, 1085 (6th Cir.

1983). Third, during the strip search, Parker felt through Ms. Hebshi's hair, lifted

her eyelids, and looked in her mouth. (Compl. ¶¶ 92-94.) Physical contact during

the strip search is a gross intrusion. *Cf. Stanley v. Henson*, 337 F.3d 961, 965 (7th

Cir. 2003) (characterizing search as a "narrow intrusion" in part because detainee

retained some clothing, was not subjected to a body cavity inspection, and was not

touched by jail officers).

Moreover, although the strip search took place in a cell where Ms. Hebshi

was the sole occupant, it was conducted under less-than-private conditions. A

male guard was positioned by Ms. Hebshi's cell door. There is no indication that

he left during Ms. Hebshi's strip search. (*See* Compl. ¶ 83.) Also, a video camera

hung in Ms. Hebshi's cell. (*Id.* ¶ 84.) Even Parker acknowledged that the presence

of the camera intensified the strip search's intrusiveness when she instructed Ms.

Hebshi to disrobe facing away from the camera. (*Id.* ¶ 91.)

The vacuum of information in which Ms. Hebshi's search took place also

made it more invasive. No one told Ms. Hebshi why she was removed from the

flight until two hours after the strip search. (*See id.* ¶¶ 77, 99, 101.) Ms. Hebshi's

humiliating ordeal was made even more terrible by being in the dark about the

alleged basis for the strip search. *See Stoudemire*, 705 F.3d at 573 (finding

officer's manner contributed to invasiveness of search when officer refused to tell

detainee reason for search).

### 2.    The Strip Search of Ms. Hebshi Was Not Reasonably Related to a Legitimate Penological Interest

The WCAA Defendants assert that *Florence* categorically allows the strip

search of an individual being held in a detention center.  (Defs.' Br. Supp. Joint

Mot. Partial J. Pleadings 24.)  However, the Court in *Florence* specified that it was

*not* deciding "whether an arrestee whose detention has not yet been reviewed by a

magistrate or other judicial officer, and who can be held in available facilities

removed from the general population," may be subject to strip searches.  132 S. Ct.

at 1523; *see also id.* at 1522 (declining to rule "on the types of searches that would

be reasonable in instances where . . . a detainee will be held without assignment to

the general population and without substantial contact with other detainees.").

Ms. Hebshi was arrested without probable cause and her detention was not

reviewed by a judicial officer, facts that not only distinguish *Florence*, *see Flonder

v. Sheriff of Kankakee County*, No. 12-2115, 2012 WL 4321714, at *5-6 (C.D. Ill.

Aug. 31, 2013), but also make the strip search *a priori* unconstitutional, *see

Graham v. Sequatchie County*, No. 1:10-cv-20, 2011 WL 1305961, at *33 (E.D.

Tenn. Apr. 4, 2011).  Moreover, Ms. Hebshi was held alone, not introduced to a

general jail population, which also makes *Florence* inapposite.[2]  *See Ellsworth v. Wachtel*, No. 1:11-CV-0381, 2013 WL 140342, at *5 (N.D.N.Y. Jan. 11, 2013).

*Florence* did not obviate consideration of "'the need for the *particular* search' at issue," *Stoudemire*, 705 F.3d at 573 (quoting *Bell*, 441 U.S. at 559), and the security interests of a detention facility do not always outweigh the detainees' privacy interests, *Dobrowolskyj v. Jefferson County*, 823 F.2d 955, 957 (6th Cir. 1987).  Under the circumstances of this case, ensuring security cannot justify the strip search.  Prior to being detained, Ms. Hebshi was not acting suspiciously and was not reported by passengers or flight attendants as acting suspiciously.  (*Id.* ¶ 46.)  A pat down of Ms. Hebshi revealed no evidence of contraband or a concealed weapon.  (*See id.* ¶¶ 75-76.)  Most crucially, the WCAA Defendants waited an entire hour to strip search Ms. Hebshi after bringing her into custody, belying their claim that Ms. Hebshi posed such an immediate security risk as to warrant a strip search.  In short, there were no articulable facts connecting Ms. Hebshi to criminal activity, so the strip search was unconstitutional.  *Cf. Daugherty v. Campbell*, 33 F.3d 554, 555-56 (6th Cir. 1994) (unconfirmed information that prison visitor was smuggling drugs was not reasonable cause for strip search).

---

[2] The *Florence* court identified a penological interest in detecting disease, gang affiliation, or contraband at intake—before the detainee was introduced to the general population—so as to prevent new inmates from exposing others at the facility, to harm.  132 S. Ct. at 1518-22.  These interests are not relevant here.

19

**B.      Ms. Hebshi's Right Not to Be Strip Searched Under the Circumstances Alleged Was Clearly Established**

The WCAA Defendants had "fair warning" that their actions violated Ms. Hebshi's rights, *Hope*, 536 U.S. 730, "in light of the legal rules that were clearly established at the time" of the strip search, *Messerschmidt*, 132 S. Ct. at 1245 (internal quotation marks omitted).  As with Ms. Hebshi's unreasonable seizure claim, Supreme Court and Sixth Circuit law at the time of Ms. Hebshi's ordeal could not have been clearer:  When the detainee is unlikely to come in contact with other detainees, and absent suspicion that the detainee is armed or concealing contraband, a strip search is permissible only if it was "reasonable under the circumstances and performed pursuant to a legitimate penological justification." *Stoudemire*, 705 F.3d at 575; *see also Masters v. Crouch*, 872 F.2d 1248 (6th Cir. 1989); *Graham*, 2011 WL 1305961, at *34.  Thus, Ms. Hebshi's right not to be strip searched under the circumstances presented here was clearly established.[3]

**III.   None of the WCAA Defendants Are Entitled to Qualified Immunity for Violating Ms. Hebshi's Fourth Amendment Rights**

To state a claim that will survive the WCAA Defendant's qualified-immunity defense, Ms. Hebshi must show that "each Government-official

---

[3] As *Florence* was issued after the events at issue, the WCAA Defendants cannot rely on it to demonstrate lack of clarity as to whether Ms. Hebshi's strip search violated her Fourth Amendment rights.  *See Messerschmidt*, 132 S. Ct. at 1245 (confirming that qualified immunity inquiry assesses an officer's action "in light of the legal rules that were clearly established *at the time it was taken*" (emphasis added) (internal quotation marks omitted)).

defendant, through the official's own individual actions, has violated the Constitution." *Iqbal*, 556 U.S. at 676.  The WCAA Defendants devote the majority of their brief to parsing Ms. Hebshi's allegations about each WCAA Defendant's role in her arrest, detention, and strip search, insisting that, when viewed individually, no single Defendant's actions violated Ms. Hebshi's constitutional rights.  But Ms. Hebshi has alleged specific facts showing that each named WCAA Defendant participated in some aspect of her arrest, detention, or strip search, without justification.  This is enough to move beyond the pleadings.

### A.    Grant and Johnson Failed to Investigate Tips About Ms. Hebshi

Grant received the email from Frontier stating that Ms. Hebshi "might also be with" the two male passengers reportedly acting suspiciously, and Johnson was allegedly told by the pilot that the passenger in Ms. Hebshi's seat "may also be involved in the incident but is seated and compliant at this time."  (Compl. ¶¶ 49, 51, 55.)  Grant and Johnson were thus responsible for investigating the veracity of the information provided by Frontier before passing it on to other officers.

Both Grant and Johnson failed in this.  The email from Frontier revealed, on its face, that the captain had requested information only about the two passengers seated next to Ms. Hebshi who the flight crew believed were "acting strangely," and it was an on-the-ground employee who added, with no explanation, a note that Ms. Hebshi "might also be with" these two passengers.  (*Id.* ¶¶ 48-49.)  Had Grant

investigated the discrepancy between the pilot's message and the employee's email, he might have determined that there was no reasonable suspicion to detain Ms. Hebshi since she was reported based only on her name and seat assignment. (*See id.* ¶ 50.)  Similarly, when Johnson was informed by the pilot that the passenger in Ms. Hebshi's seat "may also be involved in the incident," the appropriate response would have been to ask the pilot for the facts underlying this supposition, like those the pilot had provided for the two other passengers.  (*Id.* ¶ 55.)  Grant's and Johnson's "incomplete, poorly conducted investigations" into the facts allegedly justifying Ms. Hebshi's detention preclude them from receiving qualified immunity.  *See Schebil*, 188 F.3d at 371; *cf. id.* at 372 ("[O]fficers, in the process of determining whether probable cause exists, cannot simply turn a blind eye toward potentially exculpatory evidence known to them in an effort to pin a crime on someone.").

### B.   DeBeau, Driscoll, and Wasiukanis Unjustifiably Ordered the Arrest, Detention, and Strip Search of Ms. Hebshi

DeBeau, Driscoll, and Wasiukanis determined whether to detain Ms. Hebshi and the circumstances of her ultimate detention.  Driscoll, after being informed about the Frontier email reviewed by Grant, decided a tactical entry of the plane was necessary and recommended to DeBeau that Ms. Hebshi and her two seatmates be removed to the detention site; he later told agents to handcuff Ms. Hebshi and the two others on contact.  (Compl. ¶¶ 59, 61.)  DeBeau authorized that

22

tactical entry and the decision to remove and detain Ms. Hebshi and her seatmates. (*Id.* ¶ 60.) Once Ms. Hebshi and the others were in detention, Wasiukanis was one of the officials who made the decision to strip search them. (*Id.* ¶ 85.)

To justify detention under the conditions imposed on Ms. Hebshi, Driscoll, DeBeau, and Wasiukanis were required to have probable cause, yet they lacked even reasonable suspicion. *See supra* Section I.A.2. That these Defendants did not personally seize or search Ms. Hebshi does not insulate them from liability, since they actively participated in the seizure and search by ordering that they be performed. *See Gregory v. City of Louisville*, 444 F.3d 725, 751 (6th Cir. 2006) (§ 1983 liability attaches to superior officials who "somehow encouraged or condoned the actions of their inferiors"). Driscoll, DeBeau, and Wasiukanis are not entitled to qualified immunity.

### C. Grant, Johnson, Bohn, Carmona, Bradley, and Parker Effected the Unlawful Arrest, Detention, and Strip Search of Ms. Hebshi

Grant, Johnson, Bohn, Carmona and Bradley executed the arrest, detention, and strip search of Ms. Hebshi: Grant and Johnson organized the tactical entry onto the plane with the objective of forcing Ms. Hebshi and her seatmates off the plane, (Compl. ¶ 58); Bohn, Carmona, and Johnson helped execute the tactical entry and forcibly removed Ms. Hebshi and her seatmates from the plane, after Carmona placed Ms. Hebshi in handcuffs (*id.* ¶¶ 68, 72); Bradley put Ms. Hebshi in a police car and transported her from the plane to the detention facility, (*id.* ¶ 78); and

23

Parker performed the strip search of Ms. Hebshi (*id.* ¶¶ 89-97).  Again, all of these actions were taken without reasonable suspicion or probable cause.

To be sure, the WCAA Defendants in taking such actions may rely not only on their own direct observations, but also on "such sources as informant tips, dispatch information, and directions from other officers."  *Dorsey v. Barber*, 517 F.3d 389, 395 (6th Cir. 2008).  However, "if an investigating officer lacked sufficient information to satisfy the reasonable suspicion requirement, and the responding officer's subsequent observations did not produce reasonable suspicion, then the stop violates the Fourth Amendment."  *United States v. Lyons,* 687 F.3d 754, 766 (6th Cir. 2012) (internal quotation marks and alteration omitted).  Taken as a whole, the information known to law enforcement did not justify Ms. Hebshi's arrest, detention, and strip search, so qualified immunity is inappropriate.

Each WCAA Defendant's specific role in Ms. Hebshi's arrest, detention, and strip search, and the particular knowledge they possessed, are highly fact-intensive inquires.  Where, as here, "the legal question of immunity is dependent upon which view of the facts the trier of fact accepts," dismissal before any factual development is especially inappropriate.  *See Washington v. Newsom*, 977 F.2d 991, 996 (6th Cir. 1992) (internal quotation marks omitted).  Ms. Hebshi has pleaded a violation of clearly established law through objectively unreasonable actions by each WCAA Defendant.  At this stage, she need not do more.

## CONCLUSION

For these reasons, Ms. Hebshi respectfully requests that the Court deny the

WCAA Defendants' motion for partial judgment on the pleadings.

Respectfully submitted,

Michael J. Steinberg (P43085)
Kary L. Moss (P49759)
Brooke Merriweather-Tucker
AMERICAN CIVIL LIBERTIES UNION
    FUND OF MICHIGAN
2966 Woodward Avenue
Detroit, MI 48201
(313) 578-6823
msteinberg@aclumich.org
kmoss@aclumich.org
btucker@aclumich.org

Dennis Parker
Rachel E. Goodman
AMERICAN CIVIL LIBERTIES UNION
    FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2500
rgoodman@aclu.org
dparker@aclu.org

 *s/Sarah E. Tremont*

William H. Goodman (P14173)
Julie H. Hurwitz (P34720)
Kathryn Bruner James (P71374)
Miriam R. Nemeth  (P76789)
GOODMAN & HURWITZ, P.C.
Cooperating Attorneys, American Civil
    Liberties Union Fund of Michigan
1394 E. Jefferson Ave.
Detroit, MI 48207
(313) 567-6170
bgoodman@goodmanhurwitz.com
jhurwitz@goodmanhurwitz.com
kjames@goodmanhurwitz.com
mnemeth@goodmanhurwitz.com

Anna P. Engh
Shelli L. Calland
Arjun Sethi
Sarah E. Tremont (P73809)
COVINGTON & BURLING LLP
1201 Pennsylvania Ave., N.W.
Washington D.C. 20004
(202) 662-6000
aengh@cov.com
scalland@cov.com
asethi@cov.com
stremont@cov.com

*Attorneys for Plaintiff*
SHOSHANA HEBSHI

Dated: December 24, 2013

25

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 24, 2013, I electronically filed the

foregoing paper with the Clerk of the Court using the ECF system, which will send

notification of such filing to the following:

> Lynn Marie Dodge, lynn.dodge@usdoj.gov
> Sarah E. Whitman, sarah.whitman@usdoj.gov
> Alexander A. Ayar, AAyar@FosterSwift.com
> Brian T. Maye, bmaye@amm-law.com
> Steven L. Boldt, sboldt@amm-law.com
> Alan B. Havis, ahavis@AirportDefender.com
> Lindsey A. Kaczmarek, lkaczmarek@cmda-law.com
> T. Joseph Seward, tjseward@cmda-law.com

*s/Sarah E. Tremont*
Sarah E. Tremont
COVINGTON & BURLING LLP
1201 Pennsylvania Ave., N.W.
Washington, D.C.  20004
(202) 662-6000
stremont@cov.com
