```
 1                UNITED STATES DISTRICT COURT
                 EASTERN DISTRICT OF MICHIGAN
 2                     SOUTHERN DIVISION


 3
      SHOSHANA HEBSHI,
 4
                     Plaintiff,
 5

 6    -v-                                  Case No. 13-cv-10253

 7
      UNITED STATES OF AMERICA,
 8    FRONTIER AIRLINES, INC., JOHN
      BRAND, ROBERT BALL, PAUL BRUMLEY,
 9    MARK DEBEAU, JEREMY BOHN, PATRICK
      DRISCOLL, CHARLES JOHNSON, KEVIN
10    GRANT, LIEUTENANT WASIUKANIS,
      TOYA PARKER, JOHN CARMONA, DAVID
11    LAKATOS, OFFICER BRADLEY and
      NATHANIEL DEVINS,
12
                     Defendants.
13
      -and-
14
      MARK DEBEAU, KEVIN GRANT, TOYA
15    PARKER, JOHN CARMONA, CHARLES
      JOHNSON, JEREMY BOHN, PATRICK
16    DRISCOLL, LIEUTENANT WASIUKANIS
      and OFFICER BRADLEY,
17
                   Cross-Plaintiffs,
18
      -v-
19
      FRONTIER AIRLINES, INC.,
20
                   Cross-Defendants,
21
      _____/
22

23           DEFENDANTS' MOTIONS TO DISMISS, ET AL

24          BEFORE HONORABLE TERRENCE G. BERG

25       Flint, Michigan, Monday, February 10th, 2014.
```

```
 1   APPEARANCES:

 2   FOR THE PLAINTIFF:      SARAH E. TREMONT
                             SHELLI CALLAND
 3                           1201 Pennsylvania Avenue, N.W.
                             WASHINGTON, D.C. 48009
 4

 5   FOR THE PLAINTIFF:      JULIE H. HURWITZ
                             1394 East Jefferson Avenue
 6                           Detroit, MI 48207

 7
     FOR THE DEFENDANTS:     SARAH E. WHITMAN
 8                           U.S. DEPARTMENT OF JUSTICE
                             P.O. Box 7146
 9                           Ben Franklin Station
                             WASHINGTON D.C. 20044
10

11   FOR THE DEFENDANTS:     T. JOSEPH SEWARD
                             33900 Schoolcraft
12                           Suite G-1
                             Livonia, MI 48150-1392
13

14   FOR THE DEFENDANTS:     ALAN B. HAVIS
                             25505 West Twelve Mile Road
15                           Suite 1000
                             Southfield, MI 48034
16

17   FOR FRONTIER AIRLINES:  BRIAN T. MAYE
                             One North LaSalle Street
18                           Suite 2300
                             Chicago, IL  60602
19

20

21   David B. Yarbrough, CSR, FCRR
     Official Court Reporter
22   (313) 410-7000

23

24

25
```

TABLE OF CONTENTS

PAGE

WITNESSES:

NONE

EXHIBITS

NONE

```
 1          Flint, Michigan

 2          Monday, February 10th, 2014.

 3          At or about 3:09 p.m.

 4                  --    ---    --

 5          THE CLERK OF THE COURT:  All rise.  Hear ye, hear ye,

 6   hear ye, the United States District Court for the Eastern

 7   District of Michigan is now in session, the Honorable Terrence

 8   G. Berg presiding.  All ye having business before the Court

 9   draw nigh, give attention and ye shall be heard.  God save the

10   United States of America and this Honorable Court.  You may be

11   seated.  The Court calls case number 13-10253, Shoshana Hebshi

12   versus the United States of America, et al.

13          THE COURT:  All right.  Good afternoon, everyone.

14   Let me just introduce our court reporter.  Today we have

15   Mr. David Yarbrough, thank you for your service today and we

16   also have our law clerk, Mr. Trent Crable.  Will counsel please

17   place your appearances on the record for whoever's going to

18   be -- well, everyone at counsel table.  Why don't we do that.

19          MS. TREMONT:  Sarah Tremont for the plaintiff.

20          MS. CALLAND:  Shelli Calland for the plaintiff.

21          MS. HURWITZ:  Good afternoon, your Honor.  Julie

22   Hurwitz for the plaintiff, your Honor.

23          MS. WHITMAN:  Good afternoon, your Honor.  Sarah

24   Whitman for the individual federal defendants Robert Ball, Paul

25   Brumley, Jonathan Brand, David Lakatos and Nathaniel Devins.
```

1          THE COURT:  Good afternoon.

2          MR. SEWARD:  Good morning -- or good afternoon, your

3    Honor.  Joe Seward on behalf the Wayne County Airport Authority

4    defendants, Officers Bohn, Bradley, Lieutenant Wasiukanis and

5    Captain Driscoll.

6          THE COURT:  Okay, Mr. Seward.

7          MR. HAVIS:  Good afternoon, your Honor.  Alan Havis

8    on behalf of the Wayne County Airport Authority defendants John

9    Carmona, Kevin Grant, Charles Johnson, Mark DeBeau and Toya

10   Parker.  Your Honor, I may defer the oral argument to my

11   brother counsel unless there's some specific questions about

12   the individual defendants that I represent.

13         THE COURT:  All right, thank you very much.  All

14   right, so we have two motions that we are going to consider

15   today and I guess we should start with the motion that regards

16   the count four, the motion to dismiss and so why don't we hear,

17   will it be Ms. Whitman?

18         MS. WHITMAN:  Yes, your Honor.  Good afternoon, your

19   Honor.  May it please the Court, my name is Sarah Whitman and I

20   represent defendants Robert Ball, John Brand, Paul Brumley,

21   David Lakatos and Nathaniel Devins, federal officials who

22   plaintiffs have sued in their individual capacities.  Invoking

23   the Supreme Court's decision in Bivens, plaintiff seeks money

24   damages from the personal assets of these five individual

25   federal defendants on a theory that they violated plaintiff's

1    Constitutional rights during a security incident at the Detroit

2    Metropolitan Airport on September 11th, 2011, the 10th

3    anniversary of the 911 attacks.  According to the Complaint, on

4    that day Frontier Airlines notified law enforcement of

5    suspicious activity on one of its planes soon to be arriving in

6    Detroit.

7              THE COURT:  What time was that notification; do you

8    know?

9              MS. WHITMAN:  Approximately 3 p.m., your Honor, or

10   just thereafter although in the Complaint I'm not sure that

11   that time is specified.

12             THE COURT:  All right.  So that the initial

13   notification from the aircraft to the ground was approximately

14   3 p.m.?  Is that right?

15             MS. WHITMAN:  Or shortly thereafter, that's right.

16             THE COURT:  Okay.

17             MS. WHITMAN:  Frontier identified two passengers as

18   engaging in suspicious activity in and around the plane's

19   lavatory and reported that plaintiff may be with the two

20   passengers.  Later by telephone Frontier reported to airport

21   police that plaintiff may be involved in the incident.  Law

22   enforcement removed all three passengers from the plane for

23   further investigation.  Plaintiff claims that she was subjected

24   to an unlawful search and seizure and that all five federal

25   defendants discriminated against her based on her race,

1   ethnicity or national origin in violation of the equal

2   protection component of the Fifth Amendment.  It's this last

3   claim, the equal protection claim in count four of the

4   Complaint, to which our motion is directed today.

5           I'm here to urge the Court to dismiss the equal

6   protection claim the plaintiff has asserted against the five

7   individual defendants because plaintiff has failed to allege

8   facts sufficient to overcome defendants' defense of qualified

9   immunity.  At bottom, plaintiff has failed to plead facts that

10  would show that any one of them acted on account of a

11  Constitutionally protected characteristic.

12          So the doctrine of qualified immunity shields public

13  officials like the five individual federal defendants from the

14  necessity of defending against tort claims so long as their

15  conduct does not violate a clearly established Constitutional

16  right.  Therefore, qualified immunity protects the individual

17  federal defendants unless plaintiff pleads facts showing, one,

18  that each defendant personally violated her equal protection

19  rights and two, that the right was clearly established at the

20  time of the defendant's conduct.  If plaintiff fails to meet

21  her burden at either step of the qualified immunity analysis,

22  defendants are entitled to immunity and the equal protection

23  claim should be dismissed.  Here, plaintiff fails to meet her

24  burden at both steps and I'll discuss each step in term.

25          So step one, because in <u>Bivens'</u> suits, plaintiff

1    seeks to recover from the personal assets of federal officials,

2    it makes sense that the Supreme Court requires that step one

3    for plaintiff to identify what each individual did to violate

4    the Constitutional right at issue.  What that means in practice

5    and what the Sixth Circuit case law teaches is that plaintiff

6    cannot survive a motion to dismiss by lumping defendants

7    together, ascribing acts of some defendants to others or

8    lodging conclusory allegations of misconduct against the

9    defendants.  The problem for plaintiff's equal protection claim

10   here is that she has alleged no facts showing that any of the

11   five individual federal defendants personally acted with a

12   discriminatory purpose.  Instead, plaintiff includes one

13   allegation in her Complaint that supports her equal protection

14   claim.  That allegation is in paragraph 56 of the Complaint and

15   it's also reprinted in our papers at page nine.  Plaintiff

16   states as follows:  They, meaning state and federal actors,

17   quote "acted based on the perceived ethnicity, national origin

18   or race of Ms. Hebshi's name as they had no articulable facts

19   connecting Ms. Hebshi to suspicion of criminal activity", end

20   quote.  In that allegation, plaintiff collectively attributes

21   identical discriminatory intent to all five federal individual

22   defendants along with eight other airport police.

23        Iqbal teaches that in evaluating the sufficiency of a

24   Complaint, courts should begin by identifying the conclusory

25   allegations because they, in the Court's words, do not suffice.

1    This lone conclusory statement in plaintiff's Complaint at

2    paragraph 56 is conclusory.  In fact, that statement of

3    discriminatory intent is virtually indistinguishable from the

4    conclusory allegation that the Supreme Court rejected in Iqbal.

5    Mr. Iqbal alleged quote "defendants subjected him to harsh

6    decisions solely on account of his religion, race or national

7    origin for no legitimate penological purpose."  That's at page

8    580 of the Supreme Court's decision.

9        THE COURT:  Right, but you don't disagree that all of

10    the Complaint needs to be taken into account in terms of

11    determining whether the factual allegations are sufficient,

12    correct?

13        MS. WHITMAN:  Correct.  That's correct.

14        THE COURT:  So this may well be conclusory language,

15    but if, and I'm not saying that the Complaint does that here,

16    but if the Complaint stated somewhere else that the individual

17    defendants were acting with discriminatory intent because of

18    the specific knowledge that they had for example, that that

19    would be sufficient even though this is conclusory language,

20    wouldn't it?

21        MS. WHITMAN:  Sure, your Honor.  The Court directs

22    lower courts to look at the entirety of the Complaint and all

23    of the allegations, but what my point is that in looking

24    through the entire Complaint, this allegation is the only

25    allegation that goes towards allegedly discriminatory conduct

```
 1    and under Iqbal, that conclusory statement alone should not be
 2    entitled to truth, so yes, we have to then look elsewhere and
 3    see if there's any other facts to support that conclusory
 4    allegation and one other thing, not only did Iqbal reject a
 5    similarly conclusive, conclusory statement, but so did the
 6    Sixth Circuit in Rondigo.  In Rondigo, plaintiff alleged quote
 7    "defendants knew that plaintiff was a woman and they took
 8    actions based on considerations other than those proper to the
 9    good-faith administration of justice."  That's at page 681.  So
10    as your Honor just mentioned, we have plaintiff's lone
11    conclusory allegation of discrimination and it's not entitled
12    to be assumed to be true.
13         What Iqbal teaches us next to consider as you alluded
14    to is whether plaintiff has pleaded any factual content that
15    plausibly suggests an entitlement to relief on her equal
16    protection claim.  Iqbal explains that this is supposed to be a
17    context-specific analysis.  The problem for plaintiff again is
18    that plaintiff's Complaint doesn't contain any factual
19    allegations sufficient to plausibly suggest the individual
20    federal defendant's discriminatory state of mind.  Nonetheless,
21    plaintiff asks this Court to infer discriminatory animus into
22    each of the individual federal defendant's actions because
23    according to her when they acted the only information they had
24    was her name and her seat number.  I have two primary --
25         THE COURT:  Well, they did have that information,
```

1    correct?  Do you concede that?

2            MS. WHITMAN:  Umm, I -- the government's -- different

3    people within the government are alleged to have received that

4    information, but according to the facts in the Complaint,

5    Officer Dunkin who's an officer from the Wayne County airport

6    police received the e-mail that contains that information and a

7    federal air marshal received that information.

8            THE COURT:  An unidentified air marshal?

9            MS. WHITMAN:  An unidentified air marshal.

10           THE COURT:  So are you just for the sake of argument

11   if it were the case that you had two officers whose only

12   information was, the only information that they had was the

13   plaintiff's name and the seat assignment, would that not be

14   evidence that those two officers had information and were

15   acting upon information that one could argue was discriminatory

16   based on perceived ethnic origin?

17           MS. WHITMAN:  But the problem here is that's not all

18   the information they had.

19           THE COURT:  I know, but I'm asking you just for the

20   sake of argument if that were the case.

21           MS. WHITMAN:  If we were to take that only in

22   isolation, I think that there possibly could be an argument

23   made, but I don't, I don't think that alone could state

24   discriminatory intent as to those two individuals and it

25   certainly couldn't be inferred, you couldn't infer

1   discriminatory intent as to all other federal and local

2   officials, but --

3           THE COURT:  Well, let's just say if you do have

4   information that is information that one might consider to be

5   ethnic background information such as someone's name and then

6   you also had in this case the description apparently from the,

7   umm, from the personnel on the plane of the other individuals

8   being of possible Arab descent, if you had those two pieces of

9   information, but then you also had other information such as

10  conduct, would the presence of the information that pertained

11  to their ethnic background still be considered a basis for some

12  sort of a determination that discrimination existed even when

13  you had other information?

14          MS. WHITMAN:  No, your Honor, I don't think so and I

15  think Avery addresses that.  Although it's in dicta in a

16  footnote, Avery posits that police often receive information

17  whether it's from a tip or some sort of report that contains

18  descriptive characteristics along with other identifying

19  information and the Avery Court specifically said that happens

20  all the time and if the tip contained information about the

21  suspect's race along with other information and the police then

22  investigated that suspect, that wouldn't raise any

23  Constitutional concerns, but --

24          THE COURT:  What is the other information they had?

25          MS. WHITMAN:  In this case?

1           THE COURT:  Yes.

2           MS. WHITMAN:  So in this case, the information from

3     the context of the Complaint is, one, it's September 11th, it's

4     the 10th year anniversary of the 911 attacks and Frontier, an

5     entity outside the law enforcement organization, contacted law

6     enforcement to report suspicious activity on one of its planes

7     while it's in flight.  They identified plaintiff by name and

8     see the number and said quote "she might also be with the two

9     men".

10          THE COURT:  Is that e-mail, has that been attached to

11    any of the pleadings?  I don't think I saw that.

12          MS. WHITMAN:  It has not, your Honor.

13          THE COURT:  And you say that was sent at

14    approximately 3:00 p.m. or something?

15          MS. WHITMAN:  No, that's not in the Complaint and the

16    first notification came through around 3:00, but the Complaint

17    doesn't talk about when the hand-over, the time of the

18    hand-over of the e-mail to Officer Dunkin or the federal air

19    marshal was.

20          THE COURT:  Okay.

21          MS. WHITMAN:  We know that plaintiff was seated next

22    to the two men.  The men were alleged to have spent lengthy

23    periods of time in the airplane's lavatory while the other one

24    stood outside and when the plane landed, the Frontier pilot

25    told airport police that plaintiff quote "may also be involved

1    in the incident".

2          THE COURT:  Do you know whether the Frontier employee

3    had any factual basis for that statement that the plaintiff,

4    Ms. Hebshi, may be with them?  Do you know whether he had done

5    any investigation such as whether they bought the tickets

6    together or whether they, they were, had any other reason to

7    believe that they were together when he said that?

8          MS. WHITMAN:  Your Honor, we're going way outside the

9    fact allegations of the Complaint, but regardless of what he

10   did, the officers who are responding to the report were

11   evaluating what they knew at the time and what they were

12   responding to and the bottom line is that they are responding

13   to a report from Frontier that says that there's suspicious

14   activity on the airplane, that plaintiff may be with them and

15   that the plane is landing imminently and so they took action to

16   remove the passengers from the plane for investigation and we

17   got, we touched on this a little bit earlier your Honor in your

18   earlier questioning, but none of the five individual federal

19   defendants are alleged to have received these communications

20   from Frontier, either the phone call or the e-mail, but even if

21   we were to assume that they were aware of the specific content

22   of the e-mail and the phone call, these communications from

23   Frontier to law enforcement don't mention plaintiff's

24   ethnicity, national origin or name or anyone's perception about

25   it.

1          THE COURT:  Now just a second.  What doesn't, what

2    doesn't include her name?

3          MS. WHITMAN:  No, it -- the -- well, number one the

4    e-mail includes her name and her seat number.

5          THE COURT:  This is the e-mail from Frontier to the

6    aircraft, correct?

7          MS. WHITMAN:  Exactly and that was handed over to

8    Officer Dunkin and to the federal air marshal.

9          THE COURT:  So Officer Dunkin and the federal air

10   marshal had her name.

11         MS. WHITMAN:  Her name.

12         THE COURT:  Okay.

13         MS. WHITMAN:  This call from Frontier to the Wayne

14   County airport police officer did not contain any information

15   about plaintiff's name, it's just her seat number, but in

16   neither of those two communications does anyone specifically

17   mention plaintiff's ethnicity, national origin or anyone's

18   perception about her race, ethnicity or national origin.  So in

19   other words plaintiff's sole basis for the inference that she'd

20   like you to draw from that one allegation in the Complaint is

21   just not supported by the facts in the Complaint.  Just to

22   recap, the facts in the Complaint demonstrate that it, if

23   anything, responding law enforcement officers knew more than

24   just her name and her seat number.  They knew that she had been

25   alleged to be with them and she had been alleged to have been

1   involved in the incident and I think both, the two cases, Heyne

2   that we cite in our brief and Rondigo, both are instructive on

3   this point because in Rondigo, plaintiff identified a lot of

4   facts in her Complaint and if you go through the fact section

5   of the Court's analysis, it's quite lengthy.  It details what

6   every single individual defendant had done, but what the Court

7   concluded was combing through all of those allegations there

8   still was not that allegation that goes from factually neutral

9   to factually suggestive of discriminatory intent and so in

10   Rondigo the Court dismissed the claim on a 12(b)(6) motion and

11   granted individual's qualified immunity.

12        Heyne parses it out more finely than that.  In Heyne,

13   we have an allegation that all of the individual federal -- I'm

14   sorry, all of the individual defendants were alleged to have

15   participated in a suspension decision of a student and the

16   Court parsed out what each individual defendant was alleged to

17   have done and determined that while there were some factually

18   suggestive allegations of, against some of the individuals,

19   there weren't those same kind of allegations against two of the

20   individuals and granted their motion to dismiss and so when you

21   parse it out here, whether or not there's allegations

22   sufficient to infer discriminatory intent on behalf of the

23   airline or one of its employees, that has nothing to do with

24   the analysis here as to the five individual federal defendants

25   for whom there is no factually suggestive allegation

1    whatsoever.

2         So Iqbal also instructs Courts to assess the

3    plausibility of the inference that plaintiffs seek to have the

4    Court make and the facts in the Complaint do not plausibly

5    suggest purposeful discrimination by any of the five individual

6    federal defendants.  Instead, the facts in the Complaint

7    support the obvious alternative explanation, that the

8    individual federal defendants responded to investigate three

9    passengers that an airline had included in their report and

10   both Iqbal and Twombly and also in V.R. Entertainment which is

11   an Eastern District of Michigan case that we cited in our

12   brief, the courts all concluded that as between the obvious

13   alternative explanation and the purposeful discrimination that

14   plaintiff asks the Courts to infer, discrimination was not a

15   plausible conclusion.  As such, the claim of the plaintiffs in

16   those cases could not survive a motion to dismiss and nor can

17   plaintiff's claim of discrimination here.

18        Now plaintiff's failure to meet her burden at step

19   one of the qualified immunity analysis itself warrants

20   dismissal of her equal protection claim, but she fails at step

21   two as well.  So in the Sixth Circuit, to demonstrate that a

22   right was clearly established for qualified immunity purposes,

23   plaintiff must identify case law that truly dictates for every

24   reasonable officer that what he is doing violates the equal

25   protection clause.  Plaintiff fails to meet her burden at this

```
1    step because she's not identified any case, let alone

2    controlling case law, that truly compels the conclusion as the

3    Sixth Circuit requires that what the five defendants are

4    alleged to have done here would violate the equal protection

5    clause.  While plaintiff identifies three cases in her brief,

6    Wren, a Supreme Court case, Avery, Sixth Circuit case and

7    Farm Labor, a Sixth Circuit case that generally stand for the

8    proposition that the law may not be selectively enforced based

9    on a protected characteristic, the Supreme Court has made clear

10   that Courts should not define the right at issue at such a

11   generalized -- in such a generalized sense.  Instead, Iqbal

12   teaches that the question is whether the right was clearly

13   established in a particularized sense taking into --

14        THE COURT:  Well, in what sense is the right not

15   clearly established?  I mean, what are you -- what is it about

16   arresting somebody on a plane based on ethic background is not

17   clearly established?  I mean, that's what they're saying

18   happened, so how is that not a clearly established right?

19        MS. WHITMAN:  Because it's what the officer

20   confronted.  So here we have Wren, Avery and Farm Labor that

21   says that the law can't be selectively enforced based on race,

22   ethnicity or national origin so that's the general proposition,

23   but none of those cases addressed what is alleged to have

24   happened here which is each of those case addresses a situation

25   in which the officer picks someone out for police action so the
```

1  officer scans the airport terminal and picks someone out for

2  enforcement.  In Wren, the officers choose to stop one

3  individual on a traffic stop and chose to take action against

4  that one individual and in Farm Labor, the same, it was also a

5  traffic stop situation.  So in all of those circumstances and

6  in each of those cases they talk about the officer amongst a

7  big group choosing to take action against one particular person

8  because of their race or ethnicity, but here the situation that

9  the five individual federal defendants confronted is they're

10  responding to a call from outside the police organization that

11  already identifies the individuals for investigation.  So those

12  cases that talk about the general prohibition of police

13  selecting amongst a group doesn't apply here.  The three had

14  already been identified by Frontier and they are simply

15  responding to that report.

16          As we talked about a little bit earlier, the closest

17  case that even addresses the circumstances here is that

18  footnote in Avery, footnote five and it still doesn't govern

19  here squarely because in that dicta of footnote five, it talks

20  about when the tip has race and some other information involved

21  in it and as I mentioned previously, the quote unquote "tip"

22  here didn't contain information about her race, ethnicity or

23  national origin, but given it, be that as it may --

24          THE COURT:  Well, the tip had her name.

25          MS. WHITMAN:  It had her name.

1        THE COURT:  Isn't that tantamount to providing

2    information that one can ascribe some sort of ethnic

3    characteristics to?

4        MS. WHITMAN:  I don't know if a reasonable officer

5    would know what race or ethnicity that name would suggest, but

6    assume that there was some, that they would know that, again,

7    Avery specifically says we find no Constitutional infirmity in

8    that.

9        THE COURT:  Well, is it fair to say that in your

10   interpretation that whether the person's name was Bridget

11   O'Leary or whether it was Shoshana Hebshi wouldn't have made

12   any difference?

13       MS. WHITMAN:  Exactly right, your Honor.  If the law

14   enforcement receives a call reporting suspicious activity or

15   that someone may be involved in the activity, they're going to

16   investigate the individuals regardless of name, regardless of

17   seat number and the Constitutional problems that Avery saw

18   again was, umm, they specifically said in that footnote what

19   we're dealing with is where either a policy targets a specific

20   race or where either by training or observation police target a

21   particular race and that's just not the case here.

22       THE COURT:  Well, let me ask you this question if I

23   could.  What about the application of the equal protection

24   clause to the law enforcement actions that were taken in steps

25   as we went a long here because I can see what you're saying

1    that and I can understand your argument that the information

2    that they had to enter the plane and make the arrest was based

3    on allegedly the involvement of this person with the people who

4    were engaged in the more disruptive activity, that's what the

5    claim was.  After they take her into custody, they now, they

6    have her, they have her identification, they see her, they have

7    her name.  How is it that subsequent acts by law enforcement

8    after that point are not also subject to an equal protection

9    claim?

10          MS. WHITMAN:  Well, so law enforcement in general is

11   conducting the investigation at that point, but let's talk

12   about just the individual federal defendants that are, whose

13   conduct is at issue in my motion.  So none of the individual

14   federal defendant are alleged to have interacted with

15   plaintiff.  The defendants Ball, Brand -- sorry, Ball, Lakatos

16   and Devins are simply alleged to have been at the inspection

17   site and quote "participated in a decision".  Paul Brum --

18          THE COURT:  Well, now wait a second.  You're saying

19   that the FBI was not involved in the decisions that were made

20   as to whether or not to hold her or whether or not to search

21   her?

22          MS. WHITMAN:  The three defendants that I just

23   mentioned are Robert Ball who is the federal security director

24   and Officers Lakatos and Devins who are CBP officers and so

25   they're alleged to have just responded to the site and are

1    alleged to have participated in the decision to detain her.  So

2    that's still at that initial stage that you're talking about,

3    your Honor.  Paul Brumley who is an ICE special agent is

4    alleged to have been part of the team that boarded the plane

5    and so we're still talking about that initial, umm, first

6    actions as part of the investigation and so then that leaves

7    FBI Special Agent Brand who is alleged to have discussed with

8    Wayne County airport police officer whether to strip search the

9    three passengers and then to have released her and so at best

10   under your analysis the first four are still in those initial

11   stages, but nevertheless those actions, those alleged actions

12   of FBI Special Agent Brand are part of the investigation.  They

13   are still factually-neutral allegations and there's nothing in

14   the Complaint to suggest that those actions were taken with a

15   discriminatory intent.  There's just none in there.  If you

16   comb the Complaint, there's nothing to suggest anything about

17   Agent Brand's motive or intent.  So if I may just --

18        THE COURT:  Well, wouldn't discovery be helpful on

19   that point?  I mean, wouldn't the bureau have developed all

20   sorts of information about these individuals in the time that

21   they had them during these two hours that they were in their

22   custody after the initial arrest?

23        MS. WHITMAN:  Your Honor, that's the same argument

24   that plaintiffs in Marcilis and plaintiffs in Iqbal made and

25   Iqbal was clear; quote, "Rule Eight does not unlock the doors

1   of discovery for a plaintiff armed with nothing more than

2   conclusions".  New Albany Tractor, Sixth Circuit recent case

3   interpreting Twombly and Iqbal specifically says, quote:

4        "The plaintiff may not use the discovery

5        process to obtain facts after filing suit.

6        The language of Iqbal specifically directs

7        that no discovery may be conducted in cases

8        such as this even when the information to

9        establish a claim is solely within the

10       purview of the defendants."

11       So what Twombly changed was under Conley v. Gibson,

12   the no set of facts standard, wholly conclusory statements of a

13   claim could survive a motion to dismiss and plaintiffs could

14   uncover more facts if the pleadings left open the possibility

15   that a plaintiff might be able to establish facts and Iqbal and

16   Twombly instead said Courts need to assess the facts that are

17   in the Complaint to determine whether they sufficiently allege

18   a plausible claim and here plaintiff fails on this front.

19       So to close, the doctrine of qualified immunity was

20   developed to ensure that only personal conduct, conduct that

21   unquestionably violates the Constitution, will subject an

22   official to individual liability.  Here, plaintiff simply has

23   not alleged any facts that would show that each of these five

24   individual federal defendants violated her clearly established

25   equal protection rights so count four should be dismissed.

1    Thank you, your Honor.

2         THE COURT:  All right, thank you very much.  Now I

3    know that we also have the airport officers who are responding

4    or are rather a part of this motion filing a separate motion so

5    I'll hear from Mr. Seward.

6         MR. SEWARD:  Well, thank you, your Honor.  Joe Seward

7    on behalf of the Wayne County officers.  I listened to some of

8    the questions this Court asked and you asked a question if only

9    the facts of the case were her name and a seat assignment,

10   could that show evidence of a discriminatory intent and, but

11   that's not the allegations in the Complaint.  I think that's

12   the important part of what we're trying to point out to the

13   Court because if you look at beginning at page or paragraph 45

14   of the Complaint.

15        THE COURT:  Okay.

16        MR. SEWARD:  She alleges that some of the flight

17   attendants and passengers became suspicious.  So that starts

18   the ball going.

19        THE COURT:  Yeah.

20        MR. SEWARD:  She then goes on to allege that at

21   paragraph 49 that an e-mail is sent, essentially an e-mail is

22   sent from Captain Pucci saying, you know, we have some

23   suspicious activity here, we have flight attendants and

24   passengers concerned and then that is sent to Frontier and then

25   she ads at paragraph 49 that Mr. Fraley, a Frontier employee,

1    says, the Complaint alleges that he, the Frontier person, added

2    the name of the passenger in 12A, Ms. Hebshi and again

3    plaintiff's factual allegation is that Fraley commented that

4    she may be with the two men.  So now we have a call for help

5    from Frontier Airlines informing law enforcement of a situation

6    that raised the concerns of flight attendants, passengers,

7    communicated that to the captain who then relays it to Frontier

8    who then according to paragraph 49, Mr. Fraley adds and may be

9    with them.  So under that scenario, the mere fact of her name

10   is not the allegation in the Complaint, the allegation in the

11   Complaint is the comment she may be with them.  So when you

12   look at, you know, the doctrine of qualified immunity, would an

13   officer know that it's wrong to do no investigative response to

14   that message?  And that's, while we may say that the parameters

15   of the Fourth Amendment generally are well established, but the

16   Court has to look at the actual underlying facts, you know.

17           THE COURT:  And how do you respond to the question

18   that I was asking Ms. Whitman previously which is let's say

19   that for the sake of argument that because the initial report

20   included information that linked Ms. Hebshi with the others and

21   that the decision to arrest them and remove them from the plane

22   was based on that totality of circumstances and even further,

23   again just for the sake of argument, that that alone was not

24   sufficiently discriminatory, that there wasn't proof of

25   discriminatory animus.  How do you address the question as to

1   whether or not there could be actions taken by law enforcement

2   after that point where they are acting upon, no longer only

3   acting upon that initial information, but they're making

4   decisions to hold them for a certain amount of time, to conduct

5   a particularly invasive search, to interview them, et cetera,

6   these decisions are separate.  Could there be an argument that

7   at that point any of those decisions or all those actions were

8   arguably an equal protection violation?  Can that be separated

9   is my question.

10          MR. SEWARD:  Yes and I understand it 'cause the Court

11  mentioned and I wrote down can we look at the steps along the

12  way and the answer to that question, again, we have to be

13  focused on the allegations in the Complaint.  So if you take a

14  look at the allegations of the Complaint, the e-mail is only

15  seen by three Wayne County persons, Driscoll, Carmona and

16  Johnson and a decision is made to handcuff her and take her

17  off.  So that's if we want to look at steps, that's one step.

18  What I would submit given the number of Wayne County airport

19  persons that are involved up until this point, these are the

20  only three that plaintiff alleges has knowledge of this e-mail,

21  otherwise there's no allegation that like DeBeau knew, Grant

22  knew of the name of the person.  So now once we get there, a

23  decision is made to handcuff and remove her and that's alleged

24  to be Carmona.  I would submit at that step it still has not

25  clearly established that that call for help from Frontier

1    establishes that we violated clearly, clearly established law.

2           So then we have to look at the next event that

3    plaintiff alleges which is that one of the officers, Bradley,

4    it's at paragraph 78 of the Complaint, took her in the back

5    seat of his car and transported her from the airplane to the

6    police station, building 358.  Again, looking at Bradley's only

7    involvement as alleged in the Complaint, he's taking somebody,

8    transporting someone from a scene to a more secure, safe, let's

9    do the investigation.  I would submit to the Court that at that

10   point there still is not a violation of clearly established

11   law.

12          Then I would point out now we have her at the station

13   and interesting, plaintiff points out in her brief that Toya

14   Parker who allegedly performed the search is not a part of the

15   equal protection claim.  So that leaves the only other person

16   left is Wasiukanis and plaintiff does allege that supposedly

17   his, umm, her appearance may have played a role in the decision

18   although she doesn't specify exactly what it's a conclusion,

19   but let's presume that she's saying well Wasiukanis made a

20   decision based on ethnicity, here's the problem with that.

21   First of all --

22          THE COURT:  Are you saying that Lieutenant Wasiukanis

23   indicated that the decision was made based on ethnicity?

24          MR. SEWARD:  No, no.  The allegations as to

25   Wasiukanis are at 85 and it says at approximately 4:40 p.m.,

1    Wasiukanis conferred with FBI Agent John Brand and they decided

2    that the three passengers including Ms. Hebshi should be strip

3    searched.  Now the -- 'cause the Court brought up an

4    interesting comment, well, we're focusing only on the

5    conclusion in count four which says that the equal protection,

6    there was a protection claim, don't you have to look at the

7    underlying facts?  Absolutely, so that's why I'm focusing on

8    these facts because when you look at the allegation in the

9    Complaint, I think it's 134, it just says that these acts were

10   done because of her last name or her appearance.  Well, that's

11   why I'm focusing on the specific acts of the Wayne County

12   Airport Authority.  So if we look at Wasiukanis, nowhere is

13   there an allegation, a factual allegation that, A, he saw the

14   e-mail.  Plaintiff is quite specific as to who saw the e-mail

15   from Frontier and she only mentions three.  Second of all,

16   nowhere does she allege that Wasiukanis saw Ms. Hebshi and that

17   based upon her appearance made that decision and I would submit

18   to the Court even if that allegation were somehow to come

19   forward in an amended Complaint, I would submit to the Court

20   that even that allegation as to Wasiukanis would not bring this

21   case out of the protections afforded by the qualified immunity

22   because she would have to show that someone who's arrested,

23   someone who -- strike that, someone who was taken into custody,

24   someone who's suspected of being involved in a plot to blow up

25   the plane because she does make allegation, I think it's 76 she

```
 1   was asked do you have any explosives on you, would that person
 2   know that strip-searching someone would violate the
 3   Constitution and I submit not particularly when you look at how
 4   the Supreme Court handled the Iqbal decision 'cause it
 5   focused -- it left aside the excessive force claims, they
 6   looked at the policy of taking certain people of certain
 7   descent into custody and the underlying theme to that case is,
 8   you know, since September 11th, 2001, our lives changed and law
 9   enforcement changed, so --
10           THE COURT:  Well, hold on a minute.  Don't go there.
11   Constitution didn't change, equal protection didn't change,
12   Fourth Amendment didn't change, we all know it was September
13   11th.  Move on.
14           MR. SEWARD:  Well, your Honor, I, I --
15           THE COURT:  Move on, please.
16           MR. SEWARD:  Okay.  I would submit to the Court that
17   knowing when and when not to conduct a strip search given the
18   situation presented here, there are no cases that talk about
19   that that is wrong, that there's no law that they can point to,
20   they haven't even brought it up in their Complaint or their
21   brief.  They don't separate out what Wasiukanis did.  They
22   don't cite any case that says you know, the law says you cannot
23   do that.  So absent that, then that triggers the qualified
24   immunity argument that entitles even Wasiukanis a dismissal.
25   Those are my arguments.
```

 1          THE COURT:  All right.  Thank you very much,

 2   Mr. Seward.  Okay, on behalf of plaintiff and is it Ms.

 3   Goodman?  I'm sorry --

 4          MS. TREMONT:  No, Ms. Tremont.

 5          THE COURT:  Ms. Tremont, okay, sorry about that.  I

 6   didn't have your name correctly written down.  Okay, you may

 7   proceed.  We have a podium that can go up and down.

 8          MS. TREMONT:  Your Honor, may it please the Court, on

 9   September 11th, 2011, the plaintiff here, Shoshana Hebshi,

10   underwent a terrible and inexcusable ordeal.  On that day, Ms.

11   Hebshi who is a freelance journalist, a mother of two young

12   twins was traveling home from a visit to her sister in

13   California.  In Denver, she boarded a Frontier Airlines flight

14   to her final destination which was Detroit Metro Airport.  From

15   Ms. Hebshi's perspective, that flight was pretty uneventful.

16   She remained in her seat the entire time.  She passed the time

17   by sleeping and playing games so she was surprised when the

18   plane landed, it was diverted to an area of the airport away

19   from the gates and surrounded by law enforcement vehicles.

20   That surprise turned to shock and fear when several

21   heavily-armed law enforcement officers stormed the plane, ran

22   up the aisle and stopped at her seat and asked her to get up

23   and come with them.  She asked what was going on and received

24   no answer.  Instead, she was handcuffed, forced off the plane,

25   then once outside thrown against the police car and pat

1   searched all in full view the passengers still on the plane.

2   She was then placed in a police car, transported to a detention

3   facility and locked in a cell.  All the time her repeated

4   requests about why this is happening and what was going on went

5   unanswered.

6          After she had been in that cell for a whole hour, she

7   was then strip searched.  She was strip searched in an invasive

8   and degrading manner.  She was forced to remove all of her

9   clothing so she was completely naked, then in view of an

10  officer, she was instructed to bend over and cough.  That

11  officer ran her fingers through Ms. Hebshi's hair, looked in

12  her mouth, looked under her eyelids while all the time Ms.

13  Hebshi was crying because she was so frightened.  After all of

14  this, it was still a few more hours before Ms. Hebshi was

15  finally released after an interrogation with an admission from

16  the FBI that she was not involved in any suspicious conduct.

17         THE COURT:  Do you know approximately the timeline

18  here?  I know the plane landed at approximately 3:30 and I

19  think that Ms. Hebshi was released at approximately 7:30; is

20  that right?

21         MS. TREMONT:  Yes, your Honor.

22         THE COURT:  And then approximately what time did the

23  strip search occur; do you know?

24         MS. TREMONT:  The strip search occurred approximately

25  one hour after Ms. Hebshi was taken into custody so I

1    believe --

2              THE COURT:  So approximately 4:30?

3              MS. TREMONT:  Right.

4              THE COURT:  And then she was interviewed as well,

5    correct?

6              MS. TREMONT:  That's right.

7              THE COURT:  And about what time did that happen?

8              MS. TREMONT:  It was about two hours after the strip

9    search.

10             THE COURT:  About 5:30?  No, after -- no, about 6:30

11   if you say the strip search occurred at 4:30?

12             MS. TREMONT:  Yes, that's right and then there was

13   about an hour that elapsed from the time of the interrogation

14   until when she was released.

15             THE COURT:  And about how long did the questioning

16   period last, about?

17             MS. TREMONT:  The interview lasted about half an

18   hour.  Your Honor, the facts alleged in the Complaint plausibly

19   show that Ms. Hebshi was subjected to this treatment for one

20   reason and that was because of her Middle Eastern name and

21   these facts are enough to overcome defendant's qualified

22   immunity defense at this early stage of the litigation.

23             Defendants point or allege that we have brought only

24   one allegation of discriminatory intent, however it's clearly

25   established in the law that we must look at the Complaint as a

1     whole when assessing whether a claim has been made and the

2     facts that are alleged there do make plausible the inference

3     that the defendants who arrested, detained and strip searched

4     Ms. Hebshi were acting with a discriminatory motive.  On pages

5     eight through 10 of our brief, we have broken down the specific

6     acts that each defendant is alleged to have taken with respect

7     to Ms. Hebshi's arrest, detention and strip searched.  We have

8     very clearly put each of these defendants on notice of the

9     specific actions that they took with respect to Ms. Hebshi and

10    which violated her Constitutional rights.

11         THE COURT:  Well, I, I agree that you have clearly

12    detailed the specific acts and identified which defendant you

13    are claiming was responsible for which acts, but my question is

14    can you identify as to any of the defendants what you, what you

15    are alleging as a fact showed that any of the defendants were

16    motivated by the knowledge of Ms. Hebshi's name?  I mean,

17    you've just said that that was the reason.  What fact do you

18    have that supports that?

19         MS. TREMONT:  The information that the defendants

20    received from Frontier Airlines, this was e-mail from

21    Mr. Fraley, very clearly showed that Ms. Hebshi was lumped into

22    this report of suspicious behavior solely because she had a

23    Middle Eastern name.  If you look that e-mail, what you see is

24    the report that came in from the captain of the plane which

25    identified two passengers in seats 12B and 12C, those were the

1    two men seated next to Ms. Hebshi as allegedly acting

2    suspiciously on the plane because they had been going to the

3    restroom for too long a period of time and passengers were

4    getting nervous.  Then within that same e-mail you can see a

5    communication from a Frontier employee who is on the ground not

6    involved in the plane who reports in seat 12B and 12C, here are

7    the names of those two individuals, they are very clearly names

8    that are of foreign ethnicity and then it says by the way, in

9    seat 12A is this passenger Shoshana Hebshi who may also be with

10   them.  It's clear from the face of that communication that the

11   only information known about Ms. Hebshi was that she had that

12   name and that was what was passed on to law enforcement

13   officers.

14          THE COURT:  But don't you agree that at a minimum if

15   that's the case, then only those law enforcement officers that

16   you can reasonably allege knew that information would be even

17   in a position to use it in making a decision as to what they

18   were doing, correct?

19          MS. TREMONT:  Your Honor, we're entitled to a

20   reasonable presumption at the pleadings stage that the

21   information known to law enforcement officers collectively was

22   known to each law enforcement officer individually.  The facts

23   that we have here is in addition, law enforcement officers have

24   a Constitutional duty to verify the reliability of a tip that

25   comes in from any individual and what we have here is a

1   situation where law enforcement officers received a tip that

2   contained very bare bones, conclusory assertions from lay

3   individuals that Ms. Hebshi was quote "might be involved in

4   this activity" or may be with the two other passengers who were

5   allegedly suspicious and that alone, it's not plausible that

6   that was the basis for Frontier taking this action.  When we

7   look at that, we say law enforcement officers had a duty to

8   ascertain themselves that reasonable basis for taking the

9   extensive law enforcement response against Ms. Hebshi must be

10  found and the fact that the law enforcement officers didn't ask

11  Frontier or the individual that sent this report what exactly

12  they had done to make, to do any sort of fact investigation

13  that Ms. Hebshi was actually involved in these suspicious

14  conduct, the fact that they themselves did not take a few

15  minutes to run a criminal background check or even do a Google

16  search to try and figure out how she was --

17          THE COURT:  Now do you know that?  You're saying that

18  now in your argument, but do you know that law enforcement did

19  not take those steps based on any discovery or anything you've

20  done?

21          MS. TREMONT:  We have some, received some documents

22  from a public records request to the Wayne County Airport

23  Authority and there is no indication that any sort of

24  investigatory work was done aside from reviewing these e-mails

25  and that's the facts as they are alleged in the Complaint.  We

1    have specific allegations that no additional steps were taken

2    after the law enforcement defendants received this information.

3            THE COURT:  Now according to what, I believe what the

4    government alleged just now that there was not a lot of time

5    between the initial contact from the aircraft to the ground and

6    the landing, is that your understanding as well?

7            MS. TREMONT:  Your Honor, no.  It's our understanding

8    that more than an hour passed from the time that the first

9    reports of suspicious activity came in to law enforcement and

10   the plane actually landed on the ground.

11           THE COURT:  More than an hour that would have

12   included the names of the suspicious actors?

13           MS. TREMONT:  The information that we have and as

14   alleged in the Complaint is that the initial reports of

15   actually from passengers on the plane to flight crew on the

16   plane about the two men who are allegedly acting suspiciously

17   happened shortly before 3:00 p.m. and we also know that by

18   around 3:00 p.m., so very shortly thereafter was when various

19   individuals started gathering at the inspection site and

20   preparing for the arrival of the plane.  So as alleged in the

21   Complaint, there was only a very short window between when

22   passengers on the plane initially started alleging suspicious

23   conduct to when that got transmitted to law enforcement 'cause

24   they already were --

25           THE COURT:  So there really wasn't that much time

1    between 3:00 p.m. and 3:30 when the plane landed from what

2    you're telling me.  There wasn't -- you said an hour, it's

3    really a half an hour between the time when this information

4    would have been communicated and the time that the plane

5    landed.  Is that right?

6         MS. TREMONT:  Your Honor, I think that you are

7    correct, but even if it's half an hour, that is still, we're

8    talking about very simple questions that could have been asked

9    when the individuals had the pilot on the phone or throughout

10   the numerous other channels that would have taken mere minutes

11   to ascertain exactly what was going on here.  In addition we

12   know that once Ms. Hebshi was taken into custody, even more

13   time elapsed between the time that she was arrested and strip

14   searched and then again between the time she was strip searched

15   and ultimately released so we're talking about over all several

16   hours that she was in custody where no additional action was

17   taken in a timely manner.

18        THE COURT:  Again at this point you're just, I assume

19   that you're making that as an allegation when you say no

20   additional action was taken.  You haven't really done discovery

21   to know for instance whether background checks or database

22   searches or anything else was done regarding these individuals

23   from the time that they were arrested until the time they were

24   released.

25        MS. TREMONT:  Well that's correct, your Honor.  I

1    mean, we're still at the pleading stage here.

2              THE COURT:  At this point you don't know for sure.

3              MS. TREMONT:  That's correct.

4              THE COURT:  Okay, go ahead.

5              MS. TREMONT:  So in addition to the fact that the

6    only concrete information about Ms. Hebshi herself as known to

7    law enforcement was her Middle Eastern name, there's also the

8    other allegations in the Complaint that point to a

9    discriminatory intent.  Namely, at paragraph 47, we allege that

10   initial reports of suspicious activity on the plane indicated

11   that the men involved were possibly of Arab descent.  We also

12   know from paragraph 82 that Ms. Hebshi when she was taken into

13   custody was asked if she spoke English.  These taken with again

14   the fact that law enforcement officers were seemingly acting

15   only based on her Middle Eastern name indicate that there was a

16   discriminatory intent here and make that, our equal protection

17   claim plausible under Iqbal.

18        Also your Honor, the standard here is only that we

19   prove that a discriminatory intent is plausible.  We don't have

20   to prove that there aren't any other plausible allegations.  We

21   don't even have to prove that our explanation here is more

22   plausible than what defendants posit.  We only have to prove

23   that this is a plausible version of events.  Defendants point

24   to the fact that Frontier had reported suspicious conduct on

25   the plane as itself a discrete fact that motivated their

1    conduct, but again we only have as alleged in the Complaint two

2    reports from Frontier and these are bare bones and conclusory.

3    It's only assessments from, again, lay individuals with no law

4    enforcement expertise or background basically alleging that Ms.

5    Hebshi was suspicious, that she may be involved, that she may

6    be with these two men and we know from Mr. Fraley's e-mail

7    which was information available to law enforcement officers

8    that this suspicion or may be assertions were because of Ms.

9    Hebshi's name.  As for --

10             THE COURT:  Well, do we really know that?  I mean, I

11   can see why you might infer that based on the evidence that you

12   have because apparently although I asked the question, but

13   nobody seemed to know whether the Frontier person had done any

14   checking on the people in 12B and C and A to see whether they

15   had any kind of pattern of similar conduct in buying their

16   tickets or traveling together or even getting on the same plane

17   in Denver or whatever, nobody seems to know that at this point,

18   but you don't really know that the, that he said that they were

19   together simply because of her name, right?  You're just,

20   you're inferring that.

21             MS. TREMONT:  We'd argue that it's clear from the

22   face of the report that was given to law enforcement officers

23   that that was the only basis for him lumping them together.  I

24   mean, he offers no facts to support that conclusion and frankly

25   law enforcement officers didn't ask him or anyone at Frontier

1    the basis for making this allegation and that leads to a

2    reasonable inference that they didn't think more facts were

3    necessary because in and of itself the fact that she has this

4    Middle Eastern name and is allegedly involved with two other

5    people with foreign names was enough to initiate this massive

6    law enforcement response against her.

7           Defendants also allege that there's, we have made

8    insufficient allegations that they could have formed a

9    perception of Ms. Hebshi's race or ethnicity based only on her

10   name, however it's clear just from what her name is that it's

11   of a foreign ethnicity and we have alleged discrimination on

12   the basis of race, ethnicity or national origin.  The fact that

13   we do not specifically allege that defendants believed her to

14   be of Middle Eastern origin because of her name does not defeat

15   our claim.  It is clear that her name is of a foreign ethnicity

16   and that is enough to state an equal protection violation.

17          THE COURT:  How do you respond to the argument based

18   on the Avery case that this is a situation where the reference

19   to the ethnic background or the reference to the name that was

20   arguably an ethnic name came from the tip from the airline, not

21   from law enforcement and so that they under Avery would be

22   allowed to respond to a tip provided that it had some, some

23   basis of alleged criminal activity going along with a

24   description that may involve an ethnic or racial description?

25          MS. TREMONT:  Right, so law enforcement officers have

1    a Constitutional duty to make sure that they're responding to

2    tips that are reliable.  They can't just insulate themselves

3    from their Constitutional responsibilities by claiming that

4    they were relying on a tip.  If I called 911 right now and said

5    there's a person standing on the street corner, he's black,

6    he's suspicious, law enforcement officers who responded to that

7    tip, that's not -- would not be immune from an equal protection

8    violation because it's clear that the tip is based on the fact

9    only of the informant's perceptions about race or ethnicity and

10   that's exactly what we have here.  We have a tip that's based

11   on impermissible characteristics of an individual and not on

12   any discrete facts about her conduct or anything that she was

13   doing on that plane.  And I would again, the other half of that

14   footnote in Avery explicitly says, you know, for example law

15   enforcement officers cannot look at a flight manifest and pick

16   out individuals with ethnic surnames to search or initiate

17   investigation against and essentially that's really what we

18   have here.  We have a person albeit from Frontier who's looking

19   at a flight manifest and singling out some one for a law

20   enforcement action based only on her ethnic surname and law

21   enforcement officers had information, had that information and

22   knew that's what they were doing and yet acted anyway.  And

23   also to counsel's point that it's reasonable for law

24   enforcement officers to be responding to tips like this,

25   response is not equal to arresting, putting in handcuffs, pat

1    searching, detaining for several hours, strip searching.  There

2    is proportionality involved here and the fact that Frontier

3    made these conclusory and baseless allegations against Ms.

4    Hebshi do not justify the extreme response that happened in

5    this particular instance.

6              I'd also like to talk briefly about Iqbal just to

7    point out that even under those pleadings standards, we have

8    met the requirement of stating a plausible claim for relief.

9    In that case, we had a vastly different circumstance than what

10   we had here.  The only petitioners that were before the Supreme

11   Court in that case were the Attorney General of the United

12   States and the director of the FBI and their only alleged

13   misconduct in that case was developing and implementing a

14   policy that somewhere down the road led to that plaintiff's

15   arrest -- excuse me, detention as a person of high interest in

16   the wake of September 11.  Because the two defendants before

17   the Court in that case were so removed from the discrete

18   actions taken against that individual plaintiff, his arrest,

19   his detention under harsh conditions made it implausible that

20   any sort of discriminatory motive against that individual

21   plaintiff had driven the attorney general's and FBI director's

22   decision to implement a policy at the very upper levels of law

23   enforcement, however also in Iqbal the Court explicitly stated

24   that that plaintiff might have an equal protection claim

25   against the individuals who had detained him under harsh

1    conditions and explicitly noted that those individuals were not
2    before the Court in that case.  What we have in Ms. Hebshi's
3    case are claims against exactly those types of individuals that
4    were responsible for her arrest, for her detention and her
5    strip search and given that this all happens, you know, on one
6    discrete flight on one discrete day, it is plausible that they
7    had the information that Frontier was reporting the tip only
8    because of her name because, and that she was caught up in
9    these reports of suspicious conduct only because of her name,
10   that becomes plausible because these individual people were the
11   relevant actors that were initiating action against Ms. Hebshi.
12            Really, what Iqbal confirms is nothing more than the
13   age old principle that Bivens and Section 1983 actions cannot
14   be stated through a theory of vicarious liability and that's
15   not the case that we have before us today.  I'd also drawing
16   distinction between this case and Rondigo.  There, the only
17   plausible explanation for defendant's actions was
18   nondiscriminatory treatment of that individual plaintiff and
19   her business.  Also I'd point out that in that case, the Court
20   was operating under a different standard; namely, they found
21   that merely alleging that the plaintiff was a woman-owned
22   business did not state an equal protection claim which would
23   would agree with and we would point to the fact that we have
24   far more allegations here that point to discriminatory
25   treatment, but then the Court was working on a standard of a

1    class of one or class of one equal protection claim which is

2    different in that it requires proof that the defendant's

3    alleged explanations for the treatment were not plausible.  So

4    the Court could look at the Complaint as a whole and determine

5    whether or not those proffered explanations from defendants

6    were plausible and that would take care of her claim.  That's

7    not the standard that we're operating under here.  Here we have

8    again the specific evidence that plaintiff was singled out for

9    law enforcement action because of her name and as well as the

10   other evidence that again other reports of suspicious conduct

11   associated with this incident were attributed to people of

12   possibly Arab descent and that Ms. Hebshi herself was asked if

13   she spoke English when she was brought into custody.

14           Your Honor, we also meet the second prong of the

15   qualified immunity analysis which was that Ms. Hebshi's right

16   to not be singled out for law enforcement action because of her

17   race, ethnicity or national origin was clearly established.  We

18   don't need a case that is directly on point in order for a

19   right to be clearly established.  The existing case law only

20   has to give officers reasonable notice that their actions were

21   unconstitutional and here, there is many cases that establish

22   that it's illegitimate to initiate law enforcement action

23   against an individual solely because of their name.  We would

24   point to the Farm Labor Organizing Committee case cited in our

25   brief that an equal protection violation in the law enforcement

1    context occurs whenever actions are taken against someone that

2    are motivated at least in part because of their race.  Also

3    we've already discussed the Avery case, but that again shows

4    that you can't single someone out for investigation because of

5    their ethnic surname and the fact of the matter is that because

6    law enforcement officers were relying on a tip allegedly,

7    that's defendant's position, that doesn't take away the fact

8    that they had the Constitutional duty to make sure that tip was

9    justified and the fact that they didn't do that in this case,

10   that they didn't look through and find articulable facts

11   linking Ms. Hebshi to suspicious conduct or otherwise that

12   would provide a basis to detain her, gives rise to a plausible

13   inference that they thought the information they did have

14   available to them, her Middle Eastern name, was enough to

15   detain her and strip search her and arrest her.

16           Defendants also pointed to the fact that the incident

17   took place on the 10th anniversary of September 11th and of

18   course we know that this is a significant date in our nation's

19   history, but law enforcement officers on that date should have

20   been aware of and attuned to the fact that because of its

21   significance, allegations of suspicious conduct that were

22   mistaken or baseless were especially likely to occur given the

23   sensitivities of that date.  Here, Ms. Hebshi has pleaded facts

24   that each defendant was personally involved in her arrest,

25   detention or strip search and facts that make Ms. Hebshi's

1    allegation of discriminatory intent plausible because again the

2    Complaint shows that defendants only -- the only information

3    defendants had access to about Ms. Hebshi was her Middle

4    Eastern name, there are no other facts to justify her arrest,

5    detention or strip search and we also know that initial reports

6    of suspicious conduct were attributed to people of possibly

7    Arab descent.  We also know Ms. Hebshi was asked if she spoke

8    English.  At this early stage of the litigation before we have

9    received or we've conducted any discovery, we do not need to

10   plead nor to survive a claim of motion -- a claim of qualified

11   immunity on a motion to dismiss.  In the alternative, we would

12   also ask for leave to amend the Complaint if it is found that

13   our allegations are insufficient and unless you have more

14   questions, your Honor?

15        THE COURT:  Thank you, Ms. Tremont.  All right, is

16   there any response?

17        MS. WHITMAN:  I'd like to make a brief statement,

18   your Honor.

19        THE COURT:  I'm sorry?

20        MS. WHITMAN:  I'd like to make a brief statement,

21   your Honor.

22        THE COURT:  Yes.

23        MS. WHITMAN:  Just a couple of rebuttal points, your

24   Honor.  You spent quite a few minutes speaking with Mr. Seward

25   about some of the allegations that go to the Fourth Amendment

```
 1    search, unlawful search and seizure claims and Ms. Tremont
 2    discussed at length the allegations that they have in the
 3    Complaint about whether there was a sufficient investigation,
 4    how quickly that investigation unfolded and other positions of
 5    plaintiff in terms of the manner in which the investigation was
 6    conducted.  This motion is not about her Fourth Amendment
 7    claims for unlawful search and unlawful seizure.  This motion
 8    to dismiss only applies to her equal protection claim and so in
 9    order to assess whether she's alleged sufficient facts, we need
10    to look to the Complaint to see if there's any factually
11    suggestive allegations about the individual federal defendant's
12    discriminatory intent and there are none.
13         Let's just assume for a moment that plaintiff's
14    allegation which is on information and belief that law
15    enforcement failed to investigate in those moments between
16    first call and landing, let's just assume that's true.  That
17    alleged failure to investigate could have been for all sorts of
18    reasons.  Could have been a mistake.  It could have been
19    because other people were doing it besides the actual
20    defendants, they thought someone else was doing it, they didn't
21    have enough time, they thought they had enough.  None of that
22    goes to whether law enforcement was acting based on a
23    constitutionally protected characteristics.  Plaintiff's Fourth
24    Amendment claims are going forward as to the individual federal
25    defendants.  What's at issue is just her equal protection claim
```

1    and there are just no facts in the Complaint to infer

2    discriminatory intent.

3         I also wanted to respond briefly because there was a

4    lot of discussion with the plaintiff's attorney about what

5    Mr. Fraley did and why he may have done it and what was

6    happening on the plane.  That all goes to Frontier's actions

7    and our motion is about what plaintiff alleges the five

8    individual federal defendants knew and did allegedly.

9         As to step two, we agree with plaintiffs that they

10   don't need to find one case that's specifically on point to

11   show that a right is clearly established, but they do need to

12   identify controlling authority for the proposition that's at

13   issue here and Ms. Tremont points out the Farm Labor case which

14   is interesting because again as I mentioned in my opening

15   remarks, Farm Labor is a case in which a specific state trooper

16   targeted someone for action out of a bigger group, it wasn't a

17   tip situation.  Moreover, in Farm Labor, the standard that the

18   Sixth Circuit required plaintiff to prove was not only

19   discriminatory purpose, but discriminatory affect and on page

20   534 and 535, listed a whole series of cases from across the

21   nation that required those two prongs.

22        Finally about Avery, Ms. Tremont used the footnote

23   from Avery to talk about using a flight manifest and selecting

24   names based on -- selecting people based on ethnic surnames and

25   as is clear from the Complaint here, no individual federal

1   defendant is alleged to have selected anybody.  They're simply

2   responding to a call from Frontier that identified plaintiff as

3   that she may be with them or may be involved in the conduct and

4   they took steps to conduct an investigation to determine

5   whether or not that was true.  I think Mr. Seward is also going

6   to add a few additional points unless your Honor has any

7   specific questions for me.

8              THE COURT:  No, thank you very much.

9              MS. WHITMAN:  Thank you, your Honor.

10             MR. SEWARD:  I guess that's my lead-in.  There is one

11  comment that we raised in our reply brief, but I'd like just to

12  touch upon it and that is that Ms. Tremont indicated that they

13  have specific evidence that she was singled out because of her

14  name.  Sixth Circuit has said you can have an equal protection

15  claim if there's direct evidence meaning from the individual

16  defendant's mouth or something, that person acted because that

17  person was Arabic, some protected class.  There's no such

18  allegation here of anybody stating that from law enforcement.

19  So then we have to touch upon the disparate treatment and she

20  acknowledges in her brief that she can't show that someone

21  similarly situated was treated differently.  So absent that,

22  plaintiff doesn't have and hasn't pled facts that can support

23  an equal protection claim.  And those are the only comments

24  that I'll make right now.

25             THE COURT:  Okay.  Thank you, Mr. Seward.  Well,

1    since you have two on your side, I'll ask Ms. Tremont if she

2    has anything she'd like to say in response?

3              MS. TREMONT:  Just very, very briefly on Mr. Seward's

4    last claim.

5              THE COURT:  We'll keep you to that.  I mean, what do

6    you have to say about the similarly situated argument?

7              MS. TREMONT:  Right, so the fact that the words

8    similarly situated do not appear in the Complaint does not doom

9    our equal protection claim here.  If we did have some sort of

10   allegation that plaintiff was treated differently than a

11   similarly situated individual, that would be exactly the type

12   of conclusory allegation that is not entitled to truth under

13   Iqbal and in fact in the Rondigo case cited extensively by Ms.

14   Whitman, exactly that happened.  There was an allegation of

15   being treated differently than a similarly-situated individual

16   that the Court didn't credit because it's conclusory.  The

17   facts in the Complaint establish that Ms. Hebshi was treated

18   differently than everybody else on that plane except for the

19   two individuals who were alleged to be acting suspiciously.

20   She was the only one that was identified as being with them and

21   the target of law enforcement action and that is enough to

22   state a plausible claim of discrimination on these facts.

23             THE COURT:  All right.  Thank you all very much.

24   Well, I want to thank you for your detailed briefing that

25   you've provided the Court on this motion and on the responses

1    as well as your argumentation.  All of it is very helpful.  I'm

2    not going to go ahead and issue my ruling now, but I will issue

3    a written decision that will resolve this and try to do so

4    expeditiously.

5            Now we have another motion as well and I'm not sure

6    exactly who's going to be arguing that, but we have this motion

7    by Frontier Airlines.

8            MR. HAVIS:  Your Honor, do we have to switch tables?

9            THE COURT:  I suppose you might want to or if you

10   want to sit there, you can, it doesn't matter.  If the

11   plaintiffs want to stay, they're welcomed to stay.  If they, if

12   they'd elect to leave, it's up to you all.  If you want to

13   stay, you can.  Doesn't really matter to me where you sit,

14   you're going to be at the podium most of the time.  All right,

15   so who will be handling this motion on behalf of Frontier?

16           MR. MAYE:  I will, your Honor.

17           THE COURT:  And would you place your name on the

18   record, please?

19           MR. MAYE:  Good afternoon, your Honor.  Brian Maye

20   for Frontier Airlines.

21           THE COURT:  Okay, Mr. Maye.

22           MR. MAYE:  Your Honor, this is our motion to dismiss

23   the airport defendants' cross-claims against Frontier Airlines.

24           THE COURT:  Yes.

25           MR. MAYE:  And for convenience sake, your Honor, I'm

1    going to refer to the individual airport defendants as the

2    airport.

3             THE COURT:  Okay.

4             MR. MAYE:  Your Honor, the airport and Frontier

5    entered into an airline operating agreement related to

6    Frontier's use of the Wayne County Airports.  Included in that

7    agreement was a provision that generally stated that Frontier

8    agreed to indemnify the airport for claims arising out of

9    Frontier's use of the airport.  The airport has filed a

10   cross-claim against Frontier claiming that Frontier has

11   breached its duty under the contract to indemnify and defend

12   the airports.  Frontier's position is that cross-claim or

13   cross-claims fail on the face of the pleadings because under no

14   circumstances can those cross-claims prevail because under

15   Michigan law it is against public policy to indemnify against

16   intentional misconduct or gross negligence.  That's clear under

17   the law; there's no disputing that.

18            The issue that the airport has focused on is whether

19   the claims against it are considered intentional conduct and

20   it's clear from the Complaint that the conduct is intentional,

21   it must be intentional.  These are Constitutional claims

22   against the airport.  They certainly are not claims of

23   negligence.  Court after court has concluded that equal

24   protection claims, search and seizure claims are based on

25   intentional conduct and in this case if the conduct were

```
 1    negligent conduct, the airport would be immune so from our

 2    perspective, it's clear that there are no circumstances under

 3    which the airport could prevail on its cross-claims against

 4    Frontier Airlines.

 5              THE COURT:  Now is this intended to be directed a

 6    motion against both of the claims?

 7              MR. MAYE:  That's right, your Honor.

 8              THE COURT:  Okay.

 9              MR. MAYE:  There's two pending cross-claims against

10    Frontier.

11              THE COURT:  Okay.  So if you could address how the

12    argument applies to both claims?

13              MR. MAYE:  They're the same claims, your Honor.

14    There's a handful of, umm, all the claims asserted against

15    Frontier in the cross-claims are all claims by employees of the

16    airport and under the agreement, the airline operating

17    agreement, the employees of the airport are included in this

18    indemnity provision so the employees have sought indemnity from

19    Frontier and it's our position that the employees, the

20    arguments that I just made apply to the employees.

21              THE COURT:  They apply with equal force to both of

22    the claims?

23              MR. MAYE:  That's right, your Honor.

24              THE COURT:  Okay.

25              MR. MAYE:  And that's all I have, your Honor.
```

1       THE COURT:  Well, what -- isn't it the case that the

2  indemnification agreement comes into effect if the initial

3  negligence if you will or the cause for the action is due to

4  the airline's negligence or not?

5       MR. MAYE:  Well, I think that --

6       THE COURT:  When you read that agreement, isn't that

7  what it says, that the --

8       MR. MAYE:  Yes, certainly there's the argument that

9  the claims that are, that come within this indemnity provision

10  only relates to actions of Frontier and not the action of the

11  airport, umm, but I, I don't think that we even need to go

12  there, your Honor, because it's against public policy to

13  indemnify for intentional misconducts and of gross negligence

14  and those are the claims that are pending against the airport,

15  the airport cannot prevail, but I do note your Honor that

16  nowhere in the agreement does it say that Frontier agrees to

17  indemnify for intentional misconduct or gross negligence and

18  further down the road if this motion were to fail, certainly we

19  would have an opportunity to make arguments that that indemnity

20  provision does not apply because of the facts of the case, but

21  at this -- but it's our position that we don't even get there

22  because under no circumstances can this provision apply.

23       THE COURT:  All right, thank you very much.  Okay, so

24  will this be Mr. Havis?

25       MR. HAVIS:  Yes.  Your Honor, may it please the

1    Court, Alan Havis on behalf of the Wayne County Airport

2    Authority airport police defendants.  Your Honor, what my

3    clients are seeking here is to get Frontier to stand behind its

4    call for help and to stand behind its contract.  The contract

5    as you just were discussing would invoke the indemnification by

6    Frontier, however Frontier says in this particular motion they

7    don't contest whether it would invoke or not, they're just

8    saying it can't apply because indemnification clauses are

9    against public policy when it comes to indemnifying for

10    intentional misconduct or gross negligence.

11          So the first point I guess that needs to be made is

12    that there's no allegation in the Complaint with regard to

13    gross negligence.  There's just not and the standard for gross

14    negligence is set forth in MCL 691.1402 or 1407, sub-paragraph

15    two which requires a deliberate indifference to whether injury

16    will result.  There's no allegation in the Complaint of gross

17    negligence.  There's no allegation that doesn't use the term

18    gross negligence that would support a possible cause of action

19    in gross negligence.  It's just not there.

20          With regard to intentional misconduct, that's the, I

21    guess the crux of this issue is the difference between

22    purposeful action and intentional tort if you will and the

23    airport authority defendants submit that there is a difference

24    and that the actions of each of the defendants was purposeful.

25    In response to Frontier's call for help, they responded, but

1    there is no specific allegation of intentional tort along the

2    lines of perhaps, I was trying to analogize in my own head as I

3    was thinking about what I would say to you, along the lines of

4    specific-intent crimes versus general-intent crimes.  There's

5    no allegation that the civil rights violations alleged are

6    anything of an intentional misconduct nature.

7            THE COURT:  Well, you can't have a civil rights

8    violation that's not intentional, can you?  I mean, that's what

9    we just went through the whole previous hearing about was that

10   whether or not allegations that were made which clearly attempt

11   to allege intentional violation of civil rights, I mean, that's

12   the, that was the whole basis of the argument regarding the

13   question of qualified immunity that if you had nothing but a

14   mistake, then qualified immunity would obviously protect the

15   officers, but it's when you have that personal, as the

16   government's own lawyer put it, the personal violation of

17   somebody's civil rights by an officer knowing and intentional

18   and then you have a clearly established Constitutional

19   argument, I mean, that's a high bar that the plaintiff

20   certainly claims to have hurdled here and so that's what the

21   Complaint is about and so why is the Complaint not about

22   intentional misconduct?

23           MR. HAVIS:  Well, the distinction I would make to

24   your Honor is a situation where an officer responding to a call

25   from Frontier for help perhaps tazes her after she was

1    handcuffed or something clearly alleged to be beyond the scope

2    of his duties and I suggest to the Court that there is a

3    difference between those kind of allegations and the

4    allegations contained in plaintiff's Complaint here.  What we

5    have from the airport authority officers' point of view is that

6    they -- the allegations are that they got called by Frontier

7    and that they responded.  They responded by taking her off the

8    plane, by investigating the matter and detaining her and that

9    the public policy issue with regard to those particular actions

10   actually run the other way, that the public policy is to

11   protect the officers in these cases in these kinds of

12   situations by affording them governmental immunity if this was

13   a tort case under Michigan tort law or by affording them

14   protection under 6 U.S.C., 1404 and by affording them

15   protection under qualified immunity.  The courts want -- the

16   courts are telling us that we want officers to go do their job

17   and public policy then would favor the courts -- I'm sorry,

18   would favor of the police departments to do their job and to do

19   otherwise, to say well indemnification can't apply because that

20   will promote bad behavior is just not here in this case because

21   there is no tazing after he was hand -- after she was

22   handcuffed or any allegation like that.  The allegations in the

23   Complaint are that they were doing their job.

24           THE COURT:  Well, I don't mean to interrupt you that

25   much.  I think I understand your point in that your point being

1    that if you have a, let's say an even more extreme example of

2    of some sort of invasive procedure or beating somebody up,

3    something that just looked like it was completely beyond the

4    pale and way out of proportion to the situation, but isn't it

5    in terms of the reason for not allowing indemnification of

6    intentional misconduct simply the fact that the person who's

7    insured controls the ability to misbehave because they know

8    that they will not have to pay any damages if they

9    intentionally commit some sort of tort or some sort of civil

10   rights violation no matter how egregious it may be?  I mean,

11   isn't that the reason for the public policy against that sort

12   of insurance?

13           MR. HAVIS:  Yeah, I think the law is that first of

14   all indemnification clause will be enforced as written and as

15   for purposes of our motion or for Frontier's motion today, they

16   concede I believe that this indemnification clause would apply

17   to this situation, but the public policy exception if you will

18   is that fringe exception where you got a bad actor acting

19   beyond the scope of their employment and what they do.  There's

20   no allegation that that took place.  There's no allegation, I

21   keep oncoming back to it, that she was tased or, you know,

22   pistol whipped or whatever, you know, some action by an

23   individual officer.  I think if that were the case, then I

24   think there would be an argument that hey, we didn't agree to

25   that.

1          THE COURT:  Isn't it a better test to go by whether

2    or not the Complaint alleges that the act was intentional

3    rather than how severe it was because by your argument, I would

4    think the Court would be having to try to develop some sort of

5    a spectrum of conduct and it would be very hard to know well,

6    okay, tazing is you can't get insurance for unlawful tazing,

7    but you can get insurance for unlawful banging their head on

8    the hood of the car.  I mean, how is the Court supposed to know

9    what you can get insurance for if certain intentional

10   misconduct is insurable, but other intentional misconduct is

11   not?

12          MR. HAVIS:  The, umm, I guess the question comes down

13   to intentional conduct, intentionally violating this woman's

14   civil rights versus purposeful action on behalf of the officers

15   and Frontier.  Frontier acted purposefully to give a call to

16   the federal authorities and the airport police and the airport

17   police acted purposefully to respond to that call because they

18   have an obligation to do so.  I don't believe that's the type

19   of public policy that works against the police officers.  I

20   think that's the public policy, the public policy in that

21   scenario is that we're going to protect the police officers in

22   that, we want to promote that activity.  It would be a

23   different situation if the officers did something outside of

24   responding to the call, but what they're accused of here is

25   responding to the call and taking action and that I believe is

```
 1    purposeful, but I don't believe it's intentional, an
 2    intentional tort of the kind that public policy says is,
 3    excepts the implication of the indemnification clause and
 4    specifically on that point, we cited, you know, what does the
 5    Court use to determine what public policy is and there is the
 6    Mayberry versus Madison case that says you can't just figure it
 7    out --
 8              THE COURT:  Did you say Marbury v. Madison?
 9              MR. HAVIS:  I'm sorry?
10              THE COURT:  Never mind, go ahead.
11              MR. HAVIS:  You can't just pull it out of thin air
12    what you believe public policy to be.  Public policy needs to
13    be stated in the case law and I don't believe it is in this
14    regard.  Thank you.
15              THE COURT:  All right, thank you very much,
16    Mr. Havis.  Mr. Maye, would you like to respond?
17              MR. MAYE:  Just quickly, your Honor.  One, regarding
18    Mr. Havis' contention that the intentional conduct was not so
19    bad and characterizing it as innocuous.  I would say that
20    plaintiff would have a different view on the allegations and I
21    don't think there's a distinction between intentional conduct
22    that is not so bad and intentional conduct that is bad.  The
23    fact is the allegations are that the airport committed
24    intentional misconduct that violated the Constitution.
25    Plaintiff did not allege negligence.
```

1          Regarding the public policy question, that's not a

2     question.  Michigan law is clear that it's against public

3     policy to indemnify for intentional misconduct.  That's --

4     there's no dispute over that.

5          Regarding the remaining arguments by the airport, the

6     airport's essentially argue the qualified immunity issue and

7     they're also presenting arguments to be made against, umm, in

8     defense of the claims against the airport by the plaintiff.

9     This has nothing to do with whether the indemnity provision

10    applies and we cert -- and Frontier certainly doesn't suggest

11    that the provision even without this public policy rule applies

12    in this case, but that is irrelevant at this stage.  At this

13    stage, we argue that regardless of the facts, the facts,

14    assuming all facts are true in the Complaint, there cannot be

15    indemnification because public policy doesn't permit it.  Thank

16    you, your Honor.

17         THE COURT:  All right, thank you very much, Mr. Maye

18    and thank you, Mr. Havis.  Again as I told the other counsel, I

19    appreciate your thoroughness and your briefing.  Sometimes

20    frankly it's not a pleasure to read briefs, but in you guy's

21    case, you all did a good job.  It was very informative and

22    helpful to the Court and so I'm going to take this motion under

23    advisement as well.  I will issue a written opinion that

24    resolves the issue presented by the motion.  Okay.

25         Now before we go, does anybody have anything else

1    that they need to bring up, that they want to bring to the

2    attention of the Court regarding this case?  You don't have

3    the -- we don't have the U.S. government with us anymore,

4    correct?  Counsel for the United States is not present.

5             MR. MAYE:  I'm sure there's some curiosity across the

6    parties regarding the motions to stay discovery.

7             THE COURT:  Right, okay.  On the motions to stay

8    discovery, those are directly related to the motions for, that

9    relate to qualified immunity and so the way I would like to

10   deal with that is just to address that motion as quickly as

11   possible and then that will show us which way to go with

12   respect to the discovery motions, all right?  Does that sound

13   acceptable?

14            MR. SEWARD:  Your Honor, I have a question.

15            THE COURT:  Yes?

16            MR. SEWARD:  Because -- Joe Seward on behalf my Wayne

17   County defendants.  We filed a subsequent qualified immunity

18   argument as to the Fourth Amendment so --

19            THE COURT:  Yes.

20            MR. SEWARD:  -- do I take the Court to say that he's,

21   that the Court's going to address not only the equal protection

22   and the Fourth Amendment claims before ruling on the stay

23   discovery issues?

24            THE COURT:  Yes.  I would like to do that and I'm

25   going to take a closer look at that.  I'm assuming, I don't

1    know whether you feel that you would necessarily want to have

2    oral argument on that motion or not because we have had, you

3    know, an opportunity to address the equal protection today and

4    the Court could resolve that based on the briefs which I'd be

5    glad to do.

6              MR. SEWARD:  I always find it helpful if the Court

7    has questions to be able to try to address them orally, umm --

8              THE COURT:  I'll take a look at those briefs and make

9    a decision as to whether or not to have oral argument, but if

10   we did so it would delay the issue regarding the whole matter

11   of discovery.

12             MR. SEWARD:  I understand.  Thank you.

13             THE COURT:  All right thank all.

14             MR. MAYE:  I'm sorry, your Honor.  Just for your

15   edification purposes I had my office e-mail me regarding your

16   questions about the timing of things?

17             THE COURT:  Okay.

18             MR. MAYE:  Initially the captain sent a message to

19   Frontier's dispatch at 2:12 p.m. notifying dispatch that there

20   were two males engaging in suspicious behavior.

21             THE COURT:  So that was from the aircraft to

22   Frontier?

23             MR. MAYE:  That's correct, your Honor.  Then at 2:24,

24   Mr. Fraley sent an e-mail to a limited number of people within

25   Frontier providing the names of the two suspicious men, their

1    seat assignments and then Ms. Hebshi's seat assignment, her

2    name and the comment she may be with them.  At some point

3    thereafter, a Frontier employee handed that e-mail to a TSA

4    agent and I think that happened at the gate before the plane

5    had arrived and then the plane arrived at 3:30 p.m.

6             THE COURT:  So you don't have and I don't mean to

7    suggest you should have it, but as it is right now you don't

8    have an electronic communication forwarding the 2:24 e-mail to

9    anyone in law enforcement, you're just saying that was

10   physically handed to someone, but you don't know exactly when

11   it was handed?

12            MR. MAYE:  That was hand -- that happened at the gate

13   and TSA supervisor asked the station manager of Frontier if she

14   had any additional information and she said yes, we have this

15   e-mail and she handed the, a printed copy of the e-mail.

16            THE COURT:  At the gate.  By that you mean after the

17   plane landed or?

18            MR. MAYE:  Before the aircraft landed.

19            THE COURT:  Before the plane landed, okay.  So some

20   time between 2:24 and 3:30, the copy of the e-mail was given to

21   TSA?

22            MR. MAYE:  That's correct, your Honor.

23            THE COURT:  Okay.

24            MR. MAYE:  Thank you.

25            THE COURT:  Anyone have any questions?

1          MS. HURWITZ:  Yes, your Honor.  Julie Hurwitz on

2     behalf of the plaintiff.  What just transpired between Mr. Maye

3     and the Court is a perfect example of why this is all

4     information we have not been provided with yet so the stay on

5     discovery is of some significance to us and so it's, we're a

6     little perplexed by putting the motion to stay on hold pending

7     the decision by the Court of both dispositive motions because

8     once the Court rules on the dispositive motions, the motion to

9     stay is essentially moot, we're either going to go forward or

10    we're not, so I guess the plaintiffs would request that the

11    motion to stay be disposed of sooner rather than later if

12    that's at all possible.  I'm -- is that --

13          THE COURT:  Yes --

14          MS. HURWITZ:  -- is that clear?

15          THE COURT:  Well --

16          MR. MAYE:  For clarification, your Honor, I'm sorry.

17    This information, the plaintiff does have because it came from

18    the Wayne County Airport Authority in the FOIA requests.  The

19    Fraley e-mail had the time stamped on the e-mail and the flight

20    that's, we all know when the flight arrived.

21          MS. TREMONT:  Yeah and sometimes your Honor what

22    matters at this stage is what's alleged in the Complaint,

23    right?  So I mean these additional facts may be helpful to us

24    in proving our claims.

25          MR. MAYE:  I just provided that to the Court because

1    the Court was asking earlier and I wanted to accommodate the

2    Court.

3              THE COURT:  Okay.  Well, thank you very much, Ms.

4    Hurwitz.  I will definitely take that point under advisement

5    and be looking at the discovery motions along with the other

6    motions keeping in mind that you have a concern for moving

7    forward with the discovery as soon as possible.

8              MS. HURWITZ:  We do your Honor and along just for the

9    record, as to the Fourth Amendment motion, if, if we can do

10   this expeditiously, we also believe that oral argument could be

11   helpful to the Court.

12             THE COURT:  All right, thank you very much.  We can

13   be in recess then.

14             THE CLERK OF THE COURT:  All rise.  Court's in

15   recess.

16             (Motions concluded at 4:56 p.m.)

17                       --    ---    --

<u>C E R T I F I C A T E</u>

 1

 2

 3

 4

 5

 6

 7          I, David B. Yarbrough, Official Court

 8   Reporter, do hereby certify that the foregoing pages

 9   comprise a true and accurate transcript of the

10   proceedings taken by me in this matter on Monday,

11   February 10th, 2014.

12

13

14

15

16   <u>2/18/2014</u>                <u>/s/ David B. Yarbrough</u>

17   Date                      David B. Yarbrough, CSR, FCRR
                               600 Church Street
18                             Flint, MI   48502

19

20

21

22

23

24

25