UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SHOSHANA HEBSHI,

                          Plaintiff,

        v.

                                            Case No. 13-10253

UNITED STATES OF AMERICA, et al.            HON. TERRENCE G. BERG
                                            HON. LAURIE J. MICHELSON

                          Defendants.

_____/

**ORDER GRANTING
CROSS-DEFENDANT'S MOTION TO DISMISS CROSS-COMPLAINT**

This matter is before the Court on cross-defendant Frontier Airlines's June 14, 2013 motions to dismiss (Dkts. 73, 74) the cross-complaints brought by cross-plaintiffs Jeremy Bohn, Corporal Bradley, Lieutenant M. Wasiukanis, Captain Patrick Driscoll, Mark DeBeau, Officer Grant, Toya Parker, Detective Carmona, and Officer Johnson (Dkts. 37-1, 40-2). The motions are brought under Federal Rule of Civil Procedure 12(b)(6). The parties have fully briefed the motions, and oral argument was heard on February 10, 2014.

For the reasons set forth below, Cross-Defendant's motions (Dkts. 73, 74) are GRANTED.

## I.   FACTUAL BACKGROUND

### A.   The Parties.

Plaintiff Shoshana Hebshi is a natural person, a United States citizen, a resident of Ohio, and the daughter of a Jewish mother and a father who immigrated to the United States from Saudi Arabia. (Dkt. 1 ¶ 12.)

Defendant United States of America is a sovereign state and the employer of Defendants Robert Ball, John Brand, Paul Brumley, Nathaniel Devins, and David Lakatos. (*Id.* ¶¶ 13, 15, 30, 31, 33, 36.)

Defendant Frontier Airlines is an American airline headquartered in Denver, Colorado, and was the operator of flight 623 from Denver to Detroit on September 11, 2011, upon which Plaintiff was a passenger. (*Id.* ¶¶ 14, 41.)

Defendants Robert Ball, John Brand, Paul Brumley, Nathaniel Devins, and David Lakatos are all federal agents who allegedly participated in the seizure, detention, and searches of Plaintiff's person and personal effects as described below. (*Id.* ¶¶ 15, 30, 31, 33, 36.)

Defendants Jeremy Bohn, Corporal Bradley, Lieutenant M. Wasiukanis, Captain Patrick Driscoll, Mark DeBeau, Officer Grant, Toya Parker, Detective Carmona, and Officer Johnson are all Wayne County Airport Authority (WCAA) agents who allegedly participated in the seizure, detention, and searches of Plaintiff's person and personal effects as described below. (*Id.* ¶¶ 19–27.)

Plaintiff has also named six unknown federal agents as Defendants. (*Id.* ¶¶ 16, 17, 28, 32, 34, 35.) Plaintiff had also named federal agents John Etling and Thomas Pipis as defendants, but they have since been voluntarily dismissed from the case. (*Id.* ¶¶ 18, 29; Dkts. 54, 55.)

## B.   Allegations Made in the Complaint.

On September 11, 2011, Plaintiff Shoshana Hebshi flew on Frontier Airlines flight 623 . . . . Upon landing, heavily armed agents forcibly removed [Plaintiff] from the airplane; handcuffed, pat searched, and striped searched her; and locked her in a cell at Detroit Metropolitan

Wayne County Airport before interrogating her. [She] was detained for approximately four hours before being released with no charges.

(Dkt. 1 ¶ 1.)

Plaintiff Shoshana Hebshi is a United States citizen whose first name is of Hebrew origin and surname is of Saudi Arabian origin. (*Id.* ¶ 12.) Plaintiff, traveling alone, flew on Frontier Airlines flight 623 from Denver to Detroit on September 11, 2011. (*Id.* ¶¶ 39, 41–42.) She sat in seat 12A and did not leave her seat at any time during the flight. (*Id.* ¶ 42.)

Seated next to Plaintiff, in seats 12B and 12C, were two men of "South Asian descent." (*Id.* ¶ 43.) Plaintiff did not know these men and did not speak to them at any time. (*Id.* ¶ 44.)

"During the flight, some flight attendants and passengers noticed that the two men seated in [Plaintiff's] row were acting in a way that they considered to be suspicious." (*Id.* ¶ 45.) "Specifically, these flight attendants and passengers alleged that the men went to the restroom around the same time and each spent ten, fifteen[,] or twenty minutes there. Some passengers and flight attendants also reported that the men were standing in the aisle for long periods." (*Id.*) None of the passengers or crew observed or reported anything suspicious about Plaintiff. (*Id.* ¶ 46.)

"Shortly before 3:00 p.m., flight attendants alerted the pilot . . . that two men of 'possibly Arab descent' had been observed repeatedly going to the bathroom and standing in the aisle for long periods . . . ." (*Id.* ¶ 47.) The pilot then "sent a message through the Aircraft Communications Addressing and Reporting System . . . asking

for information about the passengers seated in 12B and 12C, whom he and the flight attendants believed were acting strangely  . . . ." (*Id.* ¶ 48.)

The pilot's message was received by Mark Fraley, a Frontier Airlines employee, who forwarded the message by e-mail to several people, including other Frontier staff. (*Id.* ¶ 49.) He provided the names of the passengers in 12B and 12C, and also included Plaintiff's name as the passenger in 12A, noting that she might also be with them. (*Id.*)

Tammara Faforke, a Frontier Airlines employee, passed along Fraley's e-mail to a Transportation Security Administration air marshal and Officer Duncan, a WCAA police officer. (*Id.* ¶ 51.) Officer Duncan then passed the e-mail along to another WCAA officer, Defendant Grant. (*Id.*) Defendant Grant relayed the information from the e-mail, including that Plaintiff may be traveling with the two men, to Defendants Driscoll and Carmona, also WCAA officers. (*Id.* ¶ 52.)

The Transportation Security Administration also contacted Wayne County Airport Authority and reported the suspicious passenger behavior on flight 623. (*Id.* ¶ 53.)

At approximately 3:00 p.m., Defendants Bohn of WCAA, Lakatos and Ball (federal agents), and other law enforcement officers went to a designated inspection site to wait for the airplane to arrive. (*Id.* ¶ 54.) "At the inspection site, Defendant WCAA Officer Johnson . . . spoke via cell phone with [the plane's captain], who told Officer Johnson that a male passenger from row 12 had entered the . . . restroom for a long period . . . while the other man from row 12 stood outside." (*Id.* ¶ 55.) "According to Defendant Johnson . . . the captain stated that a third passenger

seated in 12A may also be involved in the incident but is seated and compliant at this time." (*Id.*)

None of the officers requested further evidence regarding Plaintiff's involvement in suspicious activities. (*Id.* ¶ 56.)

The responding agencies, which included several federal agencies as well as the WCAA police, collaborated and put in place a plan to divert and board the aircraft, arrest all three passengers, and remove them to a detention facility for questioning. (*Id.* ¶ 57.)

Defendant WCAA Officer Grant organized the tactical entry of the flight with the assistance of Defendant WCAA Officer Johnson and officers from United States Customs and Border Protection. (*Id.* ¶ 58.)

Defendant WCAA Captain Driscoll recommended to Defendant DeBeau, WCAA Vice President of Public Safety, that all three passengers be removed and taken to a detention facility for further investigation. Defendant DeBeau authorized the plan. (*Id.* ¶ 59–60.)

"At approximately 4:25p.m., Defendants [WCAA officers] Carmona, Bohn, Johnson[,] [and] . . . [federal agent] Brumley, along with other officers, boarded the plane, heavily armed, and ran down the aisle . . . ." (*Id.* ¶ 68.) The officers stopped at Plaintiff's row and yelled at all three passengers to get up. (*Id.* ¶ 70.) Defendant WCAA Detective Carmona put Plaintiff in handcuffs, and all three passengers were forcefully rushed down the aisle and off the plane. (*Id.* ¶¶ 72–73.)

After she was removed from the plane, an unidentified officer pushed Plaintiff roughly against a police car, made her spread her legs while he pat searched her,

and asked her if she was wearing explosives. (*Id.* ¶¶ 75–76.) Plaintiff answered that she was not wearing explosives. (*Id.* ¶ 76.)

By this point, Plaintiff had twice asked the officers for an explanation of what was happening, and was not given a reply. (*Id.* ¶¶ 71, 77.)

Defendant WCAA Corporal Bradley put Plaintiff in a police car with one of the two men who had also been removed from the plane, and drove them to Building 358. (*Id.* ¶ 78.) After they reached the building, Plaintiff, still handcuffed, was removed from the car and placed in a cell that was approximately six feet by ten feet with a metal cot and a video camera hanging over the toilet. (*Id.* ¶¶ 80–81.)

An unidentified male officer came to the door of the cell and asked Plaintiff if she spoke English, to which she said yes and added that she is an American citizen. (*Id.* ¶ 82.) "The officer told her he would stand by the door to make sure she did not 'flush anything' down the toilet." (*Id.* ¶ 83.) Plaintiff badly needed to use the toilet, but could not because of the presence of the guard and the camera. (*Id.* ¶ 84.)

At approximately 4:40 p.m., Defendants WCAA Lieutenant Wasiukanis and federal agent Brand conferred and decided that all three passengers should be strip searched. (*Id.* ¶ 85.) The "standard operating procedures in effect for the Wayne County Airport Authority" provided that "[a] person shall not be strip searched unless the person is being lodged into a detention facility, by order of a court or there is reasonable cause to believe that the person is concealing a weapon, controlled substance, or evidence of a crime." (*Id.* ¶ 86.)

An hour later, Defendant WCAA Officer Parker performed the strip search of Plaintiff, during which Plaintiff's handcuffs were removed and she was made to

remove all of her clothing "so that she was completely naked," told to face the wall, bend over, spread her buttocks, and cough while Defendant WCAA Officer Parker watched. (*Id.* ¶¶ 88–92.) Defendant Parker then felt through Plaintiff's hair, lifted Plaintiff's eyelids, and looked into her mouth. (*Id.* ¶¶ 93–94.) Plaintiff was then told to dress, after which Defendant Parker put the handcuffs back on Plaintiff. (*Id.* ¶ 97.)

Approximately two hours later, Plaintiff was taken to an interview room where two unidentified federal agents questioned her for approximately 30 minutes. (*Id.* ¶¶ 99–102.) The agents questioned her about her family, her previous travel, and the two men who were seated next to her. (*Id.* ¶ 100.)

Before she was permitted to leave, an unknown federal agent "required that [Plaintiff] show the Twitter messages she had sent out from the airplane upon landing, as well as her Facebook profile." (*Id.* ¶ 105.)

At approximately 7:30 p.m., Defendant federal agent Brand authorized the release of the three passengers. (*Id.* ¶ 106.)

## C.    Plaintiff's Claims.

Counts I, II, and III are brought against Frontier Airlines for violation of 42 U.S.C. § 1981, 42 U.S.C. § 2000d, and 49 U.S.C. § 40127(A), respectively. All of these claims involve allegations of discrimination based on race, ethnicity, or national origin. (*Id.* ¶¶ 110–31.)

Count IV is brought against the individual federal defendants and all of the WCAA defendants except WCAA Officer Toya Parker for violation of Equal Protection under the Fifth and Fourteenth Amendments. (*Id.* ¶¶ 132–38.)

7

Count V is brought against the individual federal defendants and all of the WCAA defendants except WCAA Officer Toya Parker for Unreasonable Seizure under the Fourth and Fourteenth Amendments. (*Id.* ¶¶ 139–45.)

Count VI is brought against Defendants federal agent Brand, WCAA Officer Parker, and WCAA Lieutenant Wasiukanis for Unreasonable Search under the Fourth and Fourteenth Amendments. (*Id.* ¶¶ 146–52.)

Count VII is brought against the United States of America for False Arrest and False Imprisonment under the Federal Tort Claims Act. (*Id.* ¶¶ 153–55.)

**D.    The WCAA Defendants' Cross-Complaints.**

All of the defendants who are employees or agents of the WCAA, that is, Defendants Jeremy Bohn, Corporal Bradley, Lieutenant M. Wasiukanis, Captain Patrick Driscoll, Mark DeBeau, Officer Grant, Toya Parker, Detective Carmona, and Officer Johnson ("WCAA Defendants"), have made cross-claims against Frontier Airlines. The WCAA Defendants have been proceeding in this case as two sets of individual Defendants with separate counsel. Those two sets are: (1) Defendants DeBeau, Carmona, Grant, Johnson, and Parker, represented by attorney Alan B. Havis (Dkts. 9–11, 41); and (2) Defendants Bohn, Bradley, Driscoll, and Wasiukanis, represented by attorney T. Joseph Seward (Dkts. 39, 41). Mr. Havis's Defendants' cross-complaint is document 37-1 on the case docket, while Mr. Seward's Defendants' cross-complaint is document 40-2. Aside from the names of the Cross-Plaintiffs, the size of the page margins, and the signatures of the lawyers, the two cross-complaints are identical. Therefore, in the course of this

order, any reference to a cross-complaint is intended to apply to both cross-complaints, unless otherwise stated.

The following are the factual allegations made in the cross-complaints that relate specifically to the WCAA Defendants' cross-claims:

A. Plaintiff has sued the WCAA Defendants seeking damages (Dkts. 37-1 & 40-2 ¶1.)

B. The acts alleged in Plaintiff's complaint are alleged to have arisen at Detroit Metro Airport. (*Id.* ¶ 6.)

C. Plaintiff's complaint alleges that her civil rights were violated by the Defendants, "for their activities surrounding and involving Ms. Hebshi's detainment at Metro Airport." (*Id.* ¶ 8.)

D. "On January 1, 2009 Frontier entered into an [sic] four [sic] Non-Signatory Airline Operating Agreement with the WCAA to lease space and operate air carrier services at Metro Airport (hereinafter 'Frontier/WCAA contract')." (*Id.* ¶ 9.)

E. "[Under] the Frontier/WCAA contract, Frontier has agreed to indemnify, defend, and hold the WCAA including its employees harmless from and against all liability to persons related to Frontier's acts or omissions in its use of the Airport, however [sic] it shall not be liable for any injury caused by the WCAA's sole negligence." (*Id.* ¶ 10.)

F. "This incident arose out of Frontier's operations at Metro Airport." (*Id.* ¶ 11.)

G. "Defendant Cross Plaintiffs . . . are each employees of the WCAA." (*Id.* ¶ 12.)

H. The WCAA Defendants "tendered this matter to Frontier seeking indemnification [under] the Frontier/WCAA contract, and Frontier has failed to respond to the tender demand." (*Id.* ¶ 14.)

I. "Failure to accept the tender by [WCAA Defendants] violates the indemnification provision of the Frontier/WCAA contract, and as such, Frontier is liable to [WCAA Defendants] for their attorneys [sic] fees and costs in defending this matter, and for other damages including . . . any settlement entered into by the [WCAA Defendants] or judgment rendered against them." (*Id.* ¶ 15.)

**J.**  "[Under] the Frontier/WCAA contract, Frontier was to obtain, in the name of the WCAA as an additional insured, a Comprehensive Airline Liability Insurance policy, in an amount of not less than . . . $500,000,000 per occurrence." (*Id.* ¶ 17.)

**K.**  "The WCAA acts through its employees and said policy applies to [WCAA Defendants] as employees of the WCAA." (*Id.* ¶ 18.)

**L.**  "A claim on Frontier's insurance policy was instituted by [WCAA Defendants] and Frontier's insurer has not responded." (*Id.* ¶ 19.)

**M.**  "To the extent that Frontier failed to obtain the insurance specified within the Frontier/WCAA contract, Frontier breached its contract with the Airport Authority and is liable for all natural and foreseeable consequential damages sustained by [WCAA Defendants]." (*Id.* ¶ 20.)

## II.    LEGAL STANDARD

A Rule 12(b)(6) motion tests whether a legally sufficient claim has been pleaded, and provides for dismissal when a plaintiff fails to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). A claim is facially plausible when a plaintiff pleads factual content that permits a court to reasonably infer that the defendant is liable for the alleged misconduct. *Id.* (citing *Twombly*, 550 U.S. at 556). When assessing whether a plaintiff has set forth a "plausible" claim, the district court must accept all of the complaint's factual allegations as true. *See Ziegler v IBP Hog Mkt., Inc.*, 249 F.3d 509, 512 (6th Cir. 2001). "Mere conclusions," however, "are not entitled to the assumption of truth. While legal conclusions can provide the complaint's framework, they must be supported by factual allegations."

*Iqbal*, 556 U.S. at 664. A plaintiff must provide "more than labels and conclusions," or "a formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 556. Therefore, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678.

In ruling on a motion to dismiss, the Court may consider the complaint as well as (1) documents that are referenced in the plaintiff's complaint or that are central to plaintiff's claims, (2) matters of which a court may take judicial notice, and (3) documents that are a matter of public record. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007); *see also Greenberg v. Life Ins. Co. of Virginia*, 177 F.3d 507, 514 (6th Cir. 1999) (finding that documents attached to a motion to dismiss that are referred to in the complaint and central to the claim are deemed to form a part of the pleadings).

## III.   ANALYSIS

The WCAA Defendants brought two cross-claims against Defendant Frontier Airlines, both for breach of contract. (Dkts. 37-1, 40-2.) In Count I, the WCAA Defendants claim that Frontier has failed to indemnify them and hold them harmless, and, in Count II, they claim that Frontier has failed to obtain specified insurance, both in violation of a contract between Frontier and the WCAA. (*Id.*) Frontier moves to dismiss the cross-complaints for failure to state a claim upon which relief can be granted, arguing that the indemnification and insurance provisions it is accused of breaching are void as against public policy. (Dkts. 73 & 74 at 10–14.)

11

Under Michigan law

> to establish a breach of contract claim . . . a plaintiff must establish both the elements of a contract and the breach of it. The essential elements of a valid contract are: (1) parties competent to contract, (2) a proper subject matter, (3) a legal consideration, (4) mutuality of agreement, and (5) mutuality of obligation. Once the plaintiff establishes the elements of a contract, it must then establish that the contract was breached and damages resulting from the breach. Where performance is due under a contract, nonperformance constitutes a breach.

*RSM Richter, Inc. v. Behr Am., Inc.*, 781 F. Supp. 2d 511, 517 (E.D. Mich. 2011) (internal citations omitted). Here, Frontier argues that the agreement is void because it violates public policy, which is to say that the contract does not cover "a proper subject matter." *See Morris & Doherty, P.C. v. Lockwood*, 672 N.W.2d 884, 893 (Mich. Ct. App. 2003) ("A proposed contract is concerned with a proper subject matter only if the contract performance requirements are not contrary to public policy.").

The WCAA Defendants' allegations are deficient with respect to the alleged breach. For this reason, more fully explained below, the WCAA Defendants' cross-complaints fail to state a claim upon which relief can be granted.

## A. The WCAA Defendants Have Failed to Allege Breach of Contract Sufficiently.

With a breach of contract claim, like the two in the WCAA Defendants' cross-complaints, to "state a claim to relief that is plausible on its face," *Twombly*, 550 U.S. at 555, the pleader must allege "sufficient factual matter, accepted as true," *Iqbal*, 556 U.S. at 678, that establishes both that the elements of a contract were satisfied and that the contract was breached. "To defeat a motion to dismiss, 'a

complaint must contain either direct or inferential allegations respecting all the material elements to sustain a recovery under some viable legal theory.'" *Thornberry v. Grand Trunk W. R.R. Inc.*, 776 F. Supp. 2d 453, 456 (E.D. Mich. 2011) (citing *Allard v. Weitzman*, 991 F.2d 1236, 1240 (6th Cir. 1993)).

All of the cross-complaints' allegations possibly relevant to whether the contract was breached are summarized at the end of the Factual Background section above, listed as A through M. Those allegations are plainly insufficient to establish a breach of contract claim.

### 1. The allegations are insufficient to support Count I.

As to Count I of the cross-complaints, the language of the indemnification clause as alleged clearly states that Frontier must defend and indemnify the WCAA Defendants *only* for claims "related to Frontier's acts or omissions in its use of the Airport" that are not caused by the WCAA's sole negligence. (Dkts. 37-1 & 40-2 ¶ 10.) The only allegation the WCAA Defendants make as to whether the Plaintiff's claims qualify under that clause is this one: "This incident arose out of Frontier's operations at Metro Airport." (*Id.* ¶ 11.) But that allegation is conclusory and not entitled to the assumption of truth—"[w]hile legal conclusions can provide the complaint's framework, they must be supported by factual allegations." *Iqbal*, 556 U.S. at 664. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* at 678. Further, even if it were accepted as true, the alleged fact that the incident "arose out of Frontier's operations" at the airport is insufficient to trigger the contract's indemnification

13

requirement because that provision applies to claims that are "related to Frontier's acts or omissions in its use of the Airport."

The WCAA Defendants have not alleged what it is that Frontier did that made it so Plaintiff's claims against the WCAA Defendants are the fault or responsibility of Frontier. There is not a single fact alleged that explains what Frontier did to make it such that the WCAA Defendants' alleged violations of Plaintiff's civil rights were "related to Frontier's acts or omissions in its use of the Airport." Further, there is no allegation that Plaintiff's alleged damages are not the result of the WCAA's sole negligence.

Even if the WCAA Defendants were to incorporate the allegations from Plaintiff's complaint, the cross-complaint would still fail to state a claim upon which relief can be granted. Based on their response to the motion to dismiss—which contains more facts than are pleaded in the cross-complaints—the WCAA Defendants' theory of the breach appears to be that their alleged actions against Plaintiff were somehow caused by Frontier's actions. (Dkt. 80 at 13.) But even if the cross-complaints were to allege that Frontier agents had alerted the WCAA Defendants to the "suspicious activity" occurring on flight 623, or that it was a Frontier agent who communicated to the WCAA Defendants that Plaintiff might be with the two men who were acting suspiciously, that would not be sufficient to establish that Plaintiff's claims trigger the indemnification clause in the contract. That is to say, such allegations would not be sufficient to fall within the coverage of the indemnification agreement because they do not contend that Plaintiff's civil rights claims against the WCAA Defendants either actually or allegedly arose from,

14

were related to, or were caused by, the airline's "acts or omissions . . . in its use or occupancy of the airport or the conduct of any of its operations or activities at the airport."

Defendants' cross-claims fail to allege any facts capable of answering two questions that must be addressed to make a plausible claim that Frontier violated the indemnity clause. First, how is it that Frontier, in having made a report to law enforcement, is responsible for the conduct of the law enforcement officers who react to that report; and second, how could it be the case that Plaintiff's claims against the WCAA Defendants arose from, related to, or were caused by Frontier's acts or omissions, or the conduct of any of its operations or activities at the airport? The absence of any facts addressing these questions prevents the cross-claims from stating a cause of action for a breach of the indemnity clause. Whether it may be possible to allege such facts is unknown, but the Court notes that the WCAA Defendants would have had a substantial bar to clear if they had sought leave to amend, particularly when "indemnity contracts are construed most strictly against the party who drafts them and the indemnitee." *Powers v. Apcoa Standard Parking, Inc.*, 259 F. Supp. 2d 606, 609 (E.D. Mich. 2003).

### 2. *The allegations are insufficient to support Count II.*

As to Count II, the allegations are insufficient there as well. The WCAA Defendants allege that the Non-Signatory Airline Operating Agreement required Frontier to "obtain, in the name of the WCAA as an additional insured, a Comprehensive Airline Liability Insurance Policy, in an amount not less than . . . $500,000,000 per occurrence." (Dkts. 37-1 & 40-2 ¶ 17.) This allegation sets out

Frontier's obligation to obtain insurance, but it does not state that Frontier breached the agreement by failing to obtain insurance. The WCAA Defendants allege that "Frontier's *insurer* has not responded" (emphasis added) to the claim they "instituted" with the insurer, and that "*to the extent that* Frontier failed to obtain insurance . . . Frontier breached its contract." (*Id.* ¶¶ 19–20) (emphasis added). This allegation also fails to state any facts showing that Frontier failed to obtain insurance as required. Neither of these are an allegation of a breach of contract. They are allegations that WCAA believes Frontier has breached the contract, which is insufficient to plead a breach.

Because the WCAA Defendants have failed to plead sufficient facts, "accepted as true, to 'state a claim to relief that is plausible on its face,'" *Iqbal*, 556 U.S. at 678, their cross-complaint fails to state a claim upon which relief can be granted.

**B.    If the Indemnification Provision Were Interpreted to Require Indemnification of the Airport Defendants for Plaintiff's Claims Against Them, it Would Necessarily Be Void as Against Public Policy.**

Absent allegations of truly extraordinary facts, the WCAA Defendants cannot redeem Count I of the cross-complaints. As discussed above, it is far from clear that Plaintiff's claims against the WCAA Defendants are even covered by the plain language of the agreement. But what is clear is that if the indemnification provision were read to cover Plaintiff's claims against the WCAA Defendants, that provision would be void as against public policy, in which case the WCAA Defendants would be unable to establish either a breach or even a that the contract is one over a "proper subject matter."

The parties agree that "this Court's supplemental jurisdiction over the contract claim requires that it 'sits as a court of the forum state and is bound to apply its substantive law.'" (Dkt. 80 at 13; Dkts. 73 & 74 at 10.)

In its motions to dismiss the cross-complaints, Frontier argues that the motion should be granted because

> all the claims made by [Plaintiff] against Cross Plaintiffs . . . seek recovery for alleged *intentional* and unconstitutional conduct in arresting, detaining, and strip searching [Plaintiff]. To the extent that Frontier allegedly has an obligation under the contract to indemnify and insure the Cross Plaintiffs for such conduct, which is explicitly denied, such an agreement, as applied to these claims, is void and unenforceable under Michigan law.

(Dkts. 73 & 74 at 13.) In support of this argument, Frontier offers the following cases as "controlling authority": *Caldwell v. Enyeart*, 72 F.3d 129 (Table) (6th Cir. 1995); *Wagner v. Regency Inn Corp.*, 186 Mich. App. 158 (Mich. Ct. App. 1990); *Holmes v. St. Clair County, Michigan*, No. 04-73830, 2005 WL 1684136 (E.D. Mich. July 18, 2005); and *Powers v. Apcoa Standard Parking, Inc.*, 259 F. Supp. 2d 606 (E.D. Mich. 2003).

The WCAA Defendants argue that the indemnification provision is not void and unenforceable because (1) their conduct was not intentional in that they believed it was proper police activity and to the extent it might have violated Plaintiff's civil rights that consequence was not intended, and (2) indemnifying them in this matter would not violate Michigan public policy. (Dkt. 80 at 13–22.)  In support of their position, the WCAA Defendants offer the following cases and statutes as "controlling or most appropriate authority": *Terrien v. Zwit*, 648 N.W.2d 602 (Mich. 2002); *Twin City Pipeline Co. v. Harding Glass Co.*, 283 U.S. 353, 357 (1931);

17

*Anderson v. Creighton*, 483 U.S. 635, 643 (1987); 6 U.S.C. § 1404; and Michigan
Compiled Laws 691.1407(2).[1]

Both of the WCAA Defendants' arguments fail. The complaint alleges intentional
constitutional violations, actions which are not appropriate for contractual
indemnification under Michigan law. And even if their actions could somehow be
classified as something other than intentional torts, indemnification for the civil
rights violations alleged in this case would still be void as against public policy.

1.  *The WCAA Defendants' alleged actions against Plaintiff were
    intentional.*

Plaintiff's allegations and claims against the WCAA Defendants' are brought
under 42 U.S.C. § 1983 for the intentional violation of her civil rights, specifically
her rights to equal protection, to be free from unreasonable seizures, and to be free
from unreasonable searches. (Dkt. 1 at ¶¶ 132–52.) Section 1983 claims, by their
very nature, are not claims of negligence. *See Firefighters Local Union No. 1784 v.
Stotts*, 467 U.S. 561, 583 n.16 (1984) (citing *Washington v. Davis*, 426 U.S. 229
(1976); *Gen. Bldg. Contractors Assn. v. Pennsylvania*, 458 U.S. 375 (1982)); *Bass v.
Robinson*, 167 F.3d 1041, 1050 (6th Cir. 1999). Frontier makes this argument.
(Dkts. 73 & 74 at 13; Dkt. 85 at 2.)

In response, the WCAA Defendants argue that, "in the area of insurance and
indemnity law," "intent . . . means more than merely intent to do a specific act. It
must also include intent to bring about a result that is itself wrongful." (Dkt. 80 at

---

[1] WCAA Defendants should please note that the Court's practice guidelines require that citations
"must conform to the latest edition of The Bluebook: A Uniform System of Citation published by the
Harvard Law Review." http://www.mied.uscourts.gov/Judges/guidelines/topic.cfm?topic_id=459. Few
if any of the case citations in the response (Dkt. 80) conform to the Bluebook.

15–16.) WCAA does not offer a citation to any case or other authority to support that statement. Instead, they offer what they view as the "best exposition of this requirement" by quoting from and citing to a case that discusses the use of "occurrence" and "accident" in the context of insurance coverage. (*Id.* at 16.) They note that under Michigan law "'an accident is an undesigned contingency, a casualty, a happening by chance, something out of the usual course of things, unusual, fortuitous, not anticipated, and not naturally to be expected.'" *Frankenmuth Mut. Ins. Co. v. Masters*, 595 N.W.2d 832, 838 (1999) (quoting *Arco Indus. Corp. v. Am. Motorists Ins. Co.*, 531 N.W.2d 168, 173 (1995) *abrogated by* 595 N.W.2d 832 (1999)). They also claim, again with no supporting citation, that "it is not enough that the person acted intentionally. . . . the actor must also intend to cause the wrongful result." (Dkt. 80 at 16.) They then offer another quotation from the *Frankenmuth* case: ". . . a determination must be made whether the consequences of the insured's intentional act either were intended by the insured or reasonably should have been expected because of the direct risk of harm intentionally created by the insured's actions." *Frankenmuth Mut. Ins. Co.*, 595 N.W.2d at 839.

What this argument, and the holdings of the cited *Frankenmuth* case, have to do with whether the Plaintiff's claims against the WCAA Defendants arise from intentional acts or negligence is a mystery. How Michigan courts interpret the undefined term "accident" in an insurance policy tells us nothing about whether the particular actions of the WCAA Defendants were intentional. As this is the WCAA

Defendants' only argument, and the *Frankenmuth* case is the only cited case on this point, their defense against Frontier's motion fails.

It is clear from the response, however, that the WCAA Defendants' position is that while the actions were intentional, they did not intend the "harmful result." (Dkt. 80 at 17.) But that is not the standard. As alleged, the actions of the WCAA Defendants were clearly intentional—they did not accidentally or negligently forcefully remove Plaintiff from the plane, or detain her, or strip search her. Whether those actions were in fact violations of her civil rights, whether they were reasonable and excusable, is a different question. But the answer to that different question does not convert the WCAA Defendants' actions from intentional acts to negligence.

To the extent the indemnification provision in the agreement (Dkts. 37-1 & 40-2 ¶¶ 9–20; Dkt. 80-2) were to require Frontier to indemnify the WCAA Defendants for Plaintiff's claims against them, it would be void under Michigan law. *See, e.g.*, *Caldwell v. Enyeart*, 72 F.3d 129 (Table) (6th Cir. 1995) (citing *Island Creek Coal Co. v. Lake Shore, Inc.*, 692 F. Supp. 629, 633 (W.D. Va. 1988); *Klann v. Hess Cartage Co.*, 214 N.W.2d 63, 65 (Mich. Ct. App.1973); *Vigilant Ins. Co. v. Kambly*, 319 N.W.2d 382, 385 (Mich. Ct. App. 1982); *Universal Gym Equip., Inc. v. Vic Tanny Int'l, Inc.*, 526 N.W.2d 5, 7 (Mich. Ct. App. 1994)); *see also Mahon v. City of Bethlehem*, 902 F. Supp. 76, 79 (E.D. Pa. 1995) ("There is even more reason to demand specificity when the indemnitee seeks to be indemnified for his or her own intentional conduct. The clauses at issue make no reference to intentional torts, but rather use terms of general import except on the subject of negligence. The drafters

20

could have included terms relating to intentional torts if they had so desired and as they did for negligent torts. They did not and we hold that as a matter of law the clauses do not indemnify Moving Defendants for their own intentional torts.").[2]

> ### 2. *Public Policy prohibits the indemnification of the WCAA Defendants for Plaintiff's claims against them.*

Even if the WCAA Defendants' actions against Plaintiff could somehow be classified as something other than intentional torts, and thus the indemnification agreement was not void for indemnifying a party for its own intentional misconduct, the indemnification provision would still be void as against public policy. *See Federoff v. Ewing*, 192 N.W.2d 242, 245–46 (Mich. 1971); *see also Caldwell*, 72 F.3d 129. All agreements that create a situation that "tends to operate to the detriment of the public interest are against public policy and void." *Federoff*, 192 N.W.2d at 245; *Caldwell*, 72 F.3d 129.

The WCAA Defendants' sole argument that contractual indemnification for civil rights claims is not void as against public policy is: both Michigan and federal law provide qualified immunity for those claims, including the claims brought against the WCAA Defendants. This argument is specious at best. The same is true as to the fact that one can get insurance coverage for civil rights violations. That both state and federal law, and thus public policy, provide law enforcement officers qualified immunity under some circumstances, including many circumstances where the subject of the actions believe her civil rights have been violated, does not

---

[2] In their response, the WCAA Defendants refer to two distinct agreements (Dkt. 80 at 11), but their cross-complaints are made only on the provisions of one of those agreements, the "Non-Signatory Airline Operating Agreement," attached as exhibit 1 to the response. (Dkts. 37-1 & 40-2 ¶¶ 9–20.)

mean that public policy supports contractual indemnification for those claims regardless of whether the officers are protected by qualified immunity. WCAA is seeking indemnification for *any kind of conduct*, whether protected by qualified immunity (in which case no indemnification would be needed) or whether it amounts to an intentional violation of constitutional rights. The doctrine of qualified immunity protects reasonable police conduct and advances the public interest; the notion that allegedly unreasonable and intentional police misconduct should be indemnified by contract does not.

While a Michigan trial court has held that a contractual indemnification for civil rights violations is void as against public policy, the Court is not aware of a Michigan appellate court that has squarely addressed this question. *See Badiee v. Brighton Area Sch.*, 695 N.W.2d 521, 531 (Mich. Ct. App. 2005). Nevertheless, it is clear that the indemnification provision at issue here, if it were read to cover claims such as those the Plaintiff has brought against WCAA Defendants, is contrary to the public policy of both the state of Michigan and the United States. *See, e.g.*, *Hurd v. Hodge*, 334 U.S. 24, 35 (1948) (noting that agreements that tend to injure the public good violate public policy); *Caldwell*, 72 F.3d 129; *L'Orange v. Med. Protective Co.*, 394 F.2d 57, 60 (6th Cir. 1968) (noting that courts should not hesitate to void agreements that tend to injure the public good or contravene an established interest of society); *Holmes v. St. Clair County, Mich.*, No. 04-73830, 2005 WL 1684136, at *5 (E.D. Mich. July 18, 2005); *Federoff*, 192 N.W.2d at 245.

If airport law enforcement officers could be indemnified for their alleged civil rights violations, such as those alleged here, it would, in the words of the Michigan

courts "operate to the detriment of the public interest," *Federoff*, 192 N.W.2d at 245, and, in the words of the United States Supreme Court, "tend to injure the public good," *Hurd*, 334 U.S. at 35. It is in the public interest to have law enforcement officers who refrain from violating the civil rights of citizens and the human rights of noncitizens. It is further in the public interest that airline employees feel free to alert law enforcement of suspicious activity on aircraft. Both of these would be stymied by contractual indemnification: the officers might feel freer to push the limits of reasonable police action, aware that if they cross the line it will be neither them nor their employer that would suffer the consequences; and the airlines might feel less free to alert law enforcement of suspicious activity, aware that any unreasonable actions or over-reactions by the officers, would be their burden to defend. Such a circumstance would clearly "tend to injure the public good." *Cf. Cramer v. Matish*, 924 F.2d 1057 (Table), at *4 (6th Cir. 1990) ("Indemnification clauses in collective bargaining agreements which purport to relieve public employers from liability for violations of federal constitutional and civil rights are void as against public policy."); *Stamford Bd. of Educ. v. Stamford Educ. Ass'n*, 697 F.2d 70, 73–74 (2d Cir. 1982); *but cf. Chicago Hous. Auth. v. Fed. Sec., Inc.*, 161 F.3d 485, 489 (7th Cir. 1998) (where an indemnification clause required a private security agency to indemnify the Chicago Housing Authority for the consequences of negligence and intentional misconduct committed *by the private security agency's own officers*, it is not necessarily contrary to public policy under Illinois state law). For the above reasons, the clause at issue, if construed to require Frontier to indemnify WCAA for their alleged civil rights violations committed against

Plaintiff, is void as against public policy. Consequently, WCAA's cross-claim brought under this clause will be dismissed.

## IV.   CONCLUSION

For the reasons set forth above, it is hereby ORDERED that Frontier's motions to dismiss (Dkts. 73 &74) the WCAA Defendants' cross-complaints (Dkts. 37-1 & 40-2) are GRANTED and the cross-complaints are DISMISSED. It is FURTHER ORDERED that Count I of the cross-complaint cannot be redeemed by amendment and thus is DISMISSED WITH PREJUDICE. It is FURTHER ORDERED that any motion for leave to amend the cross-complaint must be made by March 31, 2014, in accordance with Federal Rule of Civil Procedure 15 and this Court's Local Rule 15.1.

s/Terrence G. Berg
TERRENCE G. BERG
UNITED STATES DISTRICT JUDGE

Dated:  March 18, 2014

**Certificate of Service**

I hereby certify that this Order was electronically submitted on March 18, 2014, using the CM/ECF system, which will send notification to each party.

By:  s/A. Chubb
Case Manager

24