UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SHOSHANA HEBSHI,

                        Plaintiff,

        v.

                                                Case No. 13-10253

UNITED STATES OF AMERICA, et al.,              HON. TERRENCE G. BERG
                                                HON. LAURIE J. MICHELSON
                        Defendants.

_____/

**ORDER DENYING
DEFENDANTS' MOTIONS FOR PARTIAL JUDGMENT ON THE
PLEADINGS, TO DISMISS COUNT IV, AND TO STAY DISCOVERY**

This matter is before the Court on a motion to dismiss Count IV (Dkt. 57)

brought by Defendants Robert Ball, John Brand, Paul Brumley, Nathaniel Devins,

and David Lakatos, all of whom are federal law enforcement officials or agents

("Federal Agent Defendants"), and a motion for partial judgment on the pleadings to

dismiss Count IV (Dkt. 69) brought by Defendants Jeremy Bohn, Corporal Bradley,

Lieutenant M. Wasiukanis, Captain Patrick Driscoll, Mark DeBeau, Officer Grant,

Toya Parker, Detective Carmona, and Officer Johnson, who are law enforcement

officers of the Wayne County Airport Authority ("WCAA Defendants"). The motions

are brought under Federal Rule of Civil Procedure 12(b)(6) and 12(c), respectively,

and both assert that the individual law enforcement defendants are entitled to

qualified immunity as to Plaintiff's claims that her arrest and detention on

September 11, 2011, was in violation of her rights to Equal Protection under the

United States Constitution. The parties have fully briefed the motions, and oral

argument was heard on February 10, 2014. Defendants have also moved for a stay of discovery pending resolution of these motions relating to qualified immunity.

For the reasons set forth below, Defendants' motions to dismiss and for judgment on the pleadings (Dkts. 57, 69) are DENIED, and the motions to stay discovery (Dkts. 66, 70) are DENIED as moot.

## I.   FACTUAL BACKGROUND

### A.   The Parties.

Plaintiff Shoshana Hebshi is a natural person, a United States citizen, a resident of Ohio, and the daughter of a Jewish mother and a father who emigrated from Saudi Arabia. (Dkt. 1 ¶ 12.)

Defendant United States of America is a sovereign state and the employer of Defendants Robert Ball, John Brand, Paul Brumley, Nathaniel Devins, and David Lakatos. (*Id.* ¶¶ 13, 15, 30, 31, 33, 36.)

Defendant Frontier Airlines is an airline headquartered in Denver, Colorado, and was the operator of flight 623 from Denver to Detroit on September 11, 2011, upon which Plaintiff was a passenger. (*Id.* ¶¶ 14, 41.)

Defendants Robert Ball, John Brand, Paul Brumley, Nathaniel Devins, and David Lakatos are federal law enforcement agents who allegedly participated in the seizure, detention, and searches of Plaintiff's person and personal effects as described below. (*Id.* ¶¶ 15, 30, 31, 33, 36.)

Defendants Jeremy Bohn, Corporal Bradley, Lieutenant M. Wasiukanis, Captain Patrick Driscoll, Mark DeBeau, Officer Grant, Toya Parker, Detective Carmona, and Officer Johnson are Wayne County Airport Authority (WCAA) law

enforcement agents who allegedly participated in the seizure, detention, and searches of Plaintiff's person and personal effects as described below. (*Id.* ¶¶ 19–27.)

In addition, Plaintiff has also named six unknown federal agents as Defendants. (*Id.* ¶¶ 16, 17, 28, 32, 34, 35.) Plaintiff had also named federal agents John Etling and Thomas Pipis as defendants, but they were voluntarily dismissed from the case. (*Id.* ¶¶ 18, 29; Dkts. 54, 55.)

## B.   Allegations Made in the Complaint.

Plaintiff's primary allegations are summarized in the first paragraph of the Complaint:

> On September 11, 2011, Plaintiff Shoshana Hebshi flew on Frontier Airlines flight 623 . . . . Upon landing, heavily armed agents forcibly removed [Plaintiff] from the airplane; handcuffed, pat searched, and strip searched her; and locked her in a cell at Detroit Metropolitan Wayne County Airport before interrogating her. [She] was detained for approximately four hours before being released with no charges.

(Dkt. 1 ¶ 1.) The details follow.

Plaintiff Shoshana Hebshi is a United States citizen whose first name is of Hebrew origin and surname is of Saudi Arabian origin. (*Id.* ¶ 12.) Plaintiff, traveling alone, flew on Frontier Airlines flight 623 from Denver to Detroit on September 11, 2011. (*Id.* ¶¶ 39, 41–42.) She sat in seat 12A and did not leave her seat at any time during the flight. (*Id.* ¶ 42.)

Seated next to Plaintiff, in seats 12B and 12C, were two men of "South Asian descent." (*Id.* ¶ 43.) Plaintiff did not know these men and did not speak to them at any time. (*Id.* ¶ 44.)

"During the flight, some flight attendants and passengers noticed that the two men seated in [Plaintiff's] row were acting in a way that they considered to be suspicious." (*Id.* ¶ 45.) "Specifically, these flight attendants and passengers alleged that the men went to the restroom around the same time and each spent ten, fifteen[,] or twenty minutes there. Some passengers and flight attendants also reported that the men were standing in the aisle for long periods." (*Id.*) None of the passengers or crew observed or reported anything suspicious about Plaintiff. (*Id.* ¶ 46.)

"Shortly before 3:00 p.m., flight attendants alerted the pilot . . . that two men of 'possibly Arab descent' had been observed repeatedly going to the bathroom and standing in the aisle for long periods . . . ." (*Id.* ¶ 47.) The pilot then "sent a message through the Aircraft Communications Addressing and Reporting System . . . asking for information about the passengers seated in 12B and 12C, whom he and the flight attendants believed were acting strangely  . . . ." (*Id.* ¶ 48.)

The pilot's message was received by Mark Fraley, a Frontier Airlines employee, who forwarded the message by e-mail to several people, including other Frontier staff. (*Id.* ¶ 49.) He provided the names of the passengers in 12B and 12C, and also included Plaintiff's name as the passenger in 12A, noting that she might also be with them. (*Id.*)

Tammara Faforke, a Frontier Airlines employee, passed Fraley's e-mail to a Transportation Security Administration air marshal and Officer Duncan, a WCAA police officer. (*Id.* ¶ 51.) Officer Duncan then passed the e-mail to another WCAA officer, Defendant Grant. (*Id.*) Defendant Grant relayed the information from the e-

4

mail, including that Plaintiff may be traveling with the two men, to Defendants Driscoll and Carmona, also WCAA officers. (*Id.* ¶ 52.)

The Transportation Security Administration also contacted the Wayne County Airport Authority and reported the suspicious passenger behavior on flight 623. (*Id.* ¶ 53.)

At approximately 3:00 p.m., Defendants Bohn of WCAA, Lakatos and Ball (federal agents), and other law enforcement officers went to a designated inspection site to wait for the airplane to arrive. (*Id.* ¶ 54.) "At the inspection site, Defendant WCAA Officer Johnson . . . spoke via cell phone with [the plane's captain], who told Officer Johnson that a male passenger from row 12 had entered the . . . restroom for a long period . . . while the other man from row 12 stood outside." (*Id.* ¶ 55.) "According to Defendant Johnson . . . the captain stated that a third passenger seated in 12A may also be involved in the incident but is seated and compliant at this time." (*Id.*)

None of the officers requested further evidence regarding Plaintiff's involvement in suspicious activities. (*Id.* ¶ 56.)

The responding agencies, which included several federal agencies as well as the WCAA police, collaborated and put in place a plan to divert and board the aircraft, arrest all three passengers, and remove them to a detention facility for questioning. (*Id.* ¶ 57.)

Defendant WCAA Officer Grant organized the tactical entry of the flight with the assistance of Defendant WCAA Officer Johnson and officers from United States Customs and Border Protection. (*Id.* ¶ 58.)

Defendant WCAA Captain Driscoll recommended to Defendant DeBeau, WCAA Vice President of Public Safety, that all three passengers be removed and taken to a detention facility for further investigation. Defendant DeBeau authorized the plan. (*Id.* ¶ 59–60.)

"At approximately 4:25 p.m., Defendants [WCAA officers] Carmona, Bohn, Johnson[,] [and] . . . [federal agent] Brumley, along with other officers, boarded the plane, heavily armed, and ran down the aisle . . . ." (*Id.* ¶ 68.) The officers stopped at Plaintiff's row and yelled at all three passengers to get up. (*Id.* ¶ 70.) Defendant WCAA Detective Carmona put Plaintiff in handcuffs, and all three passengers were forcibly rushed down the aisle and off the plane. (*Id.* ¶¶ 72–73.)

After she was removed from the plane, an unidentified officer pushed Plaintiff roughly against a police car, made her spread her legs while he pat searched her, and asked her if she was wearing explosives. (*Id.* ¶¶ 75–76.) Plaintiff answered that she was not wearing explosives. (*Id.* ¶ 76.)

By this point, Plaintiff had twice asked the officers for an explanation of what was happening, and was not given a reply. (*Id.* ¶¶ 71, 77.)

Defendant WCAA Corporal Bradley put Plaintiff in a police car with one of the two men who had also been removed from the plane, and drove them to Building 358. (*Id.* ¶ 78.) After they reached the building, Plaintiff, still handcuffed, was removed from the car and placed in a cell that was approximately six feet by ten feet with a metal cot and a video camera hanging over the toilet. (*Id.* ¶¶ 80–81.)

An unidentified male officer came to the door of the cell and asked Plaintiff if she spoke English, to which she said yes and added that she is an American citizen.

6

(*Id.* ¶ 82.) "The officer told her he would stand by the door to make sure she did not 'flush anything' down the toilet." (*Id.* ¶ 83.) Plaintiff badly needed to use the toilet, but because she was handcuffed, a male guard was at the door, and there was a video camera above the toilet, she did not. (*Id.* ¶ 84.)

At approximately 4:40 p.m., Defendants WCAA Lieutenant Wasiukanis and federal agent Brand conferred and decided that all three passengers should be strip searched. (*Id.* ¶ 85.) The "standard operating procedures in effect for the Wayne County Airport Authority" provided that "[a] person shall not be strip searched unless the person is being lodged into a detention facility, by order of a court or there is reasonable cause to believe that the person is concealing a weapon, controlled substance, or evidence of a crime." (*Id.* ¶ 86.)

An hour later, Defendant WCAA Officer Parker arrived and told Plaintiff she was going to be strip searched. Plaintiff was afraid and began to cry. WCAA Officer Parker performed the strip search of Plaintiff, during which Plaintiff's handcuffs were removed and she was made to remove all of her clothing "so that she was completely naked," told to face the wall, bend over, spread her buttocks, and cough while Defendant WCAA Officer Parker watched. (*Id.* ¶¶ 88–92.) Defendant Parker then felt through Plaintiff's hair, lifted Plaintiff's eyelids, and looked into her mouth. (*Id.* ¶¶ 93–94.) Plaintiff was then told to dress, after which Defendant Parker put the handcuffs back on Plaintiff. (*Id.* ¶ 97.)

Approximately two hours later, Plaintiff was taken to an interview room where two unidentified federal agents questioned her for approximately 30 minutes. (*Id.*

¶¶ 99–102.) The agents questioned her about her family, her previous travel, and the two men who were seated next to her. (*Id.* ¶ 100.)

Before she was permitted to leave, an unknown federal agent "required that [Plaintiff] show the Twitter messages she had sent out from the airplane upon landing, as well as her Facebook profile." (*Id.* ¶ 105.)

At approximately 7:30 p.m., Defendant federal agent Brand authorized the release of the three passengers. (*Id.* ¶ 106.)

## C.     Plaintiff's Claims.

Counts I, II, and III are brought against Frontier Airlines for violation of 42 U.S.C. § 1981, 42 U.S.C. § 2000d, and 49 U.S.C. § 40127(A), respectively. All of these claims involve allegations of discrimination based on race, ethnicity, or national origin. (*Id.* ¶¶ 110–31.)

Count IV is brought against the individual Federal Agent Defendants and all of the WCAA Defendants except WCAA Officer Toya Parker for violation of Equal Protection under the Fifth and Fourteenth Amendments. (*Id.* ¶¶ 132–38.)

Count V is brought against the individual Federal Agent Defendants and all of the WCAA Defendants except WCAA Officer Toya Parker for Unreasonable Seizure under the Fourth and Fourteenth Amendments. (*Id.* ¶¶ 139–45.)

Count VI is brought against Defendants federal agent Brand, WCAA Officer Parker, and WCAA Lieutenant Wasiukanis for Unreasonable Search under the Fourth and Fourteenth Amendments. (*Id.* ¶¶ 146–52.)

Count VII is brought against the United States of America for False Arrest and False Imprisonment under the Federal Tort Claims Act. (*Id.* ¶¶ 153–55.)

## II.   LEGAL STANDARD

A Rule 12(b)(6) motion tests whether a legally sufficient claim has been pleaded, and provides for dismissal when a plaintiff fails to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). A claim is facially plausible when a plaintiff pleads factual content that permits a court to reasonably infer that the defendant is liable for the alleged misconduct. *Id.* (citing *Twombly*, 550 U.S. at 556). When assessing whether a plaintiff has set forth a "plausible" claim, the district court must accept all of the complaint's factual allegations as true. *See Ziegler v. IBP Hog Mkt., Inc.*, 249 F.3d 509, 512 (6th Cir. 2001). "Mere conclusions," however, "are not entitled to the assumption of truth. While legal conclusions can provide the complaint's framework, they must be supported by factual allegations." *Iqbal*, 556 U.S. at 664. A plaintiff must provide "more than labels and conclusions," or "a formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 556. Therefore, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678.

In ruling on a motion to dismiss, the Court may consider the complaint as well as (1) documents that are referenced in the plaintiff's complaint or that are central to plaintiff's claims, (2) matters of which a court may take judicial notice, and (3) documents that are a matter of public record. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007); *see also Greenberg v. Life Ins. Co. of Virginia*,

177 F.3d 507, 514 (6th Cir. 1999) (finding that documents attached to a motion to dismiss that are referred to in the complaint and central to the claim are deemed part of the pleadings).

The legal standard for adjudicating a Rule 12(c) motion is the same as for a 12(b)(6) motion. *See Lindsay v. Yates*, 498 F.3d 434, 437 n.5 (6th Cir. 2007).

## III.   ANALYSIS

Both the Federal Agent Defendants and the WCAA Defendants have moved to dismiss Plaintiff's Equal Protection claims under Count IV of the Complaint, asserting that their conduct is protected by qualified immunity, and that therefore Plaintiff's claims fail to state a claim upon which relief can be granted. (Dkts. 57 & 69.)

The Equal Protection Clause of the Fourteenth Amendment forbids a state from denying "to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. The Fifth Amendment extends that same prohibition to federal actors. *See, e.g.*, *Bolling v. Sharpe*, 347 U.S. 497, 500 (1954).

"To state an equal protection claim, a plaintiff must adequately plead that the government treated the plaintiff 'disparately as compared to similarly situated persons and that such disparate treatment either burdens a fundamental right, targets a suspect class, or has no rational basis.'" *Ctr. for Bio-Ethical Reform, Inc. v. Napolitano*, 648 F.3d 365, 379 (6th Cir. 2011) (quoting *Club Italia Soccer & Sports Org., Inc. v. Charter Twp. of Shelby, Mich.*, 470 F.3d 286, 299 (6th Cir. 2006)). The analysis is the same under the Fifth Amendment for the Federal Agent Defendants

10

and under the Fourteenth Amendment for the WCAA Defendants. *See Ctr. for Bio-Ethical Reform, Inc.*, 648 F.3d at 379.

When a defendant raises a defense of qualified immunity, the plaintiff bears the burden of pleading facts that would be sufficient to show that the defendant is not entitled to its protection. *See Reilly v. Vadlamudi*, 680 F.3d 617, 623 (6th Cir. 2012). "Qualified immunity shields federal and state officials from money damages unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2080 (2011) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).

For the reasons explained below, the Court finds that Count IV of the Complaint has alleged facts that, when viewed in the light most favorable to Plaintiff, would establish that the conduct of the Federal Agent Defendants and the WCAA Defendants violated a constitutional right that was clearly established. Count IV therefore states an Equal Protection violation claim upon which relief can be granted, and Defendants' motions to dismiss and for partial judgment on the pleadings must be denied.[1]

## A.   Plaintiff Adequately Alleges that Defendants Violated a Constitutional Right.

Plaintiff has alleged that each of the Federal Agent Defendants and the WCAA Defendants, except for Toya Parker, violated her right to equal protection of the

---

[1] WCAA Defendant Toya Parker joined in the WCAA Defendants' motion for partial judgment on the pleadings (Dkt. 69), but she was not among the Defendants against whom Plaintiff asserted Count IV. Thus dismissal of that Count against her is neither necessary nor possible.

laws with both her arrest and detention, but only those claims supported by sufficient factual allegations can survive the Defendants' motions to dismiss. *See, e.g.*, *Iqbal*, 556 U.S. at 678. Considering the allegations in the Complaint, Plaintiff met her burden of adequately pleading that the individual defendants treated her "disparately as compared to similarly situated persons and that such disparate treatment either burdens a fundamental right, targets a suspect class, or has no rational basis." *Club Italia Soccer & Sports Org., Inc. v. Charter Twp. of Shelby, Mich.*, 470 F.3d 286, 299 (6th Cir. 2006).

1. *The Arguments of Federal Agent Defendants and the WCAA Defendants.*

The Federal Agent Defendants make two arguments in their motion to dismiss Count IV:

    i.   Plaintiff has failed to plead facts stating an equal protection claim against the individual Federal Agent Defendants.
        a.  Plaintiff fails to identify what each defendant did to violate the equal protection clause.
        b.  Plaintiff's only allegation of discrimination is conclusory.
        c.  Plaintiff's claim of discriminatory animus by these defendants is not plausible.
    ii.  To the extent Plaintiff has alleged the violation of a constitutional right by each of these defendants, the right as not clearly established.

(Dkt. 56 at 16–26.)

The WCAA Defendants make one argument in their motion for partial judgment on the pleadings as to Count IV:

    i.   Plaintiff's allegations fail to state a facially plausible claim under the Equal Protection Clause.
        a.  Plaintiff's Allegation of Intentional Discrimination is not entitled to the assumption of truth.

   b. Plaintiff's remaining allegations do not plausibly suggest entitlement to relief.

(Dkt. 69 at 21–28.) The WCAA Defendants' arguments challenging the sufficiency of the Complaint as to Count IV are essentially the same as the first argument made by the Federal Agent Defendants. They suggest that Plaintiff's complaint contains one allegation of intentional discrimination and that it is not entitled to the assumption of truth because it is conclusory. (Dkt. 69 at 21–22.)

   2. *The Specific Allegations Against the Federal Agent Defendants.*

 The Federal Agent Defendants contend that Plaintiff's complaint contains one "allegation of discriminatory motive asserted against thirteen defendants," and that "Plaintiff's solitary allegation of discrimination, Compl. ¶ 56, lumps all of the defendants together without specifying what any individual defendant did." (Dkt. 57 at 17.) These statements cannot be reconciled with Plaintiff's allegations, taken as a whole. As to each of the Federal Agent Defendants, Plaintiff's allegations are as follows:

- Robert Ball, the Transportation Security Administration's Federal Security Director for Detroit (¶ 33): Participated in the decision to arrest and detain Plaintiff despite a lack of probable cause or articulable facts connecting Plaintiff to criminal activity (¶ 33); went to wait for the plane at the inspection site (¶ 54); and did not request further information or evidence regarding Plaintiff's alleged involvement in suspicious activities, and acted based on the perceived ethnicity, national origin, or race of Plaintiff (¶ 56).

- John Brand, Federal Bureau of Investigation Special Agent (¶ 15): Participated in the decisions to arrest, detain, strip search, and interrogate Plaintiff despite a lack of probable cause or articulable facts

13

connecting Plaintiff to criminal activity (¶ 15); did not request further information or evidence regarding Plaintiff's alleged involvement in suspicious activities, and acted based on the perceived ethnicity, national origin, or race of Plaintiff (¶ 56); conferred with Defendant Wasiukanis and decided that Plaintiff should be strip-searched (¶ 85); and authorized the release of Plaintiff (¶ 106).

- Paul Brumley, Immigration and Customs Enforcement Special Agent (¶ 36): Participated in the decision to arrest Plaintiff despite a lack of probable cause or articulable facts connecting Plaintiff to criminal activity (¶ 36); did not request further information or evidence regarding Plaintiff's alleged involvement in suspicious activities, and acted based on the perceived ethnicity, national origin, or race (¶ 56); and boarded the plane, heavily armed (¶ 72).

- Nathaniel Devins, Customs and Border Patrol Officer (¶ 31): Participated in the decision to arrest and detain Plaintiff despite a lack of probable cause or articulable facts connecting Plaintiff to criminal activity (¶ 31); went to wait for the plane at the inspection site (¶ 54); and did not request further information or evidence regarding Plaintiff's alleged involvement in suspicious activities, and acted based on the perceived ethnicity, national origin, or race of Plaintiff (¶ 56).

- David Lakatos, Customs and Border Patrol Officer (¶ 30): Participated in the decision to arrest and detain Plaintiff despite a lack of probable cause or articulable facts connecting Plaintiff to criminal activity (¶ 30); went to wait for the plane at the inspection site (¶ 54); did not request further information or evidence regarding Plaintiff's alleged involvement in suspicious activities, and acted based on the perceived ethnicity, national origin, or race of Plaintiff (¶ 56).

When considered with all of the other allegations in the complaint, these allegations are sufficient to support Count IV against each of the Federal Agent Defendants.[2]

### 3. *The Specific Allegations Against the WCAA Defendants.*

Plaintiff's allegations against each of the WCAA Defendants, except for Toya Parker, are as follows:

- Jeremy Bohn, the WCAA Police Officer-in-Charge (¶ 20): Participated in Plaintiff's arrest and transportation to the detention site despite a lack of probable cause or articulable facts connecting Plaintiff to criminal activity (¶ 20); went to wait for the plane at the inspection site (¶ 54); did not request further information or evidence regarding Plaintiff's alleged

---

[2] A nonexhaustive list of specific allegations important to the support of Count IV: Plaintiff's name, including that her last name is "Arab" and her first name is "of Hebrew origin" (¶¶ 2, 12); her mother is Jewish and her father immigrated to the United States from Saudi Arabia (¶ 12); she never left her seat during the flight (¶¶ 3, 42); she was traveling alone (¶ 39); she did not know the men seated in 12B and 12C and did not speak with them during the flight (¶ 44); some flight attendants and passengers noticed that the two men in 12B and 12C were acting in a way that they considered to be suspicious by taking long trips to the toilets and standing in the aisles (¶ 45); no one on the flight observed or reported anything suspicious about Plaintiff or her conduct (¶ 46); the pilot sent a message to Frontier Airlines dispatch "asking for information about the passengers seated in 12B and 12C, whom he and the flight attendants believed were acting strangely," this message did not seek information regarding Plaintiff or otherwise suggest Plaintiff was acting suspiciously (¶ 48); Mark Fraley forwarded the pilot's message and included his own message indicating that Plaintiff "*might* also be with the two men" (¶ 49) (emphasis added); the only information available to Fraley about Plaintiff was her name and seat assignment (¶ 50); WCAA Defendants Grant, Driscoll, and Carmona all received Fraley's message, which included Plaintiff's name and the pilot's initial message that sought information only about the two men in 12B and 12C and in no way identified Plaintiff as a person of concern to the flight crew (¶¶ 49, 51, 52); WCAA Defendant Johnson spoke with the pilot via telephone and, according to the statement of Johnson, the pilot told him that "a male passenger from row 12 had entered the airplane restroom for a long period . . . while the other man from row 12 stood outside" and that "a third passenger seated in 12A *may* also be involved in the incident *but is seated and compliant at this time*" (¶ 55) (emphasis added); Plaintiff asked the officers who boarded the plane what was happening and did not receive a reply (¶ 71); Plaintiff was asked if she was wearing explosives (¶ 76); outside the plane, Plaintiff again asked what was happening and did not receive a reply (¶ 77); Plaintiff was asked if she speaks English (¶ 82); and the strip-search was not conducted promptly after it was decided that Plaintiff would be strip-searched (¶¶ 85–88). The Complaint alleges as to each of the Defendants that they did not "request further information or evidence regarding [Plaintiff's] alleged involvement in suspicious activities." (¶ 56.) If that is true, as the Court must assume it is at this stage, the only reliable information the officers had about Plaintiff was the proximity of her seat to the other suspects, her name, and how it sounded; the other information, that she "may" be involved, is at worst little more than a wild guess, and at best merely a suspicion expressed in the absence of any factual support.

involvement in suspicious activities, and acted based on the perceived ethnicity, national origin, or race of Plaintiff (¶ 56); and boarded the plane, heavily armed (¶ 72).

- Corporal Bradley, WCAA Police Officer (¶ 27): Arrested and transported Plaintiff to the detention facility despite a lack of probable cause or articulable facts connecting Plaintiff to criminal activity (¶ 27); did not request further information or evidence regarding Plaintiff's alleged involvement in suspicious activities, and acted based on the perceived ethnicity, national origin, or race of Plaintiff (¶ 56); and put Plaintiff in the back of a police car with one of the men from her row, and transported them to the detention facility (¶ 78).

- Lieutenant Wasiukanis, WCAA Police Officer (¶ 22): Participated in the arrest, detention, and decision to strip-search Plaintiff despite a lack of probable cause or articulable facts connecting Plaintiff to criminal activity (¶ 22); did not request further information or evidence regarding Plaintiff's alleged involvement in suspicious activities, and acted based on the perceived ethnicity, national origin, or race of Plaintiff (¶ 56); and conferred with Defendant Brand and decided that Plaintiff should be strip-searched (¶ 85).

- Captain Patrick Driscoll, WCAA Police Special Response Unit Officer (¶ 21): Participated in the decision to arrest, handcuff, and detain Plaintiff despite a lack of probable cause or articulable facts connecting Plaintiff to criminal activity (¶ 21); received the Fraley message, including Plaintiff's name, from Defendant Grant (¶ 52); did not request further information or evidence regarding Plaintiff's alleged involvement in suspicious activities, and acted based on the perceived ethnicity, national origin, or race of Plaintiff (¶ 56); and determined that a tactical entry was needed and recommended to Defendant DeBeau that all three passengers in row 12 be removed from the plane and taken to the detention facility for further investigation (¶ 59).

- Mark DeBeau, WCAA Vice President of Public Safety (¶ 19): Participated in the decision to arrest Plaintiff despite a lack of probable cause or articulable facts connecting Plaintiff to criminal activity (¶ 19); did not request further information or evidence regarding Plaintiff's alleged involvement in suspicious activities, and acted based on the perceived ethnicity, national origin, or race of Plaintiff (¶ 56); was present at the inspection site (¶ 60); and authorized Defendant Driscoll's plan to remove all three from the plane and take them to the detention facility (¶ 60).

- Officer Grant, WCAA Police Special Response Unit Officer (¶ 24): Part of the team that planned and executed the arrest of Plaintiff despite a lack of probable cause or articulable facts connecting Plaintiff to criminal activity (¶ 24); received the Fraley message, including Plaintiff's name, from Officer Duncan (¶ 51); relayed the Fraley message, including Plaintiff's name, to Defendants Driscoll and Carmona (¶ 52); did not request further information or evidence regarding Plaintiff's alleged involvement in suspicious activities, and acted based on the perceived ethnicity, national origin, or race of Plaintiff (¶ 56); and organized the tactical entry of the plane with Defendant Johnson and others (¶ 58).

- Detective Carmona, WCAA Police Officer (¶ 25): Participated in the arrest of Plaintiff despite a lack of probable cause or articulable facts connecting Plaintiff to criminal activity (¶ 25); received the Fraley message, including Plaintiff's name, from Defendant Grant (¶ 52); did not request further information or evidence regarding Plaintiff's alleged involvement in suspicious activities, and acted based on the perceived ethnicity, national origin, or race of Plaintiff (¶ 56); boarded the plane, heavily armed (¶ 72); and placed Plaintiff in handcuffs and the man in 12B in flex-cuffs (¶ 72).

- Officer Johnson, WCAA Police K9 Officer (¶ 26): Participated in the arrest of Plaintiff despite a lack of probable cause or articulable facts connecting Plaintiff to criminal activity (¶ 26); was at the inspection site (¶ 55); spoke by phone with pilot, who told him that "a male passenger from row 12 had

17

entered the . . . restroom for a long . . . time, while the other man from row 12 stood outside," and that "a third passenger seated in 12A may also be involved in the incident but is seated and compliant at this time" (¶ 55); did not request further information or evidence regarding Plaintiff's alleged involvement in suspicious activities, and acted based on the perceived ethnicity, national origin, or race of Plaintiff (¶ 56); assisted Defendant Grant with organizing tactical entry of the plane (¶ 58); and boarded the plane, heavily armed (¶ 72).

When considered with all of the other allegations in the complaint, these allegations are sufficient support Count IV against all of the WCAA Defendants.[3]

### 4. The Complaint Pleads a Plausible Equal Protection Claim Against the Federal Agent and WCAA Defendants.

The Federal Agent Defendants argue that Plaintiff's claim in Paragraph 56 of the Complaint, that they "acted based on the perceived ethnicity, national origin, or race of [Plaintiff's] name," is conclusory. (Dkt. 57 at 17.) The WCAA Defendants make the same argument as to Paragraphs 134 and 136. (Dkt. 69 at 21.) These arguments would be valid if Paragraphs 56, 134, and 136 were the only allegations made relevant to Count IV, but they are not. Paragraphs 56, 134, and 136, like Paragraphs 7 and 62, are not unsupported or isolated conclusory statements. Rather, they are the logical summation of a probable conclusion that follows from all of the alleged facts together. The complaint "contains sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 at 678 (quoting *Twombly*, 550 U.S. at 555).

---

[3] *See supra* note 2.

Unlike in *Iqbal* and *Center for Bio-ethical Reform*, the Complaint in this case, and Count IV specifically, is directed only at law enforcement officers who were present and personally involved in the discrete and direct acts that allegedly violated Plaintiff's civil rights.

When *Iqbal* reached the Supreme Court, it was on a petition from John Ashcroft, former Attorney General of the United States, and Robert Mueller, then the Director of the Federal Bureau of Investigation, who were just two of the 34 named individual defendants. "The complaint allege[d] that they adopted an unconstitutional policy that subjected respondent to harsh conditions of confinement on account of his race, religion, or national origin." *Iqbal*, 556 U.S. at 666. It was only those indirect claims against the highest-ranking officials who never had personal contact with the prisoner-plaintiffs that were the subject of the Supreme Court's analysis. The claims against the other individual defendants *survived* motions to dismiss before the trial court, and those rulings were upheld on appeal. *See Iqbal v. Hasty*, 490 F.3d 143 (2d Cir. 2007), cert. granted, cause remanded, 556 U.S. 1256 (2009), and cert. granted, cause remanded sub nom. *Sawyer v. Iqbal*, 556 U.S. 1256 (2009), and rev'd and remanded sub nom. *Ashcroft v. Iqbal*, 556 U.S. 662 (2009).[4]

---

[4] The surviving claims at that time included claims against: "Michael Rolince, former Chief of the FBI's International Terrorism Operations Section, Counterterrorism Division, and Kenneth Maxwell, former Assistant Special Agent in Charge of the FBI's New York Field Office . . . ."; "former BOP officials: Kathleen Hawk Sawyer, former BOP Director; David Rardin, former Director of the Northeast Region of the Bureau of Prisons; and Michael Cooksey, former Assistant Director for Correctional Programs of the Bureau of Prisons . . ."; "Dennis Hasty, former MDC Warden"; and others "includ[ing] Michael Zenk, MDC Warden at the time the lawsuit was filed, other MDC staff, and the United States." *Iqbal v. Hasty*, 490 F.3d 143 (2d Cir. 2007).

The claims in *Center for Bio-ethical Reform* were against Janet Napolitano, then Secretary of the Department of Homeland Security, and Eric Holder, Attorney General of the United States. The action was "challenging the policy, practice, procedure, and/or custom of Defendants that targets for disfavored treatment those individuals and groups that Defendants deem to be 'rightwing extremists' . . . ." *Ctr. for Bio-Ethical Reform, Inc. v. Napolitano*, 648 F.3d 365, 367 (6th Cir. 2011) (quoting the Amended Complaint). Like the claims against Ashcroft and Mueller in *Iqbal*, only much more far-fetched, the case involved only indirect claims against very high-ranking officials regarding some presumed "policy," of which there was little or no evidence. *Id.*

Here, in contrast, Count IV is brought against only those law enforcement officers who are alleged to have been present at the scene of Plaintiff's arrest and detention, and who were directly involved in either the decision to arrest and detain Plaintiff, or the actual arrest and detention of Plaintiff, or both. (Dkt. 1 ¶¶ 15, 30, 31, 33, 36, 56, 85, 106.)

Plaintiff claims that the law enforcement officers treated her differently from the other passengers based on her race or ethnicity, and consequently violated her right to Equal Protection of the law. The allegations are sufficient to make Plaintiff's claim plausible. (*Id.* ¶¶ 2, 3, 12, 39, 42, 44–46, 48–52, 55, 71, 76, 77, 82, 85–88.) For example, it is alleged that: Plaintiff has a last name of Arabic origin (¶ 12); her father emigrated from Saudi Arabia (¶ 12) and thus Plaintiff herself is of direct Saudi Arabian descent and presumably has to some degree the features typically associated with persons from that part of the world; she was traveling alone (¶ 39);

20

she did not know and did not speak with the two men seated in 12B and 12C (¶ 44); there were many other passengers on the plane (¶ 45) who were not forcibly removed, arrested, detained, and strip-searched (¶¶ 73, 85); the reports of "suspicious behavior" did not involve any conduct by Plaintiff (¶ 46); Frontier provided Plaintiff's name when it indicated that Plaintiff "*might*" be with the two men (¶¶ 49, 51) (emphasis added); Defendant WCAA officer Johnson stated that the pilot told him that while Plaintiff "*may*" be "involved in the incident" with the two men she was "seated and compliant at [that] time" (¶ 55) (emphasis added); no agent or officer made any effort to verify Plaintiff's identity or corroborate any connection between her and the two men (¶ 56); and Plaintiff was asked whether she was wearing explosives (¶ 76) and whether she speaks English (¶82). These alleged facts, along with the rest of the Complaint, which must be taken as true, are a sufficient basis on which to conclude, at this pleading stage, that Plaintiff's claim of an Equal Protection violation is plausible. The facts suggest that while there might have been a reasonable basis for removing the two men from the aircraft in an expeditious manner in a safe location, the reasonableness of the police action against Plaintiff is so highly questionable that it allows a greater inference that decision-making was influenced by perceptions of Plaintiff's race, national origin, or ethnicity. *Cf. Iqbal*, 556 U.S. at 682 (finding purposeful discrimination could not be plausibly inferred because there was an "obvious alternative explanation" for the arrests).

Even if the initial action of forcibly removing Plaintiff from the plane could be seen as reasonable in response to a possible emergency, which the Court cannot

21

conclude at this time without further factual development, the prolonged detention and post-detention searches of Plaintiff as alleged took place after it was clear that no emergency, and no probable cause relating to Plaintiff, existed. The Complaint makes out a plausible case that Plaintiff was singled out because of her ethnicity or race; the law enforcement officers, despite being told only that it was *possible* that Plaintiff was with the two men or *may* be involved in the incident, made no efforts to quickly and reasonably ascertain any facts that might support or disprove Plaintiff's actual involvement; and the arrest, detention, and searches would not have occurred but for Plaintiff's ethnicity or race. Plaintiff has stated a well-pleaded Equal Protection claim.

**B.     Plaintiff Has Alleged the Violation of a Clearly Established Constitutional Right.**

Since 1868, the United States Constitution has prohibited a state from denying "any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. The Fifth Amendment has been held to extend that same prohibition to federal actors. *See, e.g.*, *Bolling*, 347 U.S. at 500; *Ctr. for Bio-Ethical Reform, Inc.*, 648 F.3d at 379. "These provisions are universal in their application, to all persons within the territorial jurisdiction, without regard to any differences of race, of color, or of nationality; and the equal protection of the laws is a pledge of the protection of equal laws." *Yick Wo v. Hopkins*, 118 U.S. 356, 369 (1886). Discrimination on the basis of race, color, or nationality is "therefore illegal, and the public administration which enforces it is a denial of the equal protection of the laws, and a violation of the fourteenth amendment of the constitution." *Id.* at 374.

22

The Federal Agent Defendants argue that the right Plaintiff alleges they violated is not clearly established. (Dkt. 57 at 24–25.) Specifically, they claim:

> Plaintiff cannot credibly argue that *every* reasonable official would believe that he is violating a passenger's equal protection rights when, in responding to a report of suspicious activity from an airline on the Tenth Anniversary of the 9/11 terrorist attacks, including a report that the passenger "may also be involved in the incident" and "might also be with the two men," he fails to ask for additional information about the passenger's involvement before removing all suspects from the plane for investigation.

(*Id.*) This argument suggests that the only allegedly unreasonable conduct was "the failure to ask for additional information" before removing the suspects; the Complaint alleges many more facts, according to which a reasonable officer should have known that the arrest, search, and detention of Plaintiff, based on limited evidence available, were unreasonable.

"It is not necessary to have 'a case directly on point' for a right to be 'clearly established.' It is sufficient that existing precedent place the question 'beyond debate.'" *Nelms v. Wellington Way Apartments, LLC*, 513 F. App'x 541, 547 (6th Cir. 2013) (quoting *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2083 (2011); citing *Hope v. Pelzer*, 536 U.S. 730, 741 (2002) ("officials can still be on notice that their conduct violates established law even in novel factual circumstances")).

Under the applicable standard, "conduct violates clearly established law when, at the time of the challenged conduct, '[t]he contours of [a] right [are] sufficiently clear' that every 'reasonable official would have understood that what he is doing violates that right.'" *al-Kidd*, 131 S. Ct. at 2083 (citing *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). Plaintiff's complaint meets this standard.

As discussed above, the Complaint adequately alleges that Plaintiff was arrested *and* detained because of her race, ethnicity, or national origin, and that there was no legal justification for either her arrest *or* her detention.[5] *See supra* III.A. Arresting or detaining someone because of her race, ethnicity, or national origin is a clear violation of a clearly established right.[6] *See Whren v. United States*, 517 U.S. 806, 813 (1996) ("[T]he Constitution prohibits selective enforcement of the law based on considerations such as race."); *Bolling*, 347 U.S. at 499–500; *Yick Wo*, 118 U.S. at 374; *High v. Fuchs*, 74 F. App'x 499, 502–03 (6th Cir. 2003) ("[Because] reasonable police officers could not disagree that enforcing laws differently on the basis of race is clearly prohibited, dismissal of [the] complaint on the basis of qualified immunity, even with a finding of probable cause for the prosecution of the citation, would be inappropriate. It is for the fact-finder to determine whether . . . the Officers did in fact treat [Plaintiff] differently because of his race when they issued the [citation]."); *United States v. Avery*, 137 F.3d 343, 353–54 (6th Cir. 1997) ("A person cannot become the target of a police investigation solely on the basis of

---

[5] The Federal Defendants seem to be of the opinion that the claimed equal protection violation ended as soon as Plaintiff was removed from the aircraft, and that any alleged subsequent violations are covered solely by Plaintiff's claims in Counts V and VI, or at least that the allegations of the latter cannot support the former. (Dkt. 81 at 3.) The Court disagrees. Plaintiff has alleged that she was arrested, detained, and illegally searched without any proper justification and under circumstances where her ethnic name appears to have played a role in the decision to associate her with the other suspects. These claims, taken as a whole, support her position that she would not have been arrested *and* detained but for her race, ethnicity, or perceived nationality.

[6] The Federal Defendants also argue that the Complaint does not sufficiently allege that each of them were even aware of Plaintiff's race, ethnicity, or national origin. Setting aside that basic common sense strongly suggests that all of the defendants would have been aware of Plaintiff's last name, which is alleged to be and seems to be of Arabic origin, all of the Federal Defendants are alleged to have at least been present at the inspection site where Plaintiff was removed from the plane. *See supra* Section III.A. The allegations are sufficient to establish that all of the Federal Defendants laid eyes on Plaintiff and were consequently aware of her appearance and in a position to make judgments regarding her ethnicity, national origin, or race, which is alleged to be half-Arab and half-Jewish.

24

skin color."); *United States v. Taylor*, 956 F.2d 572, 580–81 (6th Cir. 1992) (Keith, J., dissenting) ("Equal protection principles simply prohibit state actors from using a citizen's race to catalyze this 'right to inquire.'").

The fact that the initial investigation of the Plaintiff arguably resulted because Frontier suggested that Plaintiff "*might*" be with the two other men—men whose "suspicious conduct" consisted entirely of extended visits to the toilet and standing in the aisles—does not change this result. While the Sixth Circuit has suggested that selecting "as the target of investigation" a person based on a tip from an outside source might be constitutionally permissible because "the officers obviously cannot control the race of the person they investigate and ultimately contact," in that case the court was discussing the "pre-contact" stage of investigation and the justification for initiating contact. *United States v. Avery*, 137 F.3d 343, 354 n.5 (6th Cir. 1997). The court did not conclude that the tip would shield the officers from liability regardless of how long the person was detained and how unreasonable the officer's actions were.

Based on the Plaintiff's allegations, which are assumed to be true for the purpose of deciding these motions, the unlawfulness of the defendants' actions was apparent "in the light of pre-existing law." *Risbridger v. Connelly*, 275 F.3d 565, 569 (6th Cir. 2002) (quoting *Wilson v. Layne*, 526 U.S. 603, 615 (1999)).

## IV.    CONCLUSION

For the reasons set forth above, it is hereby ORDERED that the Federal Agent Defendants' motion to dismiss (Dkt. 57) and the WCAA Defendants' motion for partial judgment on the pleadings (Dkt. 69) as to Count IV are DENIED. It is

25

FURTHER ORDERED that the Federal Agent Defendants' motion to stay discovery (Dkt. 66) and the WCAA Defendants' motion to stay discovery (Dkt. 70) are DENIED as moot.

s/Terrence G. Berg
TERRENCE G. BERG
UNITED STATES DISTRICT JUDGE

Dated:  March 31, 2014

### Certificate of Service

I hereby certify that this Order was electronically submitted on March 31, 2014, using the CM/ECF system, which will send notification to each party.

By:  s/A. Chubb
     Case Manager