UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SHOSHANA HEBSHI,

                    Plaintiff,

        v.

                                            Case No. 13-10253

UNITED STATES OF AMERICA, et al.,          HON. TERRENCE G. BERG
                                            HON. MONA K. MAJZOUB
                    Defendants.

_____/

## ORDER DENYING WCAA DEFENDANTS' MOTION FOR PARTIAL JUDGMENT ON THE PLEADINGS AS TO COUNTS V & VI, AND MOTIONS FOR PROTECTIVE ORDERS

This matter is before the Court on a motion for partial judgment on the pleadings to dismiss Counts V and VI (Dkt. 89) brought by Defendants, law enforcement officers of the Wayne County Airport Authority (the "WCAA Defendants"), including Jeremy Bohn, Corporal Bradley, Lieutenant M. Wasiukanis, Captain Patrick Driscoll, Mark DeBeau, Officer Grant, Toya Parker, Detective Carmona, and Officer Johnson. The motion is brought under Federal Rule of Civil Procedure 12(c), asserting that the WCAA Defendants are entitled to qualified immunity as to Plaintiff's claim that her arrest, detention, and search were in violation of her Fourth Amendment rights under the United States Constitution to be free from unreasonable searches and seizures. Having reviewed the motion and its accompanying exhibits, Plaintiff's response, and the remainder of the record, the Court finds that the documents adequately present the issues in the motion, and that oral argument would not aid the decision. Accordingly, the Court

will decide the WCAA Defendants' motion (Dkt. 89) without a hearing. E.D. Mich. LR 7.1(f)(2).

The WCAA Defendants, and non-parties Thomas J. Naughton and the Wayne County Airport Authority, have also moved for protective orders seeking to stay discovery pending resolution of this motion. (Dkts. 94, 98.)

For the reasons set forth below, the WCAA Defendants' motion for partial judgment on the pleadings to dismiss Counts V and VI (Dkt. 89) is DENIED, and their motion and the non-parties' motion for protective orders (Dkts. 94, 98) are DENIED as moot.

## I.    FACTUAL BACKGROUND

### A.    The Parties.

Plaintiff Shoshana Hebshi is a natural person, a United States citizen, a resident of Ohio, and the daughter of a Jewish mother and a father who emigrated from Saudi Arabia. (Dkt. 1 ¶ 12.)

Defendant United States of America is a sovereign state and the employer of Defendants Robert Ball, John Brand, Paul Brumley, Nathaniel Devins, and David Lakatos. (*Id.* ¶¶ 13, 15, 30, 31, 33, 36.)

Defendant Frontier Airlines is an airline headquartered in Denver, Colorado, and was the operator of flight 623 from Denver to Detroit on September 11, 2011, upon which Plaintiff was a passenger. (*Id.* ¶¶ 14, 41.)

Defendants Robert Ball, John Brand, Paul Brumley, Nathaniel Devins, and David Lakatos are federal law enforcement agents who allegedly participated in the

2

seizure, detention, and searches of Plaintiff's person and personal effects as described below. (*Id.* ¶¶ 15, 30, 31, 33, 36.)

Defendants Jeremy Bohn, Corporal Bradley, Lieutenant M. Wasiukanis, Captain Patrick Driscoll, Mark DeBeau, Officer Grant, Toya Parker, Detective Carmona, and Officer Johnson are Wayne County Airport Authority (WCAA) law enforcement agents who allegedly participated in the seizure, detention, and searches of Plaintiff's person and personal effects as described below. (*Id.* ¶¶ 19–27.)

In addition, Plaintiff has also named six unknown federal agents as Defendants. (*Id.* ¶¶ 16, 17, 28, 32, 34, 35.) Plaintiff had also named federal agents John Etling and Thomas Pipis as defendants, but they were voluntarily dismissed from the case. (*Id.* ¶¶ 18, 29; Dkts. 54, 55.)

## B.   Allegations Made in the Complaint.

Plaintiff's primary allegations are summarized in the first paragraph of the Complaint:

> On September 11, 2011, Plaintiff Shoshana Hebshi flew on Frontier Airlines flight 623 . . . . Upon landing, heavily armed agents forcibly removed [Plaintiff] from the airplane; handcuffed, pat searched, and strip searched her; and locked her in a cell at Detroit Metropolitan Wayne County Airport before interrogating her. [She] was detained for approximately four hours before being released with no charges.

(Dkt. 1 ¶ 1.) The details follow.

Plaintiff Shoshana Hebshi is a United States citizen whose first name is of Hebrew origin and surname is of Saudi Arabian origin. (*Id.* ¶ 12.) Traveling alone, Plaintiff flew on Frontier Airlines flight 623 from Denver to Detroit on September

11, 2011. (*Id.* ¶¶ 39, 41–42.) She sat in seat 12A and did not leave her seat at any time during the flight. (*Id.* ¶ 42.)

Seated next to Plaintiff, in seats 12B and 12C, were two men of "South Asian descent." (*Id.* ¶ 43.) Plaintiff did not know these men and did not speak to them at any time. (*Id.* ¶ 44.)

"During the flight, some flight attendants and passengers noticed that the two men seated in [Plaintiff's] row were acting in a way that they considered to be suspicious." (*Id.* ¶ 45.) "Specifically, these flight attendants and passengers alleged that the men went to the restroom around the same time and each spent ten, fifteen[,] or twenty minutes there. Some passengers and flight attendants also reported that the men were standing in the aisle for long periods." (*Id.*) None of the passengers or crew observed or reported anything suspicious about Plaintiff. (*Id.* ¶ 46.)

"Shortly before 3:00 p.m., flight attendants alerted the pilot . . . that two men of 'possibly Arab descent' had been observed repeatedly going to the bathroom and standing in the aisle for long periods . . . ." (*Id.* ¶ 47.) The pilot then "sent a message through the Aircraft Communications Addressing and Reporting System . . . asking for information about the passengers seated in 12B and 12C, whom he and the flight attendants believed were acting strangely  . . . ." (*Id.* ¶ 48.) The pilot did not in any way mention, ask questions about, or seek information regarding Plaintiff.

The pilot's message was received by Mark Fraley, a Frontier Airlines employee, who forwarded the message by e-mail to several people, including other Frontier staff. (*Id.* ¶ 49.) He provided the names of the passengers in 12B and 12C, and also

included Plaintiff's name as the passenger in 12A, adding that she might also be with them. (*Id.*)

Tammara Faforke, a Frontier Airlines employee, passed Fraley's e-mail to a Transportation Security Administration air marshal and Officer Duncan, a WCAA police officer. (*Id.* ¶ 51.) Officer Duncan then passed the e-mail to another WCAA officer, Defendant Grant. (*Id.*) Defendant Grant relayed the information from the e-mail, including that Plaintiff may be traveling with the two men, to Defendants Driscoll and Carmona, also WCAA officers. (*Id.* ¶ 52.)

The Transportation Security Administration also contacted the Wayne County Airport Authority and reported the suspicious passenger behavior on flight 623. (*Id.* ¶ 53.)

At approximately 3:00 p.m., Defendants Bohn of WCAA, Lakatos and Ball (federal agents), and other law enforcement officers went to a designated inspection site to wait for the airplane to arrive. (*Id.* ¶ 54.) "At the inspection site, Defendant WCAA Officer Johnson . . . spoke via cell phone with [the plane's captain], who told Officer Johnson that a male passenger from row 12 had entered the . . . restroom for a long period . . . while the other man from row 12 stood outside." (*Id.* ¶ 55.) "According to Defendant Johnson . . . the captain stated that a third passenger seated in 12A may also be involved in the incident but is seated and compliant at this time." (*Id.*)

None of the officers requested further evidence regarding Plaintiff's involvement in suspicious activities. (*Id.* ¶ 56.)

5

The responding agencies, which included several federal agencies as well as the WCAA police, collaborated and put in place a plan to divert and board the aircraft, arrest all three passengers, and remove them to a detention facility for questioning. (*Id.* ¶ 57.)

Defendant WCAA Officer Grant organized the tactical entry of the flight with the assistance of Defendant WCAA Officer Johnson and officers from United States Customs and Border Protection. (*Id.* ¶ 58.)

Defendant WCAA Captain Driscoll recommended to Defendant DeBeau, WCAA Vice President of Public Safety, that all three passengers be removed and taken to a detention facility for further investigation. Defendant DeBeau authorized the plan. (*Id.* ¶ 59–60.)

"At approximately 4:25 p.m., Defendants [WCAA officers] Carmona, Bohn, Johnson[,] [and] . . . [federal agent] Brumley, along with other officers, boarded the plane, heavily armed, and ran down the aisle . . . ." (*Id.* ¶ 68.) The officers stopped at Plaintiff's row and yelled at all three passengers to get up. (*Id.* ¶ 70.) Defendant WCAA Detective Carmona put Plaintiff in handcuffs, and all three passengers were forcibly rushed down the aisle and off the plane. (*Id.* ¶¶ 72–73.)

After she was removed from the plane, an unidentified officer pushed Plaintiff roughly against a police car, made her spread her legs while he pat searched her, and asked her if she was wearing explosives. (*Id.* ¶¶ 75–76.) Plaintiff answered that she was not wearing explosives. (*Id.* ¶ 76.)

By this point, Plaintiff had twice asked the officers for an explanation of what was happening, and was not given a reply. (*Id.* ¶¶ 71, 77.)

Defendant WCAA Corporal Bradley put Plaintiff in a police car with one of the two men who had also been removed from the plane, and drove them to Building 358. (*Id.* ¶ 78.) After they reached the building, Plaintiff, still handcuffed, was removed from the car and placed in a cell that was approximately six feet by ten feet with a metal cot and a video camera hanging over the toilet. (*Id.* ¶¶ 80–81.)

An unidentified male officer came to the door of the cell and asked Plaintiff if she spoke English, to which she said yes and added that she is an American citizen. (*Id.* ¶ 82.) "The officer told her he would stand by the door to make sure she did not 'flush anything' down the toilet." (*Id.* ¶ 83.) Plaintiff badly needed to use the toilet, but because she was handcuffed, a male guard was at the door, and there was a video camera above the toilet, she did not. (*Id.* ¶ 84.)

At approximately 4:40 p.m., Defendants WCAA Lieutenant Wasiukanis and federal agent Brand conferred and decided that all three passengers should be strip-searched. (*Id.* ¶ 85.) The "standard operating procedures in effect for the Wayne County Airport Authority" provided that "[a] person shall not be strip searched unless the person is being lodged into a detention facility, by order of a court or there is reasonable cause to believe that the person is concealing a weapon, controlled substance, or evidence of a crime." (*Id.* ¶ 86.)

An hour later, Defendant WCAA Officer Parker arrived and told Plaintiff she was going to be strip-searched. Plaintiff was afraid and began to cry. WCAA Officer Parker performed the strip-search of Plaintiff, during which Plaintiff's handcuffs were removed and she was made to remove all of her clothing "so that she was completely naked," told to face the wall, bend over, spread her buttocks, and cough

while Defendant WCAA Officer Parker watched. (*Id.* ¶¶ 88–92.) Defendant Parker then felt through Plaintiff's hair, lifted Plaintiff's eyelids, and looked into her mouth. (*Id.* ¶¶ 93–94.) Plaintiff was then told to dress, after which Defendant Parker put the handcuffs back on Plaintiff. (*Id.* ¶ 97.)

Approximately two hours later, Plaintiff was taken to an interview room where two unidentified federal agents questioned her for approximately 30 minutes. (*Id.* ¶¶ 99–102.) The agents questioned her about her family, her previous travel, and the two men who were seated next to her. (*Id.* ¶ 100.)

Before she was permitted to leave, an unknown federal agent "required that [Plaintiff] show the Twitter messages she had sent out from the airplane upon landing, as well as her Facebook profile." (*Id.* ¶ 105.)

At approximately 7:30 p.m., Defendant federal agent Brand authorized the release of the three passengers. (*Id.* ¶ 106.)

## C.   Plaintiff's Claims.

Counts I, II, and III are brought against Frontier Airlines for violation of 42 U.S.C. § 1981, 42 U.S.C. § 2000d, and 49 U.S.C. § 40127(A), respectively. All of these claims involve allegations of discrimination based on race, ethnicity, or national origin. (*Id.* ¶¶ 110–31.)

Count IV is brought against the individual Federal Agent Defendants and all of the WCAA Defendants except WCAA Officer Toya Parker for violation of Equal Protection under the Fifth and Fourteenth Amendments. (*Id.* ¶¶ 132–38.)

Count V is brought against the individual Federal Agent Defendants and all of the WCAA Defendants except WCAA Officer Toya Parker for Unreasonable Seizure under the Fourth and Fourteenth Amendments. (*Id.* ¶¶ 139–45.)

Count VI is brought against Defendants federal agent Brand, WCAA Officer Parker, and WCAA Lieutenant Wasiukanis for Unreasonable Search under the Fourth and Fourteenth Amendments. (*Id.* ¶¶ 146–52.)

Count VII is brought against the United States of America for False Arrest and False Imprisonment under the Federal Tort Claims Act. (*Id.* ¶¶ 153–55.)

## II.   LEGAL STANDARD

A Rule 12(c) motion tests whether a legally sufficient claim has been pleaded, and provides for dismissal when a plaintiff fails to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(c); *see Lindsay v. Yates*, 498 F.3d 434, 437 n.5 (6th Cir. 2007). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). A claim is facially plausible when a plaintiff pleads factual content that permits a court to reasonably infer that the defendant is liable for the alleged misconduct. *Id.* (citing *Twombly*, 550 U.S. at 556). When assessing whether a plaintiff has set forth a "plausible" claim, the district court must accept all of the complaint's factual allegations as true. *See Ziegler v. IBP Hog Mkt., Inc.*, 249 F.3d 509, 512 (6th Cir. 2001). "Mere conclusions," however, "are not entitled to the assumption of truth. While legal conclusions can provide the complaint's framework, they must be supported by factual allegations." *Iqbal*, 556

9

U.S. at 664. A plaintiff must provide "more than labels and conclusions," or "a formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 556. Therefore, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678.

In ruling on a motion to dismiss, the Court may consider the complaint as well as (1) documents that are referenced in the plaintiff's complaint or that are central to plaintiff's claims, (2) matters of which a court may take judicial notice, and (3) documents that are a matter of public record. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007); *see also Greenberg v. Life Ins. Co. of Virginia*, 177 F.3d 507, 514 (6th Cir. 1999) (finding that documents attached to a motion to dismiss that are referred to in the complaint and central to the claim are deemed part of the pleadings).

### III.   ANALYSIS

The WCAA Defendants have moved to dismiss Plaintiff's unreasonable search and seizure claims in Counts V and VI of the Complaint, asserting that their conduct is protected by qualified immunity, and that Plaintiff's claims therefore fail to state a claim upon which relief can be granted. (Dkt. 89.)

"The Fourth Amendment protects '[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures.' An arrest, of course, qualifies as a 'seizure' of a 'person' under this provision, and so must be reasonable under the circumstances." *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2080 (2011) (quoting *Dunaway v. New York*, 442 U.S. 200, 207–08 (1979)). "Fourth

Amendment reasonableness 'is predominantly an objective inquiry.'" *Id.* (quoting *Indianapolis v. Edmond*, 531 U.S. 32, 47 (2000)).

When a defendant raises a defense of qualified immunity, the plaintiff bears the burden of pleading facts that would be sufficient to show that the defendant is not entitled to its protection. *See Reilly v. Vadlamudi*, 680 F.3d 617, 623 (6th Cir. 2012). "Qualified immunity shields federal and state officials from money damages unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2080 (2011) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).

For the reasons explained below, the Court finds that Counts V and VI of the Complaint allege facts that, when viewed in the light most favorable to Plaintiff, would establish that the conduct of the WCAA Defendants violated a constitutional right that was clearly established, namely Plaintiff's right to be free from unreasonable searches and seizures. Accepted as true, Counts V and VI  state unreasonable search and seizure claims upon which relief can be granted, and WCAA Defendants' motion for partial judgment on the pleadings (Dkt. 89) as to those Counts must be denied.

## A.    Plaintiff Adequately Alleges that Defendants Violated a Constitutional Right.

Plaintiff has alleged that each of the WCAA Defendants violated her rights to be free from unreasonable searches and seizures with both her arrest and detention, but only those claims supported by sufficient factual allegations can survive the

11

Defendants' motion to dismiss.[1] *See, e.g.*, *Iqbal*, 556 U.S. at 678. The allegations in the Complaint adequately meet Plaintiff's burden of pleading that the individual defendants both: (1) arrested her without probable cause, *United States v. Jeter*, 721 F.3d 746, 751 (6th Cir. 2013), *cert. denied*, 134 S. Ct. 655 (2013) (citing *Dunaway v. New York*, 442 U.S. 200, 208 n.9 (1979)); and (2) conducted an unreasonable search of her person by means of a "strip-search" vastly more invasive than was justified by the existing need, *Bell v. Wolfish*, 441 U.S. 520, 559 (1979).

### 1. *The WCAA Defendants' Argument.*

The WCAA Defendants make essentially one argument in their motion for partial judgment on the pleadings as to Counts V and VI—that Plaintiff's allegations fail to state a plausible claim under the Fourth Amendment against each of them individually in light of their qualified immunity.[2] (Dkt. 89 at 17–30.)

### 2. *The Specific Allegations Against the WCAA Defendants.*

Plaintiff's allegations against each of the WCAA Defendants are as follows:

- Jeremy Bohn, the WCAA Police Officer-in-Charge (¶ 20): Participated in Plaintiff's arrest and transportation to the detention site despite a lack of probable cause or articulable facts connecting Plaintiff to criminal activity (¶ 20); went to wait for the plane at the inspection site (¶ 54); did not request further information or evidence regarding Plaintiff's alleged

---

[1] Count V is brought against, among others, all the WCAA Defendants except for Toya Parker. Count VI is brought against only WCAA Defendants Parker and Wasiukanis, and Federal Defendant Brand. (Dkt. 1 at 24.) The Federal Defendants have not moved to dismiss Counts V or VI based on qualified immunity.

[2] Because the WCAA Defendants' motion seeks dismissal of both Counts V and VI (Dkt. 89 at 3), the Court will assume that this argument is made against both of those Counts despite the fact that the WCAA Defendants advance very little in the way of argument addressing the lawfulness of the search.

involvement in suspicious activities, and acted based on the perceived
ethnicity, national origin, or race of Plaintiff (¶ 56); and boarded the
plane, heavily armed (¶ 72).

- Corporal Bradley, WCAA Police Officer (¶ 27): Arrested and transported
Plaintiff to the detention facility despite a lack of probable cause or
articulable facts connecting Plaintiff to criminal activity (¶ 27); did not
request further information or evidence regarding Plaintiff's alleged
involvement in suspicious activities, and acted based on the perceived
ethnicity, national origin, or race of Plaintiff (¶ 56); and put Plaintiff in
the back of a police car with one of the men from her row, and transported
them to the detention facility (¶ 78).

- Lieutenant Wasiukanis, WCAA Police Officer (¶ 22): Participated in the
arrest, detention, and decision to strip-search Plaintiff despite a lack of
probable cause or articulable facts connecting Plaintiff to criminal activity
(¶ 22); did not request further information or evidence regarding
Plaintiff's alleged involvement in suspicious activities, and acted based on
the perceived ethnicity, national origin, or race of Plaintiff (¶ 56); and
conferred with Defendant Brand and decided that Plaintiff should be
strip-searched (¶ 85).

- Captain Patrick Driscoll, WCAA Police Special Response Unit Officer (¶
21): Participated in the decision to arrest, handcuff, and detain Plaintiff
despite a lack of probable cause or articulable facts connecting Plaintiff to
criminal activity (¶ 21); received the Fraley message, including Plaintiff's
name, from Defendant Grant (¶ 52); did not request further information
or evidence regarding Plaintiff's alleged involvement in suspicious
activities, and acted based on the perceived ethnicity, national origin, or
race of Plaintiff (¶ 56); and determined that a tactical entry was needed
and recommended to Defendant DeBeau that all three passengers in row
12 be removed from the plane and taken to the detention facility for
further investigation (¶ 59).

13

- Mark DeBeau, WCAA Vice President of Public Safety (¶ 19): Participated in the decision to arrest Plaintiff despite a lack of probable cause or articulable facts connecting Plaintiff to criminal activity (¶ 19); did not request further information or evidence regarding Plaintiff's alleged involvement in suspicious activities, and acted based on the perceived ethnicity, national origin, or race of Plaintiff (¶ 56); was present at the inspection site (¶ 60); and authorized Defendant Driscoll's plan to remove all three from the plane and take them to the detention facility (¶ 60).

- Toya Parker, WCAA Police Officer (¶ 23): Performed the strip-search of Plaintiff despite a lack of probable cause or articulable facts connecting Plaintiff to criminal activity (¶ 23); "came into [Plaintiff's] cell and told her she was going to be strip searched" (¶ 89); "took off [Plaintiff's] handcuffs and told her to remove all clothing, including her underwear and bra, so that she was completely naked," and "instructed [Plaintiff] to stand facing the wall, away from the video camera, so that at least part of her body would be concealed" (¶ 91); "stood a couple of feet away and watched" as Plaintiff was "instructed to bend over, spread her buttocks, and cough" (¶ 92); "instructed [Plaintiff] to take her hair down from its ponytail so that Defendant Parker could feel through [Plaintiff's] hair" (¶ 93); "lifted [Plaintiff's] eyelids and looked into her mouth" (¶ 94); told Plaintiff to get dressed (¶ 95); and "put the handcuffs back on [Plaintiff's] wrists" (¶ 97).

- Officer Grant, WCAA Police Special Response Unit Officer (¶ 24): Part of the team that planned and executed the arrest of Plaintiff despite a lack of probable cause or articulable facts connecting Plaintiff to criminal activity (¶ 24); received the Fraley message, including Plaintiff's name, from Officer Duncan (¶ 51); relayed the Fraley message, including Plaintiff's name, to Defendants Driscoll and Carmona (¶ 52); did not request further information or evidence regarding Plaintiff's alleged involvement in suspicious activities, and acted based on the perceived

14

ethnicity, national origin, or race of Plaintiff (¶ 56); and organized the tactical entry of the plane with Defendant Johnson and others (¶ 58).

- Detective Carmona, WCAA Police Officer (¶ 25): Participated in the arrest of Plaintiff despite a lack of probable cause or articulable facts connecting Plaintiff to criminal activity (¶ 25); received the Fraley message, including Plaintiff's name, from Defendant Grant (¶ 52); did not request further information or evidence regarding Plaintiff's alleged involvement in suspicious activities, and acted based on the perceived ethnicity, national origin, or race of Plaintiff (¶ 56); boarded the plane, heavily armed (¶ 72); and placed Plaintiff in handcuffs and the man in 12B in flex-cuffs (¶ 72).

- Officer Johnson, WCAA Police K9 Officer (¶ 26): Participated in the arrest of Plaintiff despite a lack of probable cause or articulable facts connecting Plaintiff to criminal activity (¶ 26); was at the inspection site (¶ 55); spoke by phone with pilot, who told him that "a male passenger from row 12 had entered the . . . restroom for a long . . . time, while the other man from row 12 stood outside," and that "a third passenger seated in 12A may also be involved in the incident but is seated and compliant at this time" (¶ 55); did not request further information or evidence regarding Plaintiff's alleged involvement in suspicious activities, and acted based on the perceived ethnicity, national origin, or race of Plaintiff (¶ 56); assisted Defendant Grant with organizing tactical entry of the plane (¶ 58); and boarded the plane, heavily armed (¶ 72).

When considered with all of the other allegations in the complaint, these allegations are sufficient to support both Counts V and VI against the identified WCAA Defendants.[3]

---

[3] Some of the other specific allegations that provide support for Counts V and VI include: Plaintiff's name, including that her last name is of Saudi Arabian origin and her first name is "of Hebrew origin" (¶¶ 2, 12); her mother is Jewish and her father immigrated to the United States from Saudi Arabia (¶ 12); she never left her seat during the flight (¶¶ 3, 42); she was traveling alone (¶ 39); she did not know the men seated in 12B and 12C and did not speak with them during the flight (¶ 44);

### 3. *The Complaint Pleads Plausible Claims of Both Unreasonable Seizure and Unreasonable Search.*

The WCAA Defendants' argue that Plaintiff has failed to allege sufficient facts as to each individual defendant. (Dkt. 89 at 17–30.) This argument failed when the WCAA Defendants made their earlier motion for partial judgment on the pleadings as to Count IV (Dkt. 69), and it fails now as to Counts V and VI for similar reasons. (*See* Dkt. 111 at 18–25.)[4]

The allegations against each of the WCAA Defendants are plainly sufficient at this early stage of the litigation. (*Cf. id.* at 18–22.) As to Count V, each of the WCAA

---

some flight attendants and passengers noticed that the two men in 12B and 12C were acting in a way that they considered to be suspicious by taking long trips to the toilets and standing in the aisles (¶ 45); no one on the flight observed or reported anything suspicious about Plaintiff or her conduct (¶ 46); the pilot sent a message to Frontier Airlines dispatch "asking for information about the passengers seated in 12B and 12C, whom he and the flight attendants believed were acting strangely," this message did not seek information regarding Plaintiff, who was seated in 12A, or otherwise suggest Plaintiff was acting suspiciously (¶ 48); Frontier Airlines ground employee Mark Fraley forwarded the pilot's message and included his own message indicating that Plaintiff "*might* also be with the two men" (¶ 49) (emphasis added); the only information available to Fraley about Plaintiff was her name and seat assignment (¶ 50); WCAA Defendants Grant, Driscoll, and Carmona all received Fraley's message, which included Plaintiff's name and the pilot's initial message that only sought information about the two men in 12B and 12C and in no way identified Plaintiff as a person of concern to the flight crew (¶¶ 49, 51, 52); WCAA Defendant Johnson spoke with the pilot via telephone and, according to the statement of Johnson, the pilot told him that "a male passenger from row 12 had entered the airplane restroom for a long period . . . while the other man from row 12 stood outside" and that "a third passenger seated in 12A *may* also be involved in the incident *but is seated and compliant at this time*" (¶ 55) (emphasis added); Plaintiff asked the officers who boarded the plane what was happening and did not receive a reply (¶ 71); Plaintiff was asked if she was wearing explosives (¶ 76); outside the plane, Plaintiff again asked what was happening and did not receive a reply (¶ 77); Plaintiff was asked if she speaks English (¶ 82); and the strip-search was not conducted promptly after it was decided that Plaintiff would be strip-searched (¶¶ 85–88). The Complaint alleges as to each of the Defendants that they did not "request further information or evidence regarding [Plaintiff's] alleged involvement in suspicious activities." (¶ 56.) If that is true, as the Court must assume it is at this stage, the only reliable information the officers had about Plaintiff was the proximity of her seat to the other suspects, her name, and how it sounded; the other information, that she "may" be involved, is at worst little more than a wild guess, and at best merely a suspicion expressed in the absence of any factual support. It merits further investigation ("why do you say that?"), but does not approach the threshold of probable cause of criminal activity supporting an arrest or a search.

---

[4] While the WCAA Defendants claim that the allegations made against them are insufficient, they also fail to credit Plaintiff for all of her allegations. (*Compare* Dkt. 89 at 22–30 *with supra* III.A.2.)

Defendants, except for Toya Parker, are alleged to have directly participated in the execution of the unreasonable arrest of Plaintiff, the planning and authorization of the unreasonable arrest of Plaintiff, or both. *See supra* III.A.2. As to Count VI, Defendants Parker and Wasiukanis are alleged to have directly participated in the execution of the unreasonable search of Plaintiff, the planning and authorization of the unreasonable search of Plaintiff, or both. *See id.* Each Count of the Complaint is clearly limited to only those Defendants against whom that particular claim can be plausibly made. WCAA Defendants' contention that this is insufficient is wholly without merit.

Plaintiff sufficiently alleges facts that support and make plausible the unreasonableness of both her seizure and her search. There can be no dispute that she has adequately alleged that she was seized, detained, and strip-searched, and that the named WCAA Defendants participated in these actions.

### a) <u>The Complaint pleads a de facto arrest made without probable cause.</u>

The facts as alleged establish that the seizure of Plaintiff was a de facto arrest made without probable cause. *See supra* III.A.2; *see also Michigan v. Summers*, 452 U.S. 692, 699–700 (1981); *United States v. Jeter*,721 F.3d 746, 751 (6th Cir. 2013); *Hoover v. Walsh*, 682 F.3d 481, 499 (6th Cir. 2012) (noting that, with rare exceptions, ". . . the involuntary transportation of a detained suspect to a police station amounts to an arrest."); Dkt. 111 at 20–22.

The WCAA Defendants do not argue that the seizure was made upon probable cause, likely because doing so would be impossible under the facts alleged in the

complaint. Instead they argue that the seizure was not an arrest, but rather an investigatory stop made with reasonable suspicion. (Dkt. 89 at 18–19.) They note, citing cases, that the standard requires a balancing of the intrusion against the governmental interest, that officers are often forced to make "split-second decisions in tense, uncertain, and rapidly evolving circumstances," that investigatory stops are permissible when the officer suspects wrongdoing, that use of handcuffs and weapons does not make a stop necessarily unreasonable, and that "handcuffing a suspect and transporting him across an airport tarmac building is not an arrest." (*Id.*)

Defendants' argument that the conduct alleged in the complaint was an investigative stop is also without merit. Plaintiff was forced off an airplane by armed officers, handcuffed, briefly questioned and pat searched on the tarmac, transported to the jail, locked in a guarded cell under video surveillance, detained for approximately *four hours*, and then strip-searched, all before she was questioned extensively about whether she was involved in whatever it was that the passengers in 12B and 12C were suspected of doing. *See supra* III.A.2. This was clearly much more intrusive than a brief investigatory stop which may be justified by reasonable suspicion.[5] Such a full-custody detention clearly amounted to a de facto arrest. *See Hayes v. Florida*, 470 U.S. 811, 815–16 (1985); *United States v. Place*, 462 U.S. 696, 709–10 (1983); *United States v. Cochrane*, 702 F.3d 334, 340 (6th Cir. 2012) ("A valid *Terry* stop must be 'limited in scope and duration.' To be limited in scope, 'the

---

[5]  The Court does not conclude whether the facts as alleged were sufficient to meet the lower standard of reasonable suspicion because it has concluded that the circumstances amounted to a full-custodial arrest requiring probable cause.

investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time.' To be limited in duration, 'an investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop.'"); *Hoover*, 682 F.3d at 498–99. Plaintiff's Response as to this argument is well stated and well taken. (Dkt. 100 at 19–22.)

b) <u>The Complaint pleads a strip-search performed without justification.</u>

The facts also clearly allege the lack of a sufficient basis for the strip-search of Plaintiff. *See Bell*, 441 U.S. at 559. The sole argument the WCAA Defendants make in support of the strip-search is that "the Supreme Court has clearly ruled that a person being held in a detention center is subject to a strip-search." (Dkt. 89 at 28) (citing *Florence v. Bd. of Chosen Freeholders of the Cnty. of Burlington*, 132 S. Ct. 1510 (2012) ("Correctional officials have a legitimate interest, indeed a responsibility, to ensure that jails are not made less secure by reason of what new detainees may carry in on their bodies.")).

The WCAA Defendants' reliance on *Florence* is misplaced. Contrary to their argument, *Florence* does not give jailors carte blanche to strip-search anyone in their custody regardless of the circumstances. *See Florence*, 132 S. Ct. at 1522–24. In *Florence*, the "controversy concern[ed] whether every detainee who will be admitted to the general population may be required to undergo a close visual inspection while undressed." *Id.* at 1513; *see also id.* at 1515 ("The case proceeds on the understanding that the officers searched detainees prior to their admission to

19

the general population . . . ."). The Court directly noted that the "case does not
require the Court to rule on the types of searches that would be reasonable in
instances where, for example, a detainee will be held without assignment to the
general jail population and without substantial contact with other detainees." *Id.* at
1522–23. Justice Alito wrote separately to "emphasize the limits of [the] holding,"
that it applies only to "arrestees *who are committed to the general population of a
jail . . .*" and that the Court did not hold that it was necessarily reasonable "to
conduct a full strip search of an arrestee whose detention has not been reviewed by
a judicial officer and who could be held in available facilities apart from the general
population." *Id.* at 1524 (Alito, J., concurring).[6]

The Court, therefore, considers the constitutionality of the search under the
standard articulated in *Bell v. Wolfish*: "a balancing of the need for the particular
search against the invasion of personal rights that the search entails. . . .
consider[ing] the scope of the particular intrusion, the manner in which it is
conducted, the justification for initiating it, and the place in which it is conducted."
441 U.S. at 559.

---

[6] The result in *Florence* is functionally the same as that previously reached by the Sixth Circuit in
*Dobrowolskyj v. Jefferson County, Kentucky*, 823 F.2d 955, 959 (6th Cir. 1987) ("Jefferson County's
policy was not a blanket search of all detainees as in the policies held unconstitutional in the above
cases, but a more narrowly drawn policy of searching only those detainees who were required, by
force of circumstance, to be moved into the general jail population. Dobrowolskyj was not moved
until he had been at the jail for several hours. The move was necessitated by the overcrowding in the
front holding cell, which had been limited to a capacity of twenty prisoners by the class action
consent decree in *Tate v. Frey*."), and *Dufrin v. Spreen*, 712 F.2d 1084, 1089 (6th Cir. 1983) ("It is
enough here that (a) the arrestee was formally charged with a felony involving violence, (b) that her
detention was under circumstances which would subject her potentially to mingle with the jail
population as a whole, and (c) that the search actually conducted was visual only, and was carried
out discreetly and in privacy.").

Based on the facts alleged in the complaint, the strip-search constituted an invasion of Plaintiff's personal rights that was vastly greater than the need for the particular search. *See Bell v. Wolfish*, 441 U.S. 520, 559 (1979). Plaintiff claims that the law enforcement officers arrested her, detained her for approximately four hours, and strip-searched her absent probable cause and without justification. The allegations are sufficient to make Plaintiff's claim plausible. (Dkt. 1 ¶¶ 2, 3, 12, 39, 42, 44–46, 48–52, 55, 71, 76, 77, 82, 85–88.) For example, it is alleged that: she was traveling alone (¶ 39); she did not know and did not speak with the two men seated in 12B and 12C (¶ 44); there were many other passengers on the plane (¶ 45) who were not forcibly removed, arrested, detained, and strip-searched (¶¶ 73, 85); the reports of "suspicious behavior" did not involve any conduct by Plaintiff (¶ 46); it was Frontier ground personnel who provided Plaintiff's name when it indicated that Plaintiff "might" be with the two men, and it was plain from the message given to WCAA officers that those aboard the aircraft did not identify Plaintiff as a person acting suspiciously (¶¶ 48–52); Defendant WCAA officer Johnson stated that the pilot told him that while Plaintiff "may" be "involved in the incident" with the two men, she was "seated and compliant at [that] time" (¶ 55); no agent or officer made any effort to verify Plaintiff's identity or corroborate any connection between her and the two men (¶ 56); Plaintiff was handcuffed and pat searched before she was transported to the detention center (¶¶ 72, 75); she was placed in a small cell by herself, the cell was guarded by an officer, and under video surveillance (¶¶ 80–84); the strip-search was not conducted promptly after she was placed in a cell nor after it was decided that Plaintiff would be strip-searched (¶¶ 85–88); and "[t]here were

no facts suggesting that [Plaintiff] was concealing a weapon, a controlled substance, or any other evidence of a crime that might justify a strip search" (¶ 87).[7]

These allegations, along with the rest of the Complaint, which must be taken as true, are a sufficient basis on which to conclude, at this pleading stage, that Plaintiff's claim of an unreasonable search is plausible. Even if the initial action of forcibly removing Plaintiff from the plane could be seen as reasonable in response to a possible emergency, which the Court cannot conclude at this time without further factual development, the prolonged detention and post-detention searches of Plaintiff as alleged took place after it was clear that no emergency, and no probable cause relating to Plaintiff, existed. The WCAA Defendants arrested, detained for approximately four hours, and strip-searched a woman who, under the allegations in the complaint: never did anything wrong; was never accused of doing anything wrong; was compliant and confused when initially seized; was pat searched and handcuffed before taken to the detention facility; was placed in a cell alone, guarded by an officer immediately outside her cell, and under video surveillance; and was compliant and communicative while handcuffed, locked in her cell, guarded, and under video surveillance for more than an hour before she was strip-searched.[8]

---

[7] The WCAA Defendants would likely argue that paragraph 87 of the Complaint is conclusory and thus not entitled to the presumption of truth. They would be correct, if that were the only allegation, or only one of a few allegations, in the complaint related to the events of that afternoon. But it is not. Paragraph 87 is not an unsupported or isolated conclusory statement, but is rather the logical summation of a conclusion that follows from all of the alleged facts taken together.

[8] No facts are offered by the Defendants that in any way support the need for a strip-search. The defendant had been frisked, presumably quite thoroughly, so there was no reason to suspect that she was carrying a weapon or a bomb. This was not a drug arrest in which there was reason to believe that she was hiding contraband somewhere on her person. What, exactly, the WCAA Defendants thought they might discover by conducting the strip-search—one where Plaintiff was forced to "bend and spread," and where the officer examined the inside of her mouth, under her eyelids, and within her hair—is a question that may be answered only after discovery.

Counts V and VI are brought against only those WCAA officers and agents who are alleged to have been present at the scene of Plaintiff's arrest and detention, and who were directly involved in either the decision to arrest and detain Plaintiff, or the actual arrest and detention of Plaintiff, or both. (Dkt. 1 ¶¶ 19–27, 51, 52, 54–56, 58–61, 68–72, 78, 85, 89–97.) Plaintiff's allegations are sufficient to state a claim against each of the WCAA Defendants against whom those claims are made in Counts V and VI.

## B.   Plaintiff Has Alleged the Violation of a Clearly Established Constitutional Right.

Plaintiff's rights under the Fourth Amendment were clearly established under the cases cited above, in particular: *Summers*, *Jeter*, *Hoover*, *Hayes*, and *Cochrane* as to Count V; and *Bell*, *Florence*, *Dobrowolskyj*, and *Dufrin* as to Count VI. *See supra* III.A.3.

The WCAA Defendants do not directly articulate a separate argument regarding whether the alleged violated rights are clearly established, but one pair of facts that they appear to find important to the review of the alleged violations is that "the circumstances involved suspicious activity aboard an aircraft on the tenth anniversary of the September 11, 2001 terrorist attacks . . . on a flight bound for the Detroit Metro airport, which had been the intended target of a bombing less than two years earlier."[9]

"It is not necessary to have 'a case directly on point' for a right to be 'clearly established.' It is sufficient that existing precedent place the question 'beyond

---

[9] A December 2009 flight bound for Detroit had been the target of an unsuccessful bombing attempt. *See United States v. Abdulmutallab*, No. 10-CR-20005, Dkt. 7 (E.D. Mich. Jan. 6, 2010).

23

debate.'" *Nelms v. Wellington Way Apartments, LLC*, 513 F. App'x 541, 547 (6th Cir. 2013) (quoting *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2083 (2011); citing *Hope v. Pelzer*, 536 U.S. 730, 741 (2002) ("officials can still be on notice that their conduct violates established law even in novel factual circumstances")).

Under the applicable standard, "conduct violates clearly established law when, at the time of the challenged conduct, '[t]he contours of [a] right [are] sufficiently clear' that every 'reasonable official would have understood that what he is doing violates that right.'" *al-Kidd*, 131 S. Ct. at 2083 (citing *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). Plaintiff's complaint meets this standard.

The fact that the events occurred on the tenth anniversary of September 11th, on a flight bound for a city previously targeted for a terrorist attack, does not absolve the WCAA Defendants, or any law enforcement officers, of their responsibility to conduct their police work in compliance with the United States Constitution. Under the Fourth Amendment to the Constitution, a full-custodial arrest, and a warrantless strip-search of a person in temporary detention, are unreasonable in the absence of probable cause. As of yet, there is no "suspected terrorist activity exception" to the probable cause requirement of the Fourth Amendment. The Court declines to sacrifice these principles of liberty to the cause of hyper-vigilance.

Based on the Plaintiff's allegations, which are assumed to be true for the purpose of deciding this motion, the unlawfulness of the WCAA Defendants' actions was apparent "in the light of pre-existing law." *Risbridger v. Connelly*, 275 F.3d 565, 569 (6th Cir. 2002) (quoting *Wilson v. Layne*, 526 U.S. 603, 615 (1999)).

24

## IV.   CONCLUSION

For the reasons set forth above, it is hereby ORDERED that the WCAA

Defendants' motion for partial judgment on the pleadings to dismiss Counts V and

VI (Dkt. 89) is DENIED. It is FURTHER ORDERED that the WCAA Defendants'

and non-parties' motion for protective orders (Dkts. 94, 98) are DENIED as moot.

s/Terrence G. Berg
TERRENCE G. BERG
UNITED STATES DISTRICT JUDGE

Dated:  July 18, 2014

### Certificate of Service

I hereby certify that this Order was electronically submitted on July 18, 2014, using the
CM/ECF system, which will send notification to each party.

By:  s/A. Chubb
      Case Manager